# EXHIBIT A



Deposition of:

# Jeffrey Stepanovich

*January 23, 2020*

In the Matter of:

# Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Veritext Legal Solutions
800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Page 1

1              UNITED STATES DISTRICT COURT

2              MIDDLE DISTRICT OF GEORGIA

3                  VALDOSTA DIVISION

4      JEFFREY STEPANOVICH,

5             Plaintiff,

6        -vs-                        Civil Action

                                     7:18-CV-00186-HL

7

       KEN CORBETT FARMS, LLC,

8      A GEORGIA LIMITED LIABILITY COMPANY,

9             Defendant.

10     -------------------------------------------------

11          Deposition of JEFFREY STEPANOVICH, taken on

12     behalf of the DEFENDANTS, pursuant to the Federal

13     Rules of Civil procedure, taken at Moore Voyles, 1008

14     N. Patterson Street, Valdosta, Georgia  31691, on

15     Thursday, January 23, 2020, at 8:09 a.m., and

16     concluded at 12:29 p.m., before Julie F. Robinson

17     Lawrence, Certified Court Reporter, in and for the

18     State of Georgia, and concluded on the same date.

19                         - - -

20

21

22

23

24

25

Page 2

1                  A P P E A R A N C E S

2

3        Appearing on behalf of the Plaintiff:

4

         NOAH E. STORCH, ESQUIRE (Via Phone)
5              Richard Celler Legal, P.A.
               10368 W. SR 84, Suite 103
6                  Davie, Florida 33324
             noah@floridaovertimelawyer.com
7                   (954) 903-7475

8

         Appearing on behalf of the Defendant:
9

10         DESTINY S. WASHINGTON, ESQUIRE
                  Ford Harrison, LLP
11          27117th Street NW, Suite 1900
               Atlanta, Georgia  30363
12          dwashington@fordharrison.com
                  (404) 759-4981

13

14                  Also Present:
           Gregory Voyles, Attorney at Law
15             Kenneth Corbett

16

17

18

19

20

21

22

23

24

25

Page 3

1                    INDEX OF EXAMINATIONS

2                                                    Page

3    JEFFREY STEPANOVICH

4         Examination By Ms. Washington              7

5         Examination By Mr. Storch                  150

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                  INDEX OF DEFENDANT'S EXHIBITS

2      Exhibit              Description              Page

3      Exhibit 1    Plaintiff's Response              37

4      Exhibit 2    Email                             79

5      Exhibit 3    Complaint                         87

6      Exhibit 4    Plaintiff's                      101
                    Response/Interrogatories

7

       Exhibit 6    Stepanovich 2012 Tax Return      136

8

       Exhibit 7    Stepanovich 2013 Tax Return      138

9

       Exhibit 8    Stepanovich 2014 Tax Return      139

10

       Exhibit 9    Stepanovich 2015 Tax Return      143

11

       Exhibit 11   Stepanovhich 2017 Tax Return     131

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1          MS. WASHINGTON:  Everything

2     okay on your end?

3          Perfect.  Good morning.  My

4     name is Destiny Washington, and I

5     represent Defendant Ken Corbett Farms

6     in case 7:18CV00186, Jeffrey

7     Stepanovich versus Ken Corbett Farms

8     in the US District Court for the

9     Middle District of Georgia.

10          Mr. Stepanovich, can you

11     please raise your right hand.

12          (Witness Sworn).

13          MS. WASHINGTON:  There are

14     other people in the room and I guess

15     Noah doesn't have the benefit of

16     knowing who's in here.  I'll have

17     everybody introduce themselves, say

18     and spell your name for the court

19     reporter.

20          MR. VOYLES:  Greg Voyles,

21     personal attorney for Ken Corbett.

22          MR. CORBETT:  Kenneth Corbett.

23     K-E-N-N-E-T-H, C-O-R-B-E-T-T.

24          THE WITNESS:  Jeff

25     Stepanovich, J-E-F-F,

Jeffrey Stepanovich                                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

                                                              Page 6

1            S-T-E-P-A-N-O-V-I-C-H.

2                 MS. WASHINGTON:   Okay.   This

3        deposition is taken pursuant to

4        notice and agreement of counsel to be

5        used for all purposes under the

6        Federal Rules of Civil Procedure.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 7

1                    JEFFREY STEPANOVICH,

2           having been produced and first duly sworn,

3                   testified as follows:

4                        EXAMINATION

5        BY MS. WASHINGTON:

6           Q.   Mr. Stepanovich -- is it Stepanovich?

7           A.   Stepanovich.

8           Q.   Okay.  Completely different.

9                Do you understand that you are under

10       oath today?

11          A.   Yes, I do.

12          Q.   And this is a formal proceeding but you

13       can ask questions.  Do you understand?

14          A.   Yes.

15          Q.   If you don't understand what I'm saying

16       at any point, please ask for clarification.

17          A.   Okay.

18          Q.   And if you don't know the answer to any

19       question that I'm asking you, please don't guess,

20       just say that you don't know.

21          A.   Okay.

22          Q.   If there's a document that might help

23       you recall something, please let me know.  And

24       during the course of this deposition if there's

25       something that you want to correct or add to at

Jeffrey Stepanovich                                   January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 8

1    any point, just let me know.  I just ask that you
2    not interrupt -- if I'm talking, that you not
3    interrupt me.  We shouldn't interrupt each other
4    because the court reporter can't accurately record
5    that.
6         A.   Okay.
7         Q.   But I guess you can wait until I'm
8    finished with what I'm saying and then just let me
9    know if there's something you have to say.  The
10   court reporter can't hear us when we're making any
11   nonverbal gestures, so if you nod your head, she
12   won't catch that, so I might ask that you
13   verbalize whatever you were signaling.  Is that
14   okay?
15        A.   That's fine.
16        Q.   And, again, she can't transcribe what
17   we're saying if we're talking over each other, so
18   I'd ask that you wait until I finish and I'll do
19   the same for you.  Okay?  If you need a break at
20   any point, that's understandable.  Please just let
21   me know.  But the only exception is if we're in
22   the middle of a question and you haven't answered
23   yet, so after you finish your answer is fine, but
24   you can take break at any point.  All right?
25        A.   Okay.

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 9

1        Q.   Are you under the -- have you taken any

2    medication that could interfere with your ability

3    to testify today?

4        A.   No.

5        Q.   And were there any alcoholic beverages

6    you took this morning?

7        A.   No.

8        Q.   Okay.  Any other reason you can't

9    testify truthfully today?

10       A.   No.

11       Q.   Thank you.  Okay.  Can you say and spell

12   your name one more time for the court reporter?

13       A.   Jeff Stepanovich.  J-E-F-F,

14   S-T-E-P-A-N-O-V-I-C-H.

15       Q.   So your name is Jeff and not Jeffrey?

16       A.   My formal name is Jeffrey.  Jeffrey

17   John, yes.

18       Q.   Okay.  Can you spell Jeffrey for me.

19       A.   J-E-F-F-R-E-Y.

20       Q.   Okay.  Thank you.

21            And have you ever been deposed before?

22       A.   No.

23       Q.   Did you prepare for today's deposition?

24       A.   Prepare as in?

25       Q.   Did you review any documents in

Page 10

1    preparation for today's deposition?

2         A.   I went --

3              MR. STORCH:  Object to the

4         extent that the question calls for

5         attorney/client privilege.  So don't

6         discuss anything that you discussed

7         with me or anyone in my office or any

8         documents that we exchanged such as

9         emails.

10   BY MS. WASHINGTON:

11        Q.   Okay.  Yeah.  And he's correct.  You

12   shouldn't reveal -- I'm not asking you to reveal

13   any conversations that you had with your attorney,

14   but if there were any documents that you reviewed

15   to prepare you for today?

16        A.   No.

17        Q.   Okay.  And did you meet with your lawyer

18   to prepare for this deposition?

19        A.   No.

20        Q.   Okay.  Do you -- and we'll kind of shift

21   gears a little bit.  So what's your current

22   address?

23        A.   1100 Holiday Lane, Naples, Florida

24   34104.

25        Q.   And do you own that?

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 11

1        A.    Yes.

2        Q.    How long have you owned it?

3        A.    Roughly five years.

4        Q.    Okay.  Where did you live before that?

5        A.    10651 Regent Circle, Naples, Florida.

6        Q.    Did you own that?

7        A.    Yes.

8        Q.    How long did you live there?

9        A.    Seventeen years.

10       Q.    And what is your current phone number?

11       A.    Cell phone?  (239) 206-9855.

12       Q.    What's the cell phone provider?

13       A.    Sprint.

14       Q.    And how long have you had that number?

15       A.    I don't know, roughly, 10 years

16   probably.

17       Q.    Are you currently married?

18       A.    Yes.

19       Q.    And what's your wife's name?

20       A.    Lora, L-O-R-A.

21       Q.    L-O-R-A.  Stepanovich?

22       A.    Yes.

23       Q.    How long have you been married?

24       A.    Twenty-seven years.

25       Q.    And does Lora live with you?

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

                                                    Page 12

 1          A.   Yes.

 2          Q.   Has she lived with you at Holiday Lane?

 3          A.   Yes.

 4          Q.   And Regent Circle?

 5          A.   Yes.

 6          Q.   And what's her occupation?

 7          A.   Small business owner.

 8          Q.   What kind of business is it?

 9          A.   She's a concierge for estate homes.

10          Q.   Estate homes?

11          A.   Yes.

12          Q.   Okay.  Do you have any children?

13          A.   Four.

14          Q.   Are any of them under 18?

15          A.   No.

16          Q.   Can you tell me their names and

17     occupations?

18          A.   Jerry works for Toyota in San Antonio.

19     Garrett works for Shell Oil in Houston and

20     Pittsburg, Pennsylvania.  Jessica works for Wright

21     Medical and Madison works for the SBA in St. Pete.

22          Q.   Does Jessica live in Florida?

23          A.   Yes.  In St. Pete as well.

24          Q.   And Jerry and Garrett live in Texas?

25          A.   Yes.

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 13

1        Q.    Do any of them currently live with you?

2        A.    No.

3        Q.    Now, are you a member of any social

4    organizations?

5        A.    No.

6        Q.    What about professional organizations?

7        A.    No.

8        Q.    Let's talk about your education.   Tell

9    us about -- did you graduate high school?

10        A.    Yes.

11        Q.    Can you tell us about your education

12    since high school?

13        A.    Bachelor's in education, Western

14    Michigan University, graduated in 1983.

15        Q.    1983?

16        A.    Yes.

17        Q.    Okay.

18        A.    Did my graduate at Western Michigan in

19    1992.

20        Q.    So did you get a graduate degree?

21        A.    No.   I'm two classes short.

22        Q.    And have you attended any trade school?

23        A.    No.

24        Q.    Vocational school?

25        A.    No.

Page 14

```
 1         Q.    Do you have any licenses besides a

 2    driver's license?

 3         A.    No.

 4         Q.    Any certifications?

 5         A.    No.

 6         Q.    You have a driver's license?

 7         A.    Yes.

 8         Q.    What state?

 9         A.    Florida.

10         Q.    Have you ever filed for bankruptcy?

11         A.    No.

12         Q.    So tell us about your employment since

13    you graduated high school.

14         A.    Since high school?

15         Q.    Yes.

16         A.    Construction while I was in college.  I

17    worked for General Motors during the summer for my

18    last two years in college.  Once I graduated from

19    college, I was a substitute teacher in Alaska and

20    then I became a legislative aide in Alaska and

21    then I went to work for a company called Executone

22    selling telephone systems and nurse call systems.

23         Q.    You said Executone?

24         A.    Executone.  Yes.

25         Q.    Okay.
```

Page 15

1          A.    Upon leaving Alaska and coming to

2     Florida, opened an office for Executone in South

3     Florida, then left them and went with a startup

4     company called Fluid Sense.  When I left Fluid

5     Sense, I got in the produce business and went to

6     work for Florida Specialties.

7          Q.    Can you spell Fluid Sense for me.

8          A.    F-L-U-I-D S-E-N-S-E.  They're no longer

9     in -- S-E-N-S-E, yeah, I think that's what it was.

10         Q.    They're not in business anymore?

11         A.    No.

12         Q.    What did they -- what did you do for

13    them?

14         A.    We manufactured an infusion pump and I

15    was the vice president of sales from Mississippi

16    east.

17         Q.    So you did sales there?

18         A.    Yes.

19         Q.    Okay.  What is an infusion pump?

20         A.    What you get hooked up to when you get

21    your fluids in the hospital.

22         Q.    Okay.  So medical equipment?

23         A.    Yes.

24         Q.    All right.  So we'll come back to the

25    produce business -- when you got -- when you went

Page 16

1      to the produce business.

2           A.    Okay.

3           Q.    Florida Specialties.  But I just wanted

4      to fill in some of the -- ask you some more

5      questions about the other jobs that you held.  So

6      for Executone, what did you do there?

7           A.    I sold telephone systems and nurse call

8      equipment.

9           Q.    Nurse call equipment?

10          A.    Yes.

11          Q.    That's used in a hospital?

12          A.    When you lay in bed and call your nurse.

13     Yes.

14          Q.    Okay.  And you said that you moved from

15     Alaska to Florida and opened an office in Florida

16     for Executone?

17          A.    Yes.

18          Q.    Was it -- were you doing the same thing?

19          A.    Yes.

20          Q.    When you said you opened the office, did

21     you manage it?

22          A.    I was the southern sales manager.  Yes.

23          Q.    Were you in management in -- before you

24     moved to Florida?

25          A.    Yes.

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 17

1          Q.   Okay.  So I guess we can -- why -- so

2     why did you leave Executone and move into the

3     produce business?  Excuse me.  Why did you leave

4     Executone and move to Fluid Sense?

5          A.   Fluid Sense was a financial opportunity

6     to own part of the company and be the vice

7     president of the eastern region.

8          Q.   Okay.  And eastern region, did that

9     encompass a certain number of states?

10         A.   The Mississippi River east.

11         Q.   So would that be -- that would encompass

12    Florida and Georgia?

13         A.   Yes.

14         Q.   Any other states?

15         A.   Yes.  South Carolina, North Carolina,

16    Virginia, Maryland, DC, Maine, New Hampshire,

17    Vermont, New York, Pennsylvania, Michigan,

18    Wisconsin, Kentucky, Illinois.  What am I missing?

19    Iowa, Tennessee.  Without a map in front of me, I

20    think I got most of them.

21         Q.   So half the country pretty much?

22         A.   Yes.

23         Q.   Okay.  East of the Mississippi River?

24         A.   Correct.

25         Q.   Okay.  So when you said that you were

Page 18

1      the vice president, what did that -- I mean, what

2      were your duties in that position?

3           A.    Basically responsible for sales and

4      implementation of a new infusion pump throughout

5      the eastern seaboard of the United States.

6           Q.    And when you were at Fluid Sense, do

7      you -- what was your -- what were you compensated

8      there?  What was your compensation?

9           A.    Salary and then commission.

10          Q.    And could you tell me the years that you

11     were at Fluid Sense?

12          A.    Without notes in front of me, I can't

13     give you the exact dates, no.

14          Q.    Okay.  Do you remember generally what

15     your salary and commission, what the total was

16     maybe the last year you were there?

17          A.    Upper 100 -- upper lower -- it was

18     probably 180 to $200,000.

19          Q.    All right.  So tell us how you started

20     in the produce business with Florida Specialties.

21     How did you make that transition from Fluid Sense?

22          A.    Our product at Fluid Sense was regulated

23     by the FDA.  We manufactured it outside of Boston.

24     We had a self-reported seal failure on one piece

25     of equipment and the FDA shut us down, so the

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 19

1       company went into bankruptcy.

2           Q.    And at that point when the company went

3       into bankruptcy, what did you do?

4           A.    I was coaching a girls' softball team

5       and one of my players' father was a farmer and he

6       gave me the opportunity to go in the produce

7       business.

8           Q.    And how did he do that?

9           A.    He asked me if I wanted a job.

10          Q.    Did he work for Florida Specialties?

11          A.    Yes.

12          Q.    Okay.  He was a farmer that supplied

13      product to Florida Specialties?

14          A.    He was a grower for Florida Specialties

15      and a nephew of the owner of the company.

16          Q.    And what was his name?

17          A.    Skeeter Bethea.

18          Q.    How do you spell Bethea?

19          A.    B-E-T-H-E-A.

20          Q.    And who was the owner of the company?

21          A.    Jim Joiner.

22          Q.    And where were you living at that time?

23          A.    In Naples.

24          Q.    Have you continuously been in Naples

25      since that point until now?

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

                                                    Page 20

1          A.    Yes.

2          Q.    Okay.  So tell me about how you -- after

3     your conversation with Mr. Bethea or after your

4     opportunity -- how did your opportunity come about

5     after that introduction?

6          A.    Skeeter knew I was going to need a job.

7     He offered me an opportunity to talk with his

8     uncle, Jim Joiner.  I met with Mr. Joiner; he

9     offered me a job.

10         Q.    And do you remember when you started

11    that job?

12         A.    September 9th, 2001.  I believe that's

13    the date.

14         Q.    And what was the position you were hired

15    for?

16         A.    Sales.

17         Q.    Was your position salesman?

18         A.    Yes.

19         Q.    Okay.  And what was your compensation

20    there?

21         A.    That would be a guess.  It was, I think,

22    65 or 75,000 plus commission.

23         Q.    Okay.  And do you remember what you made

24    that first year?  I guess you would have been

25    employed there between September and December.  Do

Page 21

1    you remember what you made that first year?

2         A.   No, I don't.

3         Q.   The commission, what was that based on?

4         A.   It was a 5-3-1, so based on who we sold.

5    We got a commission.  Either a 5 percent, 3

6    percent or 1 percent.

7         Q.   Okay.  So you were at -- just to recap,

8    you started at Florida Specialties as a salesman

9    on September 9th, 2001.  And did you have any jobs

10   between Florida Specialties and Ken Corbett Farms?

11   Were there any other jobs?

12        A.   Yes.

13        Q.   Okay.  What was that?

14        A.   I worked for Pacific Collier.  Pacific

15   Collier.

16        Q.   Okay.  Can you spell Collier for me?

17        A.   C-O-L-L-I-E-R.

18        Q.   Okay.  Pacific Collier.  What did you do

19   there?

20        A.   I was the director of marketing.

21        Q.   When was that?

22        A.   It was 2002, is when I started there.

23        Q.   And did you work there and Florida

24   Specialties?

25        A.   No.  I left Florida Specialties to go to

Page 22

1    work for Pacific Collier.

2         Q.    Okay.  Do you remember what month in

3    2002?

4         A.    Sometime that summer.

5         Q.    So you worked for Florida Specialties

6    for less than a year?

7         A.    Correct.

8         Q.    And then -- well, how long were you at

9    Pacific Collier?

10        A.    Roughly four years.

11        Q.    So from 2004 to 2006?

12        A.    Roughly, yes.

13        Q.    And what was your compensation there?

14        A.    It was over 100,000.  I just don't

15   remember what it was.

16        Q.    And why did you leave Florida

17   Specialties to go there?

18        A.    Florida Specialties didn't have any

19   benefit package or anything, and I had four young

20   kids.  So -- no insurance.  So Pacific Collier

21   offered all of those things.

22        Q.    So why did you leave Pacific Collier?

23        A.    They shut down their farming operations.

24        Q.    So they were -- what was the line of

25   business -- what kind of business was Pacific

Jeffrey Stepanovich                          January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 23

1    Collier in?

2         A.   Produce business.

3         Q.   Okay.  So there was marketing for

4    produce?

5         A.   Marketing and selling for produce.  Yes.

6         Q.   So when you left Pacific Collier, where

7    did you go after that?

8         A.   Went back to Florida Specialties.

9         Q.   And that was in 2006?

10        A.   Roughly.  Yes.

11        Q.   And was Mr. --

12        A.   Joiner.

13        Q.   -- Jim Joiner still the owner?

14        A.   Yes.

15        Q.   Okay.  So did you approach him about a

16   job?

17        A.   He called me.

18        Q.   Okay.  Did he know that you were not

19   working at Pacific Collier anymore?

20        A.   Yes.

21        Q.   And did you -- I'm sorry if I asked you

22   this before, but did you -- you said that Pacific

23   Collier got out of the produce business.  So did

24   you -- were you terminated -- were you fired or

25   did you resign?

Page 24

1          A.    They were down-staffing, so ...

2          Q.    You were laid off?

3          A.    I was laid off, I guess.

4          Q.    And Mr. Joiner knew that you were laid

5     off and contacted you?

6          A.    Yes.

7          Q.    Okay.  And you accepted a job?

8          A.    Yes.

9          Q.    Do you remember when you started there

10    again?

11         A.    Probably that fall.

12         Q.    Fall of 2006?

13         A.    Yes.

14         Q.    Okay.  Did you have any other jobs

15    between when you started back at Florida

16    Specialties and they -- did you have any jobs

17    between Florida Specialties when you started back

18    in 2006 and Ken Corbett Farms?

19         A.    Ask me that another -- again, please.

20         Q.    Were there any other jobs between --

21    were there any other jobs -- where did you go

22    after you came back to -- tell me how -- hold on.

23    Let me get my thoughts together.

24              When did you start working for Ken

25    Corbett Farms?  What year was that?

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 25

1         A.    Directly for him?

2         Q.    Yes.

3         A.    Or selling for him?

4         Q.    Directly for him as an employee.

5         A.    What was it, 2011?

6         Q.    Okay.  So were there any other jobs --

7    did you work anywhere else besides Florida

8    Specialties before 2011?

9         A.    No.

10        Q.    Okay.  So now we can -- when you went

11   back to Florida Specialties in 2006, did you do

12   the same job that you did when you were there

13   before?

14        A.    Yes.

15        Q.    Okay.  Was it the same compensation?

16        A.    No.

17        Q.    How was the compensation different this

18   time?

19        A.    I negotiated a larger salary and had

20   some other responsibilities added.

21        Q.    And what were those?

22        A.    I built their food safety program.  I

23   was also responsible for purchasing all of the box

24   material, so ...

25        Q.    So how much was that salary?

Page 26

1        A.   It was over a hundred and something

2   thousand.

3        Q.   And was there still a commission

4   component?

5        A.   Yes.

6        Q.   And what was that?

7        A.   It varied.

8        Q.   Okay.  Was that the same 5-3-1 you

9   were --

10       A.   No.

11       Q.   Can you explain what it was?

12       A.   It was just -- if I remember correctly,

13   just a straight commission.  There wasn't an

14   adjustable.

15       Q.   Okay.  Now, you testified earlier

16   that -- you asked me a question about when you

17   started selling for Ken Corbett Farms.  Do you

18   remember that?  You asked me when.

19       A.   Yes.

20       Q.   So I guess it will be a good time to

21   transition into how you started selling for Ken

22   Corbett Farms.  So tell us about that.

23       A.   Selling for them, not working for them;

24   correct?

25       Q.   Correct.  Correct.  When was that?

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 27

1        A.    It was, I believe, two years before I

2   went to work for him.

3        Q.    So 2009?

4        A.    Roughly, I guess.  Yeah, somewhere

5   around there.

6        Q.    Okay.  So tell us how you started

7   selling for him in 2009.

8        A.    Ken and his son Justin came to Florida

9   Specialties, we met and talked about what they

10  were trying to do, and I discussed it with

11  Mr. Joiner.  He wanted to be an agent for Corbett

12  Farms.

13       Q.    When you say -- tell me, what city is

14  Florida Specialties located in.

15       A.    Immokalee.

16       Q.    I-M-O-K-L --

17       A.    I-M-M-O-K-A-L-E-E.

18       Q.    I-M-M-O-K-A-L-E-E.  Okay.

19             So when you say that Ken Corbett came to

20  Florida Specialties, what does that mean?

21       A.    Him and his son showed up one day.  I

22  believe they were in Immokalee looking for a new

23  sales agent to handle their product and they came

24  to our facility, and I was the one who met with

25  them.

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 28

1      Q.   Okay.  Can you tell us the details about

2   that first conversation.

3      A.   I don't really recall any specific

4   details, no.

5      Q.   And when you say "his son," who are you

6   referring to?

7      A.   His son Justin.

8      Q.   Okay.  Justin Corbett?

9      A.   Yes.

10      Q.   So they showed up in person --

11      A.   Correct.

12      Q.   -- to the -- okay.  And you spoke with

13   them?

14      A.   Yes.

15      Q.   And you testified earlier that Ken

16   Corbett wanted Florida Specialties to be an agent

17   for them?

18      A.   Was looking for someone to sell his

19   product, yes.

20      Q.   Okay.  And this is produce?

21      A.   Correct.

22      Q.   And you had a conversation with the

23   owner about this?

24      A.   After, yes.

25      Q.   And the owner agreed?

Page 29

1        A.    Correct.

2        Q.    Now, what was the -- what was that

3    arrangement?  Can you tell us about that?

4        A.    If I remember correctly, it was pretty

5    much a standard.  We got 6 percent commission, I

6    believe, on the product that we sold of Ken's.

7        Q.    Okay.  So you were paid 6 percent

8    commission off the product that was sold?

9        A.    I was not paid 6 percent, no.

10        Q.    Who was paid?

11        A.    Florida Specialties was paid 6 percent.

12        Q.    And that agreement, was it in writing?

13        A.    I believe so.

14        Q.    And when you say that you sold the

15    product, was that you personally sold the product?

16        A.    It was myself and Chris Tortinato in our

17    sales office sold the product.

18        Q.    Tortinato?

19        A.    Yes.

20        Q.    Okay.  And how did you go about selling

21    that product?

22        A.    Communicating with our existing client

23    base.

24        Q.    Can you walk me through that process,

25    how you did that.

Jeffrey Stepanovich                        January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 30

1        A.    Generally, on any given day, we would be

2   notified how much product would be produced that

3   day, and then once we found that out, we would

4   start selling it that morning.

5        Q.    Who would notify you how much product

6   was being produced?

7        A.    Usually the farmer which was Justin.

8        Q.    So then you got on the phone and called

9   contacts?

10       A.    Yes.

11       Q.    Okay.  And when you say existing client

12   base, are those people who you have sold to

13   before?

14       A.    Sold to before and new, yes.

15       Q.    And new?

16       A.    And we would have to develop new

17   customers because Georgia was a different sales

18   window than what we sold in Florida.

19       Q.    And what does that mean?

20       A.    Production time period.  We didn't sell

21   that particular product in Georgia, we didn't grow

22   it, so having peppers and eggplant, et cetera was

23   a different -- it just was -- we grew green beans

24   in Georgia.  Florida Specialties did.  We didn't

25   grow vegetables.  So we grew vegetables in

Page 31

```
1    Florida, but not in Georgia.

2         Q.   So Florida Specialties, they were

3    farmers and -- so Florida Specialties had its own

4    farmers?

5         A.   Yes.

6         Q.   That grew green beans in Florida?

7         A.   And vegetables, yes.

8         Q.   Okay.  And Ken Corbett grew vegetables

9    in Georgia?

10        A.   Correct.

11        Q.   So you at Florida Specialties purchased

12   Mr. Corbett's vegetables and sold them to your

13   clients?

14        A.   We didn't purchase them.  We were a

15   sales agent for Mr. Corbett.

16        Q.   Okay.  So how did you develop new

17   clients, new customers?

18        A.   Like all sales people.  On the phone, at

19   trade shows, those kind of things.

20        Q.   So when you talk about your client base

21   you refer to people that you've sold to already?

22        A.   Correct.

23        Q.   Right?  So new clients would not be --

24   or potential clients would not be included in your

25   client base?
```

Page 32

```
 1        A.   They wouldn't be considered a client yet
 2   until I sold them something.
 3        Q.   So how was that -- how long did you sell
 4   the product, Ken Corbett's product, while you were
 5   employed at Florida Specialties?
 6        A.   I think roughly two years.
 7        Q.   And how profitable was that arrangement?
 8        A.   I don't know.
 9        Q.   And when did you leave Florida
10   Specialties?
11        A.   2000 -- let's see.  I'm trying to work
12   backwards.  2011, I believe.
13        Q.   2011.  And why did you leave?
14        A.   I was let go.
15        Q.   Were you laid off?
16        A.   No.
17        Q.   Can you explain what "let go" means?
18        A.   New owner, him and I didn't agree on
19   some issues so he fired me.
20        Q.   What's his name?
21        A.   Myles Strolh.
22        Q.   M-I-L-E-S?
23        A.   M-Y-L-E-S, I believe, S-T-R-O-L-H, I
24   think.
25        Q.   S-T-R-O-L-H.  Okay.  And what didn't you
```

Jeffrey Stepanovich                                January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 33

1      agree on?

2            A.    Mainly building a new processing

3      facility, where it should be located.

4            Q.    And what happened after you were

5      terminated?

6            A.    I was approached by Mr. Corbett to

7      continue to sell his -- a part of his product

8      working with his son-in-law.

9            Q.    Okay.  When you say "a part of his

10     product," what does that mean?

11           A.    That we are going to get a piece -- we

12     were going to get a certain amount of production

13     from the total production because Florida

14     Specialties was, as far as I know, continuing to

15     sell the rest of it.

16           Q.    Okay.  And when you say "a certain

17     production," do you mean a certain vegetable?

18           A.    No.  A certain amount, certain volume.

19           Q.    And Florida Specialties was handling the

20     sale -- was selling the rest of the product?

21           A.    When we started the discussion, yes.

22           Q.    Okay.  So did that change?

23           A.    Yes.

24           Q.    Okay.  How did that change?

25           A.    At some point Florida Specialties --

Page 34

1    whether it was because I was becoming an employee

2    of Ken's or not, I can't answer that -- basically

3    terminated the contract as far as I know.

4         Q.   So when you started working directly for

5    Ken Corbett, Florida Specialties terminated -- to

6    your knowledge terminated the contract at some

7    point after that?

8         A.   Correct.

9         Q.   Okay.  Do you remember the month that

10   you started working for Ken Corbett?

11        A.   I believe it was that spring.

12        Q.   Of 2011?

13        A.   I believe so.

14        Q.   So when you were first hired there, what

15   was your compensation?

16        A.   It was a salary and then commission.

17        Q.   Do you remember how much?

18        A.   No, I don't.

19        Q.   But it was salary and commission?

20        A.   Correct.

21        Q.   Okay.  And that changed at some point

22   during your employment?

23        A.   Yes.

24        Q.   What was the change?  What did it change

25   to?

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 35

1          A.   The salary went away.

2          Q.   And it was all commission?

3          A.   Yes.

4          Q.   Okay.  What was the position you were

5     hired for at Ken Corbett?

6          A.   Salesman.

7          Q.   And did you hold the same position the

8     whole time you were employed?

9          A.   Yes.

10          Q.   And were you -- what were your duties?

11          A.   To sell the product.  There really was

12     no other defined duties than that.

13          Q.   And when you say "the product," you mean

14     Ken Corbett's produce?

15          A.   Correct.

16          Q.   Did those duties, those general duties,

17     did they ever change throughout your employment

18     with Ken Corbett Farms?

19          A.   No.

20          Q.   But your compensation changed at one

21     point?

22          A.   Yes.

23          Q.   And when you sold this product to

24     customers, was it the same -- was it the same

25     process that you explained to me earlier that you

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 36

1      engaged in when you were at Florida Specialties?

2            A.    Yes.

3            Q.    So you would get a call from the farmer

4      about the amount of production from that day --

5      for that day and then call to sell it?

6            A.    Basically, yes.

7            Q.    Okay.  And these customers that you sold

8      it to, they were customers that you knew or your

9      customers from Florida Specialties?

10           A.    Basically, yes.

11           Q.    So there were additional customers?

12           A.    We developed new customers, yes.

13           Q.    And the farmers that would call you to

14     tell you about the produce for the day, was it

15     Justin Corbett still?

16           A.    Yes.

17           Q.    Okay.  But you were just working with

18     him directly at that time?

19           A.    Yes.

20           Q.    Okay.  I'm going to -- we're going to

21     continue and go into more detail about this whole

22     sales process, but I just wanted to take the time

23     now to introduce some exhibits and talk to you

24     specifically about what were in those documents.

25                 So the first document --

Page 37

```
 1              MS. WASHINGTON:  And, Noah,
 2         this is -- the first document I'm
 3         handing him we'll mark as Exhibit 1
 4         and it's the Plaintiff's Responses to
 5         Defendant's First Request for
 6         Production.  Exhibit 1.  Please mark
 7         it as Exhibit 1.
 8              (Defendant's Exhibit No. 1 was marked
 9              for identification.)
10    BY MS. WASHINGTON:
11         Q.   Are you done?
12         A.   Yes.
13         Q.   Taking -- okay.  Do you recognize that
14    document?
15         A.   I believe I've seen it before, yes.
16         Q.   Okay.  What it?
17         A.   What is what?
18         Q.   What is that document?
19         A.   It says Plaintiff's Response to
20    Defendant's First Request for Production.
21         Q.   Okay.  So was this your response to our
22    request for production of documents in this case?
23         A.   I'm not sure if I responded to these or
24    not.
25         Q.   Did your -- you said that you may have
```

Page 38

1    seen them before?

2        A.   I've seen a lot of paperwork from you

3    guys so, yes, I may have seen it before.  I don't

4    memorize it.

5        Q.   Okay.  Did your -- you didn't prepare

6    this document, though, yourself, right?

7                    MR. STORCH:  I'm going to

8            object.  He's not going to answer

9            that question.  That's

10           attorney/client privilege.

11                   MS. WASHINGTON:  Well, he said

12           that he -- he can testify if he

13           himself prepared it.

14                   MR. STORCH:  I don't

15           necessarily agree because what if he

16           prepared it, a response, and sent it

17           to us?  That is attorney/client

18           privilege.

19                   MS. WASHINGTON:  Okay.  Well,

20           let me ask you this.  You prepared --

21           Noah, you prepared this document as

22           his attorney, right?

23                   MR. STORCH:  Well, I'm not the

24           one who is being deposed but --

25                   MS. WASHINGTON:  I -- I

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

                                        Page 39

1              understand.

2                      MR. STORCH:  Hold on.  Hold

3              on.

4                      MS. WASHINGTON:  Okay.

5                      MR. STORCH:  The responses to

6              Request for Production are dated and

7              they're signed by me, so I don't

8              necessarily think that there's

9              anything else.

10                     MS. WASHINGTON:  No.  That's

11             fine.  That's fine.

12                     MR. STORCH:  Yeah.

13                     MS. WASHINGTON:  Okay.  So I

14             am handing you -- I'm marking this

15             next exhibit as Defendant's Exhibit

16             2.

17             (Defendant's Exhibit No. 2 was marked

18                for identification.)

19     BY MS. WASHINGTON:

20         Q.   And this is the actual document

21     production that was produced in response to the

22     Request for Production of Documents.

23                     MS. WASHINGTON:  Noah, this

24             will be the claimant's -- the Bates

25             stamped documents, claimant's Bates

Jeffrey Stepanovich                                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 40

1          stamped exhibit page 1 through 31.

2          You got that?

3               MR. STORCH:   Yeah.

4    BY MS. WASHINGTON:

5        Q.   Okay.   Mr. Stepanovich, if you can look

6    through those documents and let me know when

7    you're ready.

8        A.   Is there anything specific I need to

9    look for?

10       Q.   Well, I just -- I'm going to ask you if

11   you recognize it and if you know what it is.   So

12   it's Bates stamped pages 1 through 31.

13          Did you get that marked as Exhibit 2?

14   Thank you.

15       A.   Okay.

16       Q.   Do you recognize the document?

17       A.   Yes.

18       Q.   And what is it?

19       A.   I believe it's some legal forms.

20       Q.   Are they -- are they documents that your

21   attorney produced to us or that you produced to us

22   in response to our request for production of

23   documents that was Exhibit 1?

24       A.   Based on what I'm seeing, I assume so,

25   yes.

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

                                                      Page 41

1        Q.   Okay.  That's fine.  Do you recognize

2    those documents as some documents that you

3    created?

4        A.   Yes.

5        Q.   Okay.  Thank you.  Now, when we talk

6    about -- we're going to talk about this exhibit,

7    and I'm going to refer to different page numbers,

8    and if you look in the top right-hand corner, do

9    you see the CLMT 0001?

10       A.   Yes.

11       Q.   Okay.  So when I ask you -- if I ask you

12   to go to page 10 of 20, if you'll just look at the

13   last two digits or the last couple of digits and

14   that's how we will follow along.  Is that okay?

15       A.   Okay.

16       Q.   Thank you.

17            All right.  So first I'm going to direct

18   your attention to page 6.  Tell me when you get

19   there.

20       A.   Yes.

21       Q.   Okay.  Do you recognize the document on

22   page 6 and 7?

23       A.   Yes.

24       Q.   And what is that?

25       A.   The charge of discrimination.

Case 7:18-cv-00186-HL   Document 26-1   Filed 03/02/20   Page 44 of 259
Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 42

1       Q.   Is that the charge that you filed with

2    the EEOC against Ken Corbett Farms that started

3    this case?

4       A.   Yes.

5       Q.   Okay.  And let's skip for the record to

6    page 22.  Tell me when you get there.

7       A.   I'm there.

8       Q.   Okay.  And let's look at -- I guess

9    thumb through to page 28.  So 22 to page 28 and

10   tell me what those are.

11      A.   These are my responses to, I guess, some

12   questions that were raised.

13      Q.   Questions that were raised by whom?

14      A.   I'm not sure.

15              MR. STORCH:  I'm going to

16         object.  I don't think that's a fair

17         question because perhaps we had a

18         phone call with our client and then

19         he thinks the questions are coming

20         from us.  And I think that the

21         document speaks for itself.  It's

22         really a silly question to ask him.

23              MS. WASHINGTON:  That's -- I

24         don't believe that it's a silly

25         question.  I believe it's a relevant

Page 43

1          question, but I'll rephrase it.

2     BY MS. WASHINGTON:

3          Q.   Mr. Stepanovich, was this letter drafted

4     in -- was it sent to the EEOC in connection with

5     your EEOC charge?

6          A.   I'm not sure.

7               MR. STORCH:  Object.  Mr.

8          Stepanovich, to the extent you know,

9          you can answer it.

10              MS. WASHINGTON:  I couldn't

11         hear.

12              MR. STORCH:  I said that I'm

13         going to object, but to the extent

14         that Mr. Stepanovich knows the

15         answer, feel free to answer.

16    BY MS. WASHINGTON:

17         Q.   You can answer if you know the answer.

18         A.   I'm not sure what was sent to the EEOC.

19         Q.   Okay.  Did you personally draft this

20    document?

21         A.   This document?

22         Q.   Yes, the one that you're looking at.

23         A.   No.

24         Q.   Okay.  Do you know if it was drafted by

25    Robert Pecchio or Richard Celler?

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 44

1          A.    I can't answer that.

2          Q.    Did you employ them as your attorneys at

3     any point?

4          A.    Yes.

5          Q.    Okay.  That's good enough.  When you --

6     now I'm going to ask you specifically about some

7     things that were said in here.  If you don't

8     recall saying these things or if it's -- we're

9     going to just ask you to expound more on it.  Your

10    name -- if you look at it, you see the "I" is

11    used, "I" is used on several occasions.  So

12    does -- for example, let's look under paragraphs 1

13    and 2.  Do you see the second sentence?

14         A.    Yes.

15         Q.    "I did not have a written employment

16    contract, only verbal."

17         A.    Yes.

18         Q.    Does that refer to you?

19         A.    Yes.

20         Q.    Okay.  So it doesn't refer to Robert

21    Pecchio or Richard Celler?

22         A.    No.

23         Q.    Okay.  Got it.  So at any point -- we're

24    going to go through this, and at any point if

25    there's anything in here that you don't recall

Jeffrey Stepanovich                        January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 45

1       saying or that's inaccurate, you'll let me know,

2       right?

3              A.   Yes.

4              Q.   Okay.  Thank you.

5                   So right now we're looking at -- we're

6       starting on page 22, and there's a statement here

7       towards the middle of the paragraph under the

8       paragraph, some background.  "I had left Florida

9       Specialties when Ken approached me to take part of

10      his production and market it for Ken Corbett Farms

11      with the caveat that I teach his future son-in-law

12      Eric Bolesta the business."  Is that accurate?

13             A.   Yes.

14             Q.   Okay.  So tell us more about that.  Was

15      that caveat communicated to you by Mr. Corbett?

16             A.   When you say "communicated" --

17             Q.   Did Mr. Corbett tell you, "You can come

18      and work for me but you have to teach my son the

19      business -- my son-in-law the business"?

20             A.   That was quite a while ago.  I can't be

21      exact with the words, no.

22             Q.   Okay.  Was your employment with Ken

23      Corbett Farms conditioned on you teaching Eric

24      Bolesta the produce sales business?

25             A.   I believe so, yes.

Page 46

1          Q.    Why do you believe that?

2          A.    Because Eric didn't know the business.

3          Q.    Did someone tell you that he didn't know

4     the business?

5          A.    No one had to tell me that.  No.

6          Q.    How did you know?

7          A.    Because Eric had never sold produce

8     before.

9          Q.    How did you know that?

10         A.    Because I have known Eric for a number

11    of years.

12         Q.    Did he tell you that?

13         A.    Did he tell me that?

14         Q.    Yes.

15         A.    No.

16         Q.    But you knew because you knew him for a

17    number of years?

18         A.    Yes.

19         Q.    Okay.  But Mr. Corbett didn't tell you

20    that you can only work here if you teach my future

21    son-in-law Eric Bolesta the business?

22         A.    If you say it like that, I can't answer

23    that because that conversation -- I don't recall

24    that conversation exactly, no.

25         Q.    Okay.  Well, why did you -- why do you

Page 47

1    believe that your employment was conditioned on

2    you teaching Mr. Bolesta the business?

3         A.   Because Eric had just graduated from

4    college and he wanted to get in the business, and

5    my understanding or what I believe my

6    understanding was that part of that was to teach

7    him, otherwise, how was he going to learn?

8         Q.   Why was that your understanding?

9         A.   Why he brought me there?

10        Q.   Yes.

11        A.   Again, without going back to the

12   conversation, part of my hiring, I can't remember

13   the exact words from Mr. Corbett so all I can say

14   is it was implied.

15        Q.   Okay.  Fair enough.

16             Okay.  When you say here that you were

17   approached by Ken Corbett to take part of his

18   production and market it for Ken Corbett Farms, is

19   that what you were testifying to earlier about

20   certain products?  You would -- you yourself would

21   market and sell for Ken Corbett Farms?

22        A.   Yes, that we would get part of the

23   production.

24        Q.   Okay.  And would that be the green --

25   the green bean production?

Page 48

1        A.    No.  They didn't grow green beans.

2        Q.    Okay.  What was that production?

3        A.    Bell peppers, eggplant, yellow squash,

4    green squash and whatever other items they were

5    growing at the time.

6        Q.    Okay.  So at this time when you began to

7    work directly for Ken Corbett Farms, you were not

8    selling any of Florida Specialties products?

9        A.    No.

10        Q.    Only Ken Corbett's products?

11        A.    During his season, yes.

12        Q.    Okay.  When was his season?

13        A.    It was a spring and fall season.

14        Q.    Can you tell me those months?

15        A.    Spring was basically April, May, June,

16    somewhat into July.  Fall could be mostly October,

17    November and then sometimes into December.

18        Q.    And during -- when his season was --

19    when he was not in season, so I guess during July

20    to October or January to March, did you sell

21    anyone else's products?

22        A.    Yes.

23        Q.    And whose products?

24        A.    For a couple of years Growers' Finest.

25    And then for some other period of time Windsor

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 49

1    Distributing.

2         Q.    Were you an employee of theirs during

3    that time period?

4         A.    Yes.

5         Q.    So you received a W2?

6         A.    Yes.

7         Q.    Okay.  Did your selling of the products

8    of Growers' Finest and Windsor Distributing, did

9    that ever conflict with the seasons that Ken

10   Corbett's products were being sold?

11        A.    There was some overlap coming in and out

12   of both, yes.

13        Q.    And when you say "overlap," you mean

14   that you sold for both, both products at the same

15   time?

16        A.    There could be.

17        Q.    Okay.  And just as an estimate, when

18   there was overlap, would it be more than a month?

19        A.    It could vary.

20        Q.    Now, let's go down a little bit further

21   to the last sentence on page 22 where you -- and

22   it will be page 1 at the bottom, but it's page 22

23   at the right.

24        A.    Okay.

25        Q.    "Florida Specialties would not be happy

Page 50

1     because they were no longer getting KCFs entire

2     production," go on to the next page, "and would

3     terminate their agreement with KCF."  So can you

4     explain that statement for me?

5          A.   As previously stated, I assume Florida

6     Specialties at some point made a business decision

7     to terminate the contract with Ken Corbett Farms.

8          Q.   And when you say that they were no

9     longer getting KCF's entire production, they were

10    not getting the portion of the production that you

11    were selling for KCF; right?

12         A.   Correct.

13         Q.   Okay.  So at that time when you were

14    hired in the spring of 2011, were you the only

15    salesman for Ken Corbett Farms?

16         A.   Eric Bolesta and myself were, but before

17    the season started, we hired another salesperson.

18         Q.   Okay.  So in the spring of 2011 it was

19    you and Eric who were salesmen?

20         A.   That was the original plan, yes.

21         Q.   Okay.  So the day that you started with

22    Ken Corbett Farms, Eric was an employee, too?

23         A.   I assume he was.

24         Q.   Okay.  And Jed Hunter, when did he --

25    when was he hired, do you know?

Case 7:18-cv-00186-HL   Document 26-1   Filed 03/02/20   Page 53 of 259
Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 51

1        A.    I don't know the exact dates.

2        Q.    But it was after you?

3        A.    Yes.

4        Q.    Do you remember maybe the number of

5    months?

6        A.    It wasn't long.  I recommended him to

7    Ken.

8        Q.    So where was Jed working before?

9        A.    L & M.

10        Q.    L & M?

11        A.    L & M.

12        Q.    Okay.  And was he a produce salesman as

13    well?

14        A.    Yes.

15                MS. WASHINGTON:  And just

16            to -- if anybody needs a break at any

17            point, let me know because sometimes

18            I can keep going.  So if anybody

19            needs a bathroom break, just let me

20            know.

21    BY MS. WASHINGTON:

22        Q.    Okay.  So he was at L & M Produce.  And

23    how did you know him?

24        A.    From the business.  We did business

25    together.

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

                                                    Page 52

 1          Q.   Did you sell to him before?

 2          A.   I sold to him and bought from him.

 3          Q.   Okay.  And why did you recommend him?

 4          A.   Because he was good at his job.

 5          Q.   Now, you say here, if we go to page 23,

 6     Eric Bolesta had no customers when he started to

 7     sell at KCF.  So what does he -- you mean that he

 8     started fresh like a brand new sales job; right?

 9          A.   Correct.

10          Q.   Okay.  And you say here that "Jed had a

11     customer base he brought with him as did I which

12     was developed while selling product through

13     Florida Specialties."  So when you say "which was

14     developed while selling product through Florida

15     Specialties," you're referring to yourself; right?

16          A.   In my previous employment, yes.

17          Q.   Okay.  So Jed didn't develop those --

18     didn't sell for Florida Specialties?

19          A.   He sold for L & M.

20          Q.   Okay.  And when you say a customer base,

21     to clarify, these are -- is it some -- would it be

22     a customer that you sold to on one occasion or

23     multiple occasions?

24          A.   Could be both.

25          Q.   Okay.  So a customer base would be

Page 53

1      someone who you sold to at least once?

2            A.    Correct.

3            Q.    But not potential customers?

4            A.    Correct.

5            Q.    Okay.  You say here on 23, "I gave Eric

6      most of his customers from my client base I

7      brought with me from Florida Specialties."  So

8      when you say you gave Eric most of his customers

9      from your client base, can you explain that?

10           A.    With Eric not having any contacts

11     basically in the produce business, most new

12     salespeople will just basically get on the phone

13     and start calling people to try to establish

14     business.  We had a number of customers from

15     Florida Specialties that I dealt with, business

16     with.  So at Collier Foods -- or from Growers'

17     Finest, from Windsor, all of those that I've had

18     contacts with, and when Eric started and Jed

19     started, we talked about the customers and went

20     through the customers and we gave Eric a certain

21     amount of customers to start dealing with.

22           Q.    Did you give Jed any of your customers?

23           A.    I don't believe so.

24           Q.    Did Jed give Eric any of his customers?

25           A.    I can't answer that.  I don't recall.

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 54

1        Q.    So you say here that it is very -- on

2    page 23.  This is very unusual for a salesperson

3    to give up customers as I did.  Can you explain

4    that?

5        A.    It's revenue, it's commission.  So most

6    salespeople aren't going to give another

7    salespeople an opportunity to make money that they

8    would then not be able to make themselves.

9        Q.    And why did you give him your customers?

10       A.    Because that's the way we set up the

11   sales company.

12       Q.    And explain to me how the sales company

13   is set up.

14       A.    The sales company was set up so that all

15   three of us made the same income.  So it was to

16   our benefit that everybody was successful.

17       Q.    And how did you feel about that?

18       A.    I was fine with it.

19       Q.    Okay.  Let's go down further on page 23.

20   There's a statement here, "I had to have a second

21   job because I was not compensated during the off

22   seasons."  So when you say a second job, are you

23   referring to the Growers' Finest and Windsor

24   Distributing?

25       A.    Yes.

Jeffrey Stepanovich                     January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 55

1        Q.   Okay.  And when you say you were not
2   compensated during the off season, you didn't
3   receive any -- there was no check, you didn't
4   receive any pay in certain months?
5        A.   Only compensation was, we were paid
6   based on what we sold during the season, and after
7   the bills were collected and we were paid at some
8   point.  There was no monthly paychecks or weekly
9   paychecks, no.
10       Q.   Okay.  So was this even -- so you've
11  testified that you were paid a salary plus
12  commission for a certain point in time; right?
13       A.   Correct.
14       Q.   So was it the same -- did you not
15  receive any compensation when you had a salary?
16       A.   When I -- at the beginning, yes, but I
17  don't recall if it was weekly, monthly.  I don't
18  recall.
19       Q.   Now, when there was a switch to
20  100 percent commission, then that's when you said
21  that you were only paid by what was paid -- by
22  those sales that you made; right?
23       A.   By the sales of all three of us, yes.
24       Q.   Okay.  And do you remember -- was there
25  a regular frequency to those payments that were

Jeffrey Stepanovich                January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 56

1    made when you were on 100 percent commission-based

2    structure?

3          A.    No.

4          Q.    So you just would randomly get paid

5    whenever?

6          A.    Yes.

7          Q.    Was it at least once a month?

8          A.    I can't answer that.  I don't recall.

9          Q.    Were there some months when you didn't

10   get anything?

11         A.    Yes.

12         Q.    Now, your -- those jobs at Growers'

13   Finest and Windsor, they were the same -- it was

14   the same, the produce sales; right?

15         A.    Correct.

16         Q.    Did you sell to your customer base, the

17   same customer base for these employers?

18         A.    Some.

19         Q.    Okay.  So what were the others?

20         A.    The Growers' Finest production was all

21   Mexican production, so the customer base was a

22   little different for that product.  Some the same,

23   some different.

24         Q.    What about Windsor?

25         A.    Windsor was both Mexican and domestic,

Page 57

1    so it was a combination of both.

2         Q.   Now, moving down to paragraph 3, it says

3    here at the first sentence, "At no point were farm

4    losses ever discussed with the sales staff.  The

5    only statements we heard were 'We lost money.'"

6    So when you say "farm losses -- at no point were

7    farm losses ever discussed with the sales staff,"

8    what do you mean by that?

9         A.   I mean, we didn't have sales meetings

10   where we discussed profit and loss.

11        Q.   So when you -- what do you mean by

12   "discussed"?  Like what -- and were there ever

13   statements made like something to the effect that

14   we're losing money or we doing -- we're profiting?

15        A.   Not that I can recall, no.

16        Q.   Now, you -- I'm going to just skip ahead

17   a little bit, but there was a meeting in

18   April 2017 where -- right before you were

19   terminated where you were told that the farm was

20   losing money; right?

21        A.   It wasn't a meeting, no.

22        Q.   It wasn't a meeting?

23        A.   No.

24        Q.   What -- what was it?  What -- how was

25   that conversation had?

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 58

1          A.    There was a phone call.

2          Q.    Okay.  So a meeting is in person?

3          A.    If that's what you want to clarify it

4     as.

5          Q.    Well, what's your definition of a

6     meeting?

7          A.    Meeting would be of the staff.

8          Q.    So staff meaning you and the salesman

9     and Mr. Corbett?

10          A.    Correct.

11          Q.    Okay.  So this call that was held in

12     April 2017 where the farm losses were discussed,

13     that was not a meeting because it wasn't in

14     person?

15          A.    I don't know if that was discussed with

16     me directly or not.

17          Q.    What do you mean you directly?

18          A.    Meaning that statement that the farm had

19     losses.

20          Q.    Okay.  So you don't recall if

21     Mr. Corbett made the statement the farm had losses

22     in that April 2017 phone call?

23          A.    I don't -- I can't say yes or no, no.

24          Q.    Okay.  You say in the next sentence,

25     "The only statements we heard were 'We lost

Page 59

1    money.'"

2         A.   Okay.

3         Q.   So who is "we" first of all?

4         A.   I assume that would be the farm.

5         Q.   The farm?  So you, the salesman,

6    Mr. Corbett?  I'm sorry.  I misunderstood you.

7    Let me withdraw that question.

8              "We lost money" means the farm lost

9    money?

10        A.   That's yes.

11        Q.   Okay.  So when you say the statements

12   "we heard," were you referring to you and the

13   salesman?

14        A.   If it was a phone, it was -- we were

15   never together meaning Eric, Jed and myself for a

16   conversation with Ken.  So if something was said,

17   it was said over the phone.

18        Q.   So "we lost money," would that not be a

19   discussion of farm losses?

20        A.   I don't know if it was between me and

21   one of the other salesmen and they said it to me

22   or if Ken said it to me.

23        Q.   So you're testifying that there were --

24   you were -- the statement "we lost money," the

25   farm lost money, was made to you at some point,

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 60

1    but you don't remember who said it?

2         A.   No.  And it was part of I believe the

3    conversation about adding another salesperson.

4         Q.   So the statement "we lost money" was

5    made during that conversation in April 2017 and it

6    was made in connection with the discussion about

7    hiring a new salesperson?

8         A.   That's what the original discussion was

9    about, yes.

10        Q.   Okay.  So "we lost money," this phrase,

11   Mr. Corbett never made that statement to you at

12   any other point?

13        A.   I don't believe so.

14        Q.   Other than that April 2017 phone call?

15        A.   I'm not sure if he made it then.

16        Q.   And we'll get -- we'll talk about --

17   we'll circle back to that later, more details

18   about that meeting.  Actually, let's talk about it

19   right now.  That April 2017 phone call, you were

20   not in -- you were not in person during that --

21   you were not physically with Mr. Corbett and the

22   other salesmen during that phone call?

23        A.   I don't know if anybody was with

24   Mr. Corbett during that phone call.

25        Q.   But you know that you were on the phone.

Jeffrey Stepanovich                              January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 61

1          A.    With Mr. Corbett.

2          Q.    Okay.

3          A.    I had a conversation with Mr. Corbett.

4          Q.    Well, do you know if anybody else was

5     present?

6          A.    No, I do not.

7          Q.    And do you remember what was discussed?

8          A.    In detail?

9          Q.    Yes.

10         A.    No.

11         Q.    Okay.  Do you recall anything about a

12    decrease in pay?

13         A.    For the four salesmen.

14         Q.    So the four salesmen would have a

15    decrease in pay?

16         A.    No.  The three salespeople were going to

17    have a decrease in pay to pay for the fourth

18    salesperson.

19         Q.    Okay.  Hold on a second.  At that time

20    during that meeting did you --

21         A.    There was no meeting.

22         Q.    Excuse me.  During that phone call did

23    you discuss your opinion -- did you have an

24    opinion on decreasing your salary?

25         A.    I'm sure I did.

Jeffrey Stepanovich                          January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 62

1      Q.   Did you share it with Mr. Corbett during

2   that phone call?

3      A.   I don't recall.

4      Q.   Okay.  We'll come back to this.

5               MR. VOYLES:  Do you mind if we

6          take a quick break?

7               MS. WASHINGTON:  No, not at

8          all.

9          (Recessed, 9:25 a.m.)

10          (Reconvened, 9:35 a.m.)

11   BY MS. WASHINGTON:

12      Q.   Mr. Stepanovich, are you ready?

13      A.   Yes, ma'am.

14      Q.   All right.  So we're still on page 23.

15   And let's go to that last paragraph, first

16   sentence.  If you were to look at the actual cost

17   through the years for each of us, you'd see why

18   the sales performance numbers aren't really true

19   numbers.  Can you explain that?

20      A.   I'm not sure where Mr. Corbett got his

21   numbers from, so only based on the numbers that --

22   I think you have some rough copies somewhere in

23   this exhibit that we used in the sales office,

24   so ...

25      Q.   And when you say you aren't sure where

Jeffrey Stepanovich                     January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 63

1      he got the numbers from, does -- I mean, were they

2      not -- where are the numbers -- where do you store

3      these numbers for use, for your later use?  Like,

4      how is that -- how does that whole date entry

5      process work?

6                      MR. STORCH:  I'm going to

7              object to the form.  Maybe if he can

8              answer it -- ask the question, just

9              kind of --

10                     MS. WASHINGTON:  I'll ask him

11             again.

12     BY MS. WASHINGTON:

13         Q.   Did you enter -- whenever you made

14     sales, did you have to enter the data yourself?

15         A.   Yes.

16         Q.   And did you enter it into a particular

17     software?

18         A.   Yes.

19         Q.   And was that?

20         A.   It's called Famous.

21         Q.   And you personally entered your own

22     sales information?

23         A.   My sales orders, yes.

24         Q.   And could you -- through Famous were you

25     ever able to determine what your performance was?

Jeffrey Stepanovich                      January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 64

1          A.   Well, based on --

2          Q.   Were you able to determine how many

3     sales you made during the year?

4          A.   Yes.

5          Q.   Were you able to determine, like, what

6     you sold a particular product for?

7          A.   Yes.

8          Q.   Okay.  So when you say "sales

9     performance numbers," what does that refer to?

10         A.   The information that Mr. Corbett

11    submitted in a piece of -- one of the items that

12    he submitted that I read.

13         Q.   Okay.  The items -- the information --

14    the document that he submitted to -- in connection

15    with your EEOC charge?

16         A.   Connected within this framework, yes.  I

17    don't know specifically what it was in reference

18    to.

19         Q.   Okay.  Did you read -- that document

20    that Mr. Corbett submitted, did you read -- there

21    was a letter that he wrote.  Did you read that?

22         A.   Yes.

23         Q.   Okay.  And I'll -- I don't have this

24    here.  I'll show you a little bit later and ask if

25    you recognize that document.  So sales performance

Case 7:18-cv-00186-HL   Document 26-1   Filed 03/02/20   Page 67 of 259
Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 65

1    numbers refer to the numbers that Mr. Corbett

2    discussed in his correspondence that you read?

3         A.   Correct.

4         Q.   Okay.  If we turn to page 24, the

5    third -- the second sentence, "I was tired of

6    making the two of them money and now it was their

7    turn to pay me.  The idea was at some point we

8    would all carry somewhat of an equal load."  Tell

9    me what you meant by that.

10        A.   It was just in reference to -- back to

11   our original statement that we were all paid the

12   same so at some point everybody would carry an

13   equal load.

14        Q.   So did you feel that you were making

15   Mr. Bolesta and Mr. Hunter money, that you were

16   the one responsible for the money that they made?

17        A.   I was responsible for more percentage of

18   the sales earlier in the years, yes.

19        Q.   And when you say "earlier in the years,"

20   is there a date range that you're referring to?

21        A.   Not anything specific, no.

22        Q.   But you agree that your sales

23   performance decreased towards the end of your

24   employment with Ken Corbett Farms?

25        A.   No, not at all.

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

                                                    Page 66

1        Q.    So what does it mean when you say that

2    you were responsible for more of the sales towards

3    the beginning?

4        A.    Well, think of it in terms of if we were

5    all getting paid the same, that in theory we all

6    should sell one-third of the product.  That would

7    be the balance.

8        Q.    Okay.  So were you -- you're saying that

9    you were selling one -- more than one-third of the

10   product the earlier years?

11       A.    For most of the years, yes.

12       Q.    Most of the years?

13       A.    Yes.

14       Q.    So could you quantify that for me?

15       A.    I would say -- I don't have the exact

16   numbers in front of me, so I would only guess that

17   almost through the whole period that I was selling

18   most of the -- the highest percentage of the

19   product, yes.

20       Q.    And when you say highest percentage, do

21   you have a percentage for me?

22       A.    I mean, you have some rough documents in

23   the pamphlet.  You can refer to those, I guess.

24       Q.    The ones that you submitted?

25       A.    Correct.

Jeffrey Stepanovich                January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 67

1          Q.    Okay.  We'll talk about that.  Those
2      exhibits, right?
3          A.    Yes.
4          Q.    So at any point during your employment
5      with Ken Corbett Farms were Mr. Hunter and
6      Mr. Bolesta carrying an equal load?
7          A.    Yes.
8          Q.    And when was that?
9          A.    I can't give you exact dates.
10         Q.    But at some point they were?
11         A.    Yes.
12         Q.    Okay.  And at any point during your
13     employment with Ken Corbett Farms, were you
14     carrying less of an equal load to them?
15         A.    Yes.
16         Q.    And when was that?
17         A.    I can't give you exact dates.
18         Q.    Okay.  Was it towards the end of your
19     employment?
20         A.    I can't answer that.
21         Q.    So was it your perception of your
22     employment at Ken Corbett Farms that you would
23     work harder in the beginning and that you could
24     work less towards -- at some point?
25         A.    Not at all.

Page 68

1          Q.    But that -- but if the two other
2     salesmen would carry an equal load at some point,
3     that means that you would carry less of a load,
4     right?
5          A.    Not necessarily, no.
6          Q.    Okay.  Explain that to me.
7          A.    Our production was going up.  There was
8     more packages.
9          Q.    Well, would that impact the percentage?
10         A.    I'm sure it would.
11         Q.    How is that?
12         A.    Math.
13         Q.    So because the numbers go up, that the
14    actual number that you sell a product that you
15    could sell goes up, then your percentage would go
16    up, as well?  The percentage that you sold of the
17    total amount?  I just -- I just want you to
18    explain the math.  You said math.
19         A.    Well, explain the question to me again.
20         Q.    So how could an increase in produce, how
21    would that affect the percentage that you sold?
22         A.    I said --
23         Q.    It's only --
24         A.    I said it could.
25         Q.    Okay.  And how is that?

Jeffrey Stepanovich                            January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 69

1          A.    The business isn't like something is
2     manufactured.  So based on what product the farm
3     produces, all customers take different parts of
4     that production.
5          Q.    Okay.
6          A.    So if there was example A would have
7     more of that, it may not be something my customer
8     base uses.  It may have been something Eric or
9     Jed's customer base used more of, so it was an
10    opportunity for them to sell more of that because
11    the farm produced more of that.
12         Q.    Okay.  Well, can you give me an example
13    of that occurring?  Like if there were something
14    that more of your customers would buy as opposed
15    to Jed's or Eric's?
16         A.    Nothing specific, no.
17         Q.    Okay.  So there were -- your client base
18    sometimes would have a -- they would want to
19    purchase things that were not as plentiful?
20         A.    Or could be a different grade of
21    product.
22         Q.    Okay.  And I think you talked about that
23    a little bit later in this letter, so we'll talk
24    about that in more detail.  So, for example, the
25    next statement I wanted to ask you about is here.

Case 7:18-cv-00186-HL   Document 26-1   Filed 03/02/20   Page 72 of 259
Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 70

1      Well, you say here, "Quality dictated what

2      customer certain product would go to."  Is that

3      what you were referring to?

4              A.    Yes.

5              Q.    "A retailer would get only the best

6      quality and then we'd have lower-end customers to

7      move product that was lower grade."  So tell me

8      what that means.

9              A.    It basically means that if you go to the

10     grocery store, the grocery stores usually get the

11     top -- the best product that the farm produces.

12             Q.    Okay.

13             A.    And then there are other grades of

14     product that the grocery store won't sell because

15     it doesn't meet their standards, so that goes to

16     other types of customers.

17             Q.    And what are those other types of

18     customers?

19             A.    It could be choice pepper goes to a chop

20     house who cuts the pepper for pizza or cuts it for

21     other items that's added ingredient-wise.

22             Q.    Okay.  Any other examples?  Okay.  So a

23     chop house would be an example of a customer that

24     would pay for a lower grade product?

25             A.    Correct.

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 71

1       Q.   And retailers get the highest grade

2   product?

3       A.   Generally, yes.

4       Q.   Okay.  So your particular customers, did

5   they consist of the retailers?

6       A.   We had a little bit of all customer

7   base, yes.

8       Q.   Okay.  One second.  And here on page 26,

9   a couple of pages down.  Two paragraphs.  The

10  second full paragraph up from the bottom starts,

11  "Produce customers are needing."

12      A.   Uh-huh.

13      Q.   You've got retail who takes top grade

14  product here.  Is that consistent with what you

15  just told me?

16      A.   Okay.

17      Q.   You have wholesalers who take high to

18  mid-range product.  So are these chop houses?

19      A.   No.

20      Q.   These wholesalers.  Okay.  What are

21  wholesalers?

22      A.   Wholesalers bring in a full line of

23  product and sell it to things like restaurants or

24  chain stores or whoever their client base is.

25      Q.   So they would take -- so they would take

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 72

1    high to the middle range product; right?

2         A.    They could take the whole line, yes.

3         Q.    Do they ever take low-end product?

4         A.    Yes.

5         Q.    Okay.  And cheaper clients who only use

6    the low-end product, does that refer to chop

7    houses?

8         A.    It could be a chop house, yes.

9         Q.    Okay.  And your client base ranged from

10   retailers to wholesalers to chop houses?

11        A.    We all did, yes.

12        Q.    Everybody did?

13        A.    Pretty much, yes.

14        Q.    And by everybody, you mean Eric and Jed?

15        A.    And Jed and myself, yes.

16        Q.    Okay.  Did Eric tend to have more of

17   a -- clients who wanted the high-end product?

18        A.    His bigger customers, yes.

19        Q.    His bigger customers?

20        A.    Yes.

21        Q.    But he had all three types of customers?

22        A.    Yes.

23        Q.    And what about Jed, did he -- were most

24   of his clients high -- products who -- clients who

25   wanted top-grade product?

Page 73

1      A.   We all had a combination of them so,

2    yes.

3      Q.   Was there any one of you in particular

4    that had more clients that demanded top-grade

5    product?

6      A.   Eric had more retail, so I would

7    probably say Eric.

8      Q.   Now, this price-per-package measurement,

9    does that -- do the clients who demand top-grade

10   product, do they tend to pay a higher price per

11   package?

12     A.   That product generally is priced higher,

13   correct.

14     Q.   Okay.  Let's move back to page 24.

15   It's -- there's a subheading paragraph 4 here.

16   Kind of the beginning of the second paragraph, it

17   starts off, "The entire time frame."  So the first

18   sentence -- well, the second sentence says, "None

19   of these items were ever brought to my attention."

20   The things that were listed in Mr. Corbett's

21   position statement.  So when you're saying none of

22   these items that were ever brought to your

23   attention, what are you referring to?

24     A.   The statements he made in that -- in his

25   statement.

Jeffrey Stepanovich                      January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 74

1        Q.    About your production?

2        A.    Yes.

3        Q.    Or your performance?

4        A.    (No audible response.)

5        Q.    "On Monday before I was let go, Ken

6    informed" -- and this is from the same page.  "On

7    Monday before I was let go, Ken informed Eric,

8    Jed, and me, that he was bringing on a new

9    salesperson."  So this is going back to the

10   conversation that -- or the phone call in April of

11   2017 that we were discussing earlier.  We briefly

12   discussed that, but you say here that he informed

13   you that he was bringing on a new salesperson.

14   What did he say specifically?  Do you remember?

15       A.    Not anything specific, no.

16       Q.    Okay.  But you do remember that your

17   salary was going to be cut and that there would be

18   a new salesperson brought in?

19       A.    That's correct.  It wasn't a salary.  He

20   was taking part of our commission structure away.

21       Q.    Okay.  He was taking part of your

22   commission, decreasing your commission to

23   accommodate bringing on a new salesperson?

24       A.    Correct.

25       Q.    And you said that you don't recall --

Jeffrey Stepanovich                          January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 75

1    you testified earlier that you don't recall if you

2    had voiced your opinion on that to Mr. Corbett at

3    the time?

4         A.   Generally, it didn't matter what he

5    said.  His mind was made up he was going to do

6    what he was going to do, so ...

7         Q.   You said generally it didn't matter what

8    you would say because Mr. Corbett's mind would be

9    made up?

10        A.   That was my experience from when I --

11   previous discussions with him about -- like items

12   like this, like when he took my salary away years

13   before that, yes.

14        Q.   Well, tell me about that conversation.

15        A.   I don't know.  About what?

16        Q.   Did you -- when -- so there was a

17   conversation that he had with you about

18   discontinuing your salary and making you

19   100 percent commission?

20        A.   That was years before this event, yes.

21        Q.   But you don't remember the details of

22   that conversation?

23        A.   It wasn't a very long one.

24        Q.   Do you remember any details about it?

25        A.   I just remember driving from Florida to

Page 76

1    Georgia to discuss it with him.  He was in the

2    field on a tractor and it wasn't a very long

3    discussion.

4         Q.   But you don't recall the details of it?

5         A.   Not exactly, no.

6         Q.   Okay.  Do you recall if you told him

7    that you disagreed with it?

8         A.   I would assume I would have.

9         Q.   Were there any other conversations that

10   you had with Mr. Corbett through the course of

11   your employment other than this conversation about

12   the discontinuing your salary about your

13   compensation?

14        A.   No.

15        Q.   So when you testified earlier that his

16   mind was made up and it -- and it -- his mind was

17   already made up about something and that you've

18   experienced it on other occasions, when were those

19   other occasions?

20        A.   I can't give you exact.

21        Q.   But there were other occasions?

22        A.   I'm sure if I formed that opinion I

23   would guess there was other occasions, yes.

24        Q.   But you don't remember?

25        A.   Recall them, no.

Page 77

1      Q.   None of these would have had --
2   conversations would have happened by email, would
3   they have?
4      A.   I have no -- I doubt it.
5      Q.   What about text messages?
6      A.   I don't believe he's ever texted me.
7      Q.   Okay.  All right.  So next there's a --
8   the next sentence says, "He also said that due to
9   the losses KCF had, the three of us would pay for
10  the new salesperson by taking a fourth percentage
11  or a quarter percentage from each sales staff
12  members' compensation.  The following day,
13  Tuesday, I sent an email to Ken."  So tell me
14  about -- at some point you -- the call ended,
15  right?  That call in April of 2017.
16     A.   Okay.  Yes.
17     Q.   And what happened next between the time
18  you sent the email to Ken and after you got off
19  that phone call?
20     A.   I would assume I tried speaking with
21  both Jed and Eric about it.  I don't think I had a
22  conversation with Eric.  I can't recall
23  specifically.
24     Q.   So you tried to speak with Jed and Eric?
25     A.   I'm sure I did.

Jeffrey Stepanovich                      January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 78

1        Q.    Did you actually speak with Jed?

2        A.    I believe I did.

3        Q.    Do you recall Jed voicing -- making

4   any -- having any response to Mr. Corbett's

5   conversa -- about his statement about cutting your

6   compensation?  Excuse me.  Your commission?  And

7   I'll repeat that.  Do you recall Jed saying

8   anything in response to Mr. Corbett's statement

9   about cutting the salesmen's commissions?

10        A.    No, I don't recall.

11        Q.    What about Eric?

12        A.    I don't recall.

13        Q.    And did you actually speak with Jed

14   after this phone call?

15        A.    I don't know if it was that day or not

16   or it was days following.

17        Q.    And when did you send the email to

18   Mr. Corbett?

19        A.    I believe it was on Tuesday.

20        Q.    And that was the day after the phone

21   call?

22        A.    Correct.

23        Q.    Can you look at page 20 of the

24   Defendant's Exhibit 2?

25        A.    So --

Page 79

1       Q.   So that would be this one here.  Yeah,
2    this page 20.
3       A.   So we're going backwards?
4       Q.   Yes.  Backwards.
5       A.   Okay.
6       Q.   Okay?  And is that the -- on page 20
7    through page 21 -- no, just page 20 to 21, is that
8    the email that you're referring to that you sent
9    to Ken Corbett on Tuesday?
10           (Defendant's Exhibit No. 2 was marked
11           for identification.)
12      A.   Yes.
13      Q.   All right.  Let's look at the first
14   paragraph, towards the middle second sentence.
15   "I'm not trying to be confrontational.  Just a lot
16   was thrown out there yesterday, so trying to get a
17   grasp on how this will move forward."  So when you
18   say "a lot was thrown out there yesterday," what
19   are you referring to?
20      A.   The change in compensation.
21      Q.   Okay.  And here next you say, "Based on
22   what you said, this change is due to the fact that
23   the farm is losing money."
24      A.   Okay.
25      Q.   So is that what Mr. Corbett said, the

Case 7:18-cv-00186-HL   Document 26-1   Filed 03/02/20   Page 82 of 259
Jeffrey Stepanovich                      January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 80

1    farm is losing money, so I'm going to cut your

2    commissions?

3         A.   I'm assuming that came from him at some

4    point during that phone conversation.

5         Q.   Okay.  Let's go down to the very last

6    paragraph on page 20.

7         A.   Okay.

8         Q.   "Since we're going to lose 20 percent of

9    our pay, that maybe now we can get paid once money

10   is collected and not whenever."  So what does that

11   mean?

12        A.   It's just when -- per our earlier

13   conversations, we just got paid whenever they

14   decided to pay us.  There was no rhyme or reason

15   for how they gave us our checks.

16        Q.   When you say "they," who are you

17   referring to?  How they paid us?

18        A.   I would assume Ken or Kim Carter.  Kim

19   usually paid us.

20        Q.   Okay.  So were you asking that you -- if

21   you could get paychecks at a certain point as

22   opposed to random times?

23        A.   Yes.

24        Q.   And you asked that since you were losing

25   25 percent of your pay, maybe there could be a

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 81

1    certain -- a different date of pay -- dates that
2    you get back paid?
3         A.   I guess, yes.
4         Q.   All right.  One second.  Okay.  And
5    let's look at page 21, the very last paragraph.
6    "Also from a logistics perspective if we have four
7    salespeople, that KCF will need to do something
8    about the phone system since it only has four
9    lines."  So what was the -- what was your purpose
10   for making this statement to Mr. Corbett?
11        A.   Just that it wasn't functional.  We were
12   already out of line capacity with the three of us
13   on the phone, so customers calling in were getting
14   busy signals, so if they were going to add another
15   salesperson, we needed to make some changes to
16   make it more efficient.
17        Q.   Okay.
18        A.   And the same thing for the computer
19   usage.
20        Q.   And I just want to skip back a little
21   bit to page 20.  One, two, three, four.  The
22   fourth full paragraph, second sentence, "Or are
23   the three of us going to subsidize a new person
24   for the next year or two as they learn the
25   business?"  What did you mean by that?

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

                                              Page 82

1        A.    Meaning, we didn't have -- I didn't know

2    who he was talking to or who he was going to bring

3    in.  So were they going to bring in new business

4    with them or were they going to be somebody new

5    who didn't have any business.

6        Q.    And how would that have impacted you?

7        A.    Because basically we, meaning the other

8    three salespersons, would be the ones making the

9    money and he would be getting the benefit of that.

10       Q.    All right.  Let's go back to page 24.

11   So what happened after you sent the email to

12   Mr. Corbett?

13       A.    You would have to ask him that.

14       Q.    Well, what happened on your end?  What

15   happened from your personal knowledge after you

16   sent the email?  Did anything happen between you

17   and Mr. Corbett?

18       A.    The next day he called and terminated my

19   employment.

20       Q.    And this was done by telephone?

21       A.    Yes.

22       Q.    And he called you?

23       A.    I believe so.

24       Q.    Tell me about that conversation.

25       A.    What would you like to know?

Page 83

1      Q.   Tell me what you said and what
2    Mr. Corbett said.
3      A.   That was a long time ago.  I can't say
4    what he said or what I said specifically.  I don't
5    remember.
6      Q.   So you just recall that you -- he fired
7    you, but not exactly what he said?
8      A.   No.  I mean, I'm sure he made reference
9    to -- I think I had put in here somewhere it was
10   his decision and other than that, not really.
11   There was no reason.  I'm sure I asked him for
12   what purpose or what reason was I fired.  He never
13   gave me one.
14     Q.   Okay.  Let's go to page 24 at the very
15   bottom, last paragraph.  It says, "Wednesday
16   morning Ken called and fired me, no cause on his
17   part.  It was his decision and no one else's."  So
18   does that sound like an accurate representation of
19   what Mr. Corbett said during that call?
20     A.   I'm assuming so.
21     Q.   And what does no cause on his part mean?
22     A.   Meaning he didn't tell me for any
23   reason.
24     Q.   So he told you it's no reason?
25     A.   I don't think he told me anything.  He

Page 84

1      just said I was being fired.

2            Q.   And did he tell you it's his decision

3      and nobody else's?

4            A.   Yes.

5            Q.   So was that in response to you asking --

6      did you ask him whose decision was it?

7            A.   No.  I'm sure I asked him why.

8            Q.   You didn't ask him if it was his

9      decision?

10           A.   He's the owner.  I would assume it's his

11     decision.

12           Q.   Can you look back at page 22 of the

13     document.  It's at the very top.  What's the date

14     on this document?

15           A.   June 7th, 2018.

16           Q.   Okay.  So would your recollection of

17     that conversation you had with Mr. Corbett have

18     been more accurate at that time than it is now?

19           A.   It was fresher.

20           Q.   Okay.  Now, why would you include it was

21     his decision and no one else's in this statement?

22     If you said that you assume that Mr. Corbett is

23     the owner and he would have made a decision by

24     itself, why would that be here?

25           A.   Because he specifically said it to me.

Case 7:18-cv-00186-HL   Document 26-1   Filed 03/02/20   Page 87 of 259
Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 85

1    I remember that.

2         Q.   Oh, okay.  But you don't recall how --

3    what that statement was made in response to, like

4    what was your question?

5         A.   No.

6         Q.   Okay.  Let's look at -- skip forward to

7    page 28.  And if you look, there's a heading

8    Exhibit E and let's go into the second full

9    paragraph.  "I asked him on the phone the day he

10   fired me for a reason.  He said he didn't have a

11   reason.  He just was and that it was his decision

12   and his alone."  Is that accurate?

13        A.   I'm assuming so, yes.

14        Q.   Okay.  So did he tell you that -- so

15   you're saying that he didn't have cause, but here

16   you say that he told you that he didn't have a

17   reason.  So are cause and the reason, is that the

18   same thing?  Cause for firing you and the reason

19   for firing you, is that the same thing?

20        A.   No.

21        Q.   Okay.  Well, what's the difference?

22        A.   I don't know what the legal difference

23   is.

24        Q.   What's the difference, in your words?

25        A.   Cause and reason?  Cause would be did I

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 86

1    ever get written up for anything, was I ever

2    reprimanded for anything, was there ever

3    anything -- well, we didn't have any policies, so

4    there was nothing ever -- so, no, he never gave me

5    cause or concern that I would be fired.

6         Q.   Okay.  And a reason means what to you,

7    or reason?

8         A.   A reason meaning why did he do it.

9         Q.   Okay.  Got it.  So when you refer to

10   cause, you mean -- you're referring to any

11   disciplinary action that was taken against you for

12   your firing?

13        A.   Yes.

14        Q.   Okay.  Got it.  All right.  I'm handing

15   you now what I'm marking as Exhibit 3, Defendant's

16   Exhibit 3.

17                  MS. WASHINGTON:  And, Noah,

18           this is the complaint in this case.

19                  MR. STORCH:  Got it.

20                  MS. WASHINGTON:  You got it?

21                  MR. STORCH:  Yeah.

22   BY MS. WASHINGTON:

23        Q.   Okay.  And, Mr. Stepanovich, if you can

24   just take a look at it and let me know if you

25   recognize it.

                                                    Page 87

1              (Defendant's Exhibit No. 3 was marked

2              for identification.)

3         A.    I recognize it, yes.

4         Q.    Thank you.  What is it?

5         A.    It is a complaint and demand for jury

6    trial.

7         Q.    And is that in this case that we're here

8    for today?

9         A.    Yes.

10        Q.    Okay.  Now, take a look at paragraph 15.

11   It should be on page 3 and it's at the bottom.

12        A.    Okay.

13        Q.    So were you -- here it states,

14   "Plaintiff was told he was terminated for economic

15   reasons."  So that's different than what you say

16   in this letter here; right?  It was for no reason?

17   When I say "the letter," I mean the letter that we

18   were just reading from Exhibit 2 on page 24.

19        A.    Okay.

20        Q.    Okay.  But that's different than what it

21   says here; right?

22        A.    According to this paper, yes.

23        Q.    Okay.  So explain to me why there's a

24   difference in what's here in the complaint and

25   here in your letter.

Page 88

```
 1                   MR. STORCH:  I was going to

 2             object.  Obviously, the

 3             interrogatories are sworn-to answers

 4             by Mr. Stepanovich and the complaint

 5             is not, but he can answer.

 6                   MS. WASHINGTON:  This -- we're

 7             not talking about interrogatories

 8             right now.  This is the document

 9             production.

10                   MR. STORCH:  Well, you're

11             asking him about a difference between

12             something that he specifically

13             drafted and (inaudible) filed.  So

14             you can certainly ask him and he'll

15             be happy to tell you, you know, what

16             he wrote is a hundred percent

17             accurate.

18      BY MS. WASHINGTON:

19           Q.   So in paragraph 15, Mr. Stepanovich,

20      this -- it says Plaintiff was told he was

21      terminated for economic reasons; right?

22           A.   Okay.

23           Q.   So were you terminated for economic

24      reasons?

25           A.   No.
```

Jeffrey Stepanovich                                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 89

1        Q.    So where does this come from?

2        A.    I don't know.

3        Q.    Okay.  Thank you.

4              So let's go to page -- you can put this

5      complaint to the side.

6        A.    Okay.

7        Q.    Let's go back to Exhibit 2, your letter.

8      And I know we have lots of papers here, so let me

9      know if I'm ever unclear.

10       A.    Where are you?

11       Q.    On page 28 at the top.

12       A.    Okay.

13       Q.    Okay.  So let's go to -- if you see the

14     subheading Exhibit E?

15       A.    Okay.

16       Q.    Here in the third paragraph, second

17     sentence, "I still feel to this day it was because

18     of my cancer; otherwise, why did he wait until he

19     found out about it?"  So what does this part mean,

20     "Why did he wait until he found out about it?"

21     What is -- what "wait" are you referring to?

22       A.    I'm assuming when I wrote this, if there

23     was, quote, unquote, all of these issues that

24     Mr. Corbett had with my performance and nothing

25     was ever said or done prior to this, obviously in

Case 7:18-cv-00186-HL   Document 26-1   Filed 03/02/20   Page 92 of 259
Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 90

1    my mind they weren't an issue.  So the only issue

2    was I had told him I had the cancer and he fired

3    me.

4         Q.   You told him that you had the cancer?

5         A.   I'm sure at some point.  I would -- I

6    can't give you an exact date when I told him, no.

7         Q.   Okay.  Do -- was there mention of -- in

8    this complaint -- and I'll have you take a look at

9    it again, Exhibit 3 here.

10        A.   Okay.

11        Q.   Does this say anything in your complaint

12   about you telling Mr. Corbett directly that you

13   had cancer?

14        A.   I can't -- I don't know.

15        Q.   Can you look at it?  You can't?

16        A.   I can look at it.  Do you want me to

17   read through the whole thing?

18        Q.   Yes, I do.  You can scan through it if

19   you want to but, yes, please.

20        A.   It makes reference to management.  Not

21   just Ken, specifically.  On page 3.

22        Q.   Okay.  Is there a paragraph number?  Do

23   you see a paragraph number?

24        A.   Number 13.

25        Q.   Anywhere else?  Do you see any other?

Page 91

1      A.   No.

2      Q.   No reference to you telling Mr. Corbett,

3  specifically?

4      A.   No.

5      Q.   Okay.  Now, let's look at -- on page 6

6  of that same document, not the complaint, the

7  Exhibit 2.  So just turn to page 6 at the top.  It

8  should be your EEOC charge.

9      A.   Okay.

10     Q.   Now, do you mention anywhere in your

11 EEOC charge that you disclosed your cancer to

12 Mr. Corbett?

13     A.   Yes.

14     Q.   Okay.  Where is that?  Can you read it

15 for me?

16     A.   "On March 10th Mr. Stepanovich disclosed

17 a serious medical his condition necessitating

18 surgery to KCF management; nothing specific to

19 Mr. Corbett."

20     Q.   Okay.  And what about -- do you see that

21 footnote at the bottom of the page starting on

22 March 10th, 2017?

23     A.   Okay.

24     Q.   What does it -- can you read that?

25     A.   "On March 10th, 2017, Mr. Stepanovich

Case 7:18-cv-00186-HL   Document 26-1   Filed 03/02/20   Page 94 of 259
Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 92

1    informed Eric Bolesta and Jed Hunter he had

2    prostate cancer and expected surgery scheduled for

3    July 20th, 2017."

4         Q.   Okay.  So it looks here like you state

5    you allege that you informed Eric Bolesta and Jed

6    Hunter of your prostate cancer but not Ken

7    Corbett; right?

8         A.   According to this.

9         Q.   Okay.  So management, who were you

10   referring to when you stated that you disclosed it

11   to management in your complaint?

12        A.   Ken Corbett.

13        Q.   So you are testifying here that you did

14   tell Ken Corbett?

15        A.   No.  When you asked management, that's

16   the only management.

17        Q.   Oh, okay.  But what you're -- so what

18   you're saying in your complaint is not accurate?

19   In your complaint -- if you define management as

20   Ken Corbett, but you didn't have a conversation

21   with Ken Corbett, then your complaint is not

22   accurate; right?

23        A.   No.

24                  MR. STORCH:  Objection, form.

25

Page 93

1    BY MS. WASHINGTON:

2         Q.    Okay.  So when did you -- so you told

3    Eric Bolesta and Jed Hunter about your prostate

4    cancer on March 10th, 2017?

5         A.    Okay.

6         Q.    And do you remember if this was in

7    person?

8         A.    Without looking at the calendar -- if I

9    could go back to my personal calendar, I could

10   probably tell you if it was in person or not.

11        Q.    Can you do that?  Not right now, but

12   after this deposition is over.

13        A.    Okay.

14        Q.    Subject to your attorney's advice, of

15   course.  Did you -- and you told them that your

16   surgery was scheduled for July 20th, 2017?

17        A.    Yes.

18        Q.    Okay.  And July 20th, 2017, would have

19   been outside of the growing season; right?

20        A.    Correct.

21        Q.    Did you notify Jed or Eric -- did you

22   notify Jed that you would have to take time off

23   from work to have your surgery?

24        A.    I don't recall.

25        Q.    Did you tell Eric this?

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 94

1          A.    I don't recall.

2          Q.    Did you tell anyone else at Ken Corbett

3     that you needed time off from work for your

4     surgery?

5          A.    I don't recall.

6          Q.    Did you ever request time off from work

7     before from working with Ken Corbett for medical

8     reasons?

9          A.    No.

10         Q.    So if you were -- I mean, how was your

11    work environment?  Like if you needed to take a --

12    if you needed to go to a doctor's appointment

13    during the time where you would be making calls to

14    sell product, is there a process that you went

15    through to do that?

16         A.    No.

17         Q.    So you just went to your appointment if

18    you needed to?

19         A.    I didn't have appointments I don't

20    believe, so ...

21         Q.    Well, you visited a doctor in connection

22    with your diagnosis; right?

23         A.    Not when I was at Ken's, no.

24         Q.    Not when you were at Ken's?

25         A.    No.

Page 95

1        Q.   What does that mean?

2        A.   Not when I was in Georgia, no.

3        Q.   Okay.  Did you work from an office -- an

4    office in Georgia?

5        A.   Yes.

6        Q.   And sometimes did you work from Florida?

7        A.   Yes.

8        Q.   And this was primarily telephone

9    contacts with customers; right?

10       A.   Yes.

11       Q.   Okay.  So you could have done it from

12   Florida?

13       A.   I could have, yes.

14       Q.   But you were in Georgia most of the

15   time?

16       A.   Yes.

17       Q.   Okay.  Now, you -- let's switch back to

18   page -- we're still in Exhibit 2 with the numbers

19   at the top.  One second.

20            Okay.  Now, you say here in your letter

21   that you set up your entire treatment program

22   based on your job with Ken Corbett Farms.  Tell me

23   about that.  Your whole treatment program, what is

24   that?

25       A.   Meaning my surgery and recovery time.

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

                                                    Page 96

1         Q.   So you set up your surgery and recovery

2    time, which would have been outside of growing

3    season based on your job with Ken Corbett Farms?

4         A.   Correct.

5         Q.   Okay.  Now, we might be skipping ahead a

6    little bit, but when were you diagnosed with

7    prostate cancer?

8         A.   The official?

9         Q.   Yes.

10        A.   Or the process?

11        Q.   Well, tell me about both.

12        A.   The diagnosis was a number of tests, so

13   I usually go in for my yearly physical in

14   September before I go to Georgia.  So it was some

15   negative tests that came back, ran two more tests

16   after I came back from Georgia, and the diagnosis

17   was confirmed sometime in February or March.  I'm

18   not exactly sure what the date was.

19        Q.   Okay.  So when you say September, you

20   mean September of 2016?

21        A.   Yes.

22        Q.   Okay.  And the diagnosis was -- there

23   were some tests that were run in between that time

24   in February of 2017?

25        A.   Correct.

Case 7:18-cv-00186-HL   Document 26-1   Filed 03/02/20   Page 99 of 259
Jeffrey Stepanovich                January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 97

1          Q.    And the diagnosis was confirmed in

2      February or March of 2017?

3          A.    Yes.

4          Q.    Okay.  And this was all when you were in

5      Florida?

6          A.    The testing, yes.

7          Q.    So your doctors are in Florida?

8          A.    Correct.

9          Q.    Okay.  Now, when you received that

10     diagnosis, was there a recommendation from the

11     doctor on when you should have the surgery done?

12         A.    Yes.

13         Q.    And what did the doctor recommend?

14         A.    He recommended that I do it in May.

15         Q.    Of 2017?

16         A.    Correct.

17         Q.    And you didn't follow that

18     recommendation; right?

19         A.    Correct.

20         Q.    And why is that?

21         A.    Because I had a job that I needed to --

22     I needed to work.

23         Q.    And you say here that your guess is that

24     Mr. Corbett said this to you because "not even a

25     week before his son Justin told me not to worry

Jeffrey Stepanovich                           January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 98

1       about my illness and if I needed time, my chair
2       would be there."  So tell us about that
3       conversation you had with Justin that you're
4       referring to here.
5            A.   It was always kind of an ongoing -- I
6       don't want to say joke, but banter that we knew we
7       had our jobs when we came back and our chairs were
8       at our desk.
9            Q.   So Justin knew that you were -- when you
10      were employed with Ken Corbett Farms, you told him
11      at some point that you had prostate cancer?
12           A.   I'm assuming I did, yes.  Or Eric told
13      him or --
14           Q.   Okay.  But you had a -- Justin told you
15      that, don't -- don't worry about your illness and
16      if you needed time, your chair would be there?
17           A.   I don't remember if he told me that
18      specifically or if he told Eric that.  I can't
19      remember, specifically.
20           Q.   Okay.  All right.  Let's go back just a
21      little bit to talk about the cancer.  And this
22      is -- prostate cancer is the disability that
23      you're -- that is the subject of this lawsuit;
24      right?
25           A.   Yes.

Page 99

1          Q.    Okay.  And the diagnosis was in about

2     February or March of 2017?

3          A.    Correct.

4          Q.    And you testified earlier that there was

5     a physical in September 2016; right?

6          A.    Correct.

7          Q.    And this was a normal physical that you

8     have every year?

9          A.    Yes.

10          Q.    And that there were some tests that came

11     back that indicated that you needed to have

12     further tests done for prostate cancer?

13          A.    Correct.

14          Q.    Okay.  Is this the first test that --

15     set of tests that came out this way for you

16     before?

17          A.    It was the first negative, yes.

18          Q.    And it was negative for what?  What does

19     that mean?

20          A.    The PSA.

21          Q.    PSA?

22          A.    My PSA was high.

23          Q.    And this was first time that that

24     happened in your medical history?

25          A.    Yes.

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

                                                    Page 100

1          Q.   Now, was there any -- I mean, did you

2     feel differently physically before you were

3     diagnosed with prostate cancer?

4          A.   No.

5          Q.   Were there any symptoms that you had

6     been experiencing prior to your diagnosis of

7     prostate cancer?

8          A.   No.

9          Q.   What about after your diagnosis?

10         A.   No.

11         Q.   Nothing physically different?

12         A.   No.

13         Q.   So it didn't affect your ability to do

14    your job at Ken Corbett Farms?

15         A.   No.

16         Q.   Now, since you were diagnosed, I know

17    you mentioned earlier that you had surgery.  When

18    was that surgery?

19         A.   I had moved it once I was fired.  I

20    moved it up per my doctor's wishes, and my wife's.

21         Q.   So what did you originally schedule the

22    date?  What was the original date?

23         A.   You have the date in the document.  What

24    was it?  July whatever, 20th or whatever that date

25    was.

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 101

1          Q.   Let me pull that up, actually.

2               MS. WASHINGTON:  I'm marking

3          this as -- are we on 4?  Defendant's

4          Exhibit 4.  And, Noah, this is the

5          plaintiff's responses to our

6          interrogatories.

7     BY MS. WASHINGTON:

8          Q.   Take a look at those and let me know

9     when you're done.

10              Do you recognize that document that

11    we're calling Plaintiff's Response to Defendant's

12    Interrogatories?

13              (Defendant's Exhibit No. 4 was marked

14         for identification.)

15         A.   Yes.

16         Q.   Okay.  And are these your responses to

17    the defendant's interrogatories?

18         A.   As I recall, yes.

19         Q.   Okay.  Now, let's look at question -- it

20    will be on page 5.  At the bottom you'll see 5,

21    and it's question number 7.  And this says,

22    "Identify all physical or psychiatric injuries,

23    conditions or illnesses from which you have

24    suffered since 2011, including identification of

25    the period of injury, condition or illness,

Page 102

1      treating health care providers, including name and

2      address and telephone number, and any prescription

3      medication for such injury, condition or illness."

4              And in your answer you state at the very

5      end of the response, "Plaintiff underwent surgery

6      for prostate cancer in June of 2017."

7              So you had the surgery in June of 2017.

8      A.    Okay.

9      Q.    Right?  Is that true?

10     A.    I would have to look at my calendar to

11     confirm that, but I would assume that's correct.

12     Q.    So you said that you pushed up the date

13     after you were terminated?

14     A.    Yes.

15     Q.    So what was the -- when did you

16     originally schedule it for?

17     A.    I'd have to look.  July 20th, I believe.

18     Q.    And you had it in June?

19     A.    Yes.

20     Q.    Now, did you have any -- were there any

21     doctor's appointments that you had when you

22     were -- when you underwent the test to determine

23     that you had prostate cancer, did you have any

24     doctor's appointments that you attended?

25     A.    When?

Jeffrey Stepanovich                                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 103

1          Q.   Before you were diagnosed, when you were

2     actually having the tests done.

3          A.   I'm not --

4          Q.   Did you -- okay.  Did you actually have

5     to visit the doctor's office or any other facility

6     to give samples for the test before you were

7     diagnosed with prostate cancer?

8          A.   There was a process once the first test

9     came back negative, yes.

10         Q.   And that process was to take tests?

11         A.   Correct.

12         Q.   Right.  And about how many of those were

13    there?

14         A.   There was, I believe, two more PSA --

15    one more PSA test, and then it came back high and

16    then I went in for a biopsy which is an invasive

17    procedure where they took biopsies that were then

18    sent to the lab.

19         Q.   Okay.

20         A.   Took them from -- the cancer was there.

21         Q.   So there were -- am I counting three

22    appointments?

23         A.   I would have to check my personal

24    calendar.  I would say at least three, yes.

25         Q.   Before the diagnosis?

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 104

1          A.    Before it was confirmed, yes.

2          Q.    And after your physical?

3          A.    Correct.

4          Q.    Okay.  And did you -- was there any

5     push-back from Mr. Corbett in going to these

6     appointments?

7          A.    There wouldn't have been because I

8     wasn't in Georgia at the time.

9          Q.    When did you come back to Georgia, what

10    date?

11         A.    I could look at my calendar, but

12    generally I'd come up for most of the month of

13    October and November.

14         Q.    So you came -- so in 2016, you were in

15    Georgia in October and November.  And when did you

16    come back in 2017?

17         A.    I did not.

18         Q.    Oh, so you didn't come back to Georgia

19    at all in 2017?

20         A.    No.  He released me before I was -- I

21    was getting ready to come back up.  We had started

22    production in squash, so ...

23         Q.    Now, what was your recovery time for

24    your surgery?

25         A.    A little over six weeks.

Page 105

1          Q.    And was there -- and we'll talk about

2     this in more detail later but was -- when you were

3     terminated from Ken Corbett Farms, what was the

4     first -- well, did you start searching for a job

5     immediately?

6          A.    I'm sure I started having conversations

7     with people, yes, letting them know I was

8     available.

9          Q.    And when did you start the first job

10    after you left Ken Corbett Farms?

11         A.    That was with Windsor Distributing, and

12    I don't know the exact date.  I think it was --

13         Q.    Go ahead.  I'm sorry.

14         A.    I just don't remember the exact day,

15    so ...

16         Q.    Was it after your recovery from surgery?

17         A.    Yes.

18         Q.    And you drew Unemployment at some point

19    during 2017; right?

20         A.    Right.

21         Q.    And was that after your recovery period?

22         A.    I would have to look at the dates.

23         Q.    I think we -- one second.

24               Take a look at the Exhibit 4, your

25    interrogatory responses, and at the bottom it says

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 106

1      page 3.

2            A.    Okay.

3            Q.    And there's just one response on this

4      page, so let me direct your attention to 2017

5      Unemployment income from 7/24 to 9/28, State of

6      Georgia.

7            A.    Okay.

8            Q.    So is it accurate to say that you

9      received Unemployment for the period starting

10     July 24 to September 28?

11           A.    Yes.

12           Q.    Okay.  And did you -- you testified

13     earlier that you don't recall exactly when you

14     went back to work for Windsor, but it was after

15     September 28th; right?

16           A.    Yeah, I believe it was the first part of

17     October.

18           Q.    Okay.  I'm going to switch gears again a

19     little bit to talk about the rest of your letter.

20     So let's go back to Exhibit 2, and this is the one

21     with the page numbers in the top right-hand

22     corner, the one we've been talking about the most.

23     Okay.  We're going to talk about your exhibits, so

24     we'll keep this one and then also go to -- okay.

25     Let's go to page 13 and it says Exhibit A on the

Page 107

1    front.

2            Now, Exhibit A and then the page that

3    comes after, Exhibit B, and the page that comes

4    after that, Exhibit C and then Exhibit D on page

5    19, those were all attachments to the letter we

6    were reading earlier; right?

7        A.   Yes.

8        Q.   And it starts at page 22 of Exhibit B;

9    right?  Right?

10       A.   Let me get the page righty.

11       Q.   22.

12               MS. WASHINGTON:  And if y'all

13           want to, I know, Ken, you said you

14           want to take a break.  I'm going to

15           give Mr. Stepanovich some time to

16           look through and familiarize himself

17           with these documents.  So if y'all

18           want to -- this is probably a good

19           time to take a break.

20               THE WITNESS:  Okay.

21   BY MS. WASHINGTON:

22       Q.   But before we go, Mr. Stepanovich, if

23   you could just answer the question I just asked.

24   Are these exhibits, were they attached to the

25   letter that we referenced on page 22?

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

                                                    Page 108

1           A.    I believe so, yes.

2           Q.    Okay.  If you could -- we'll take a

3     short break and give you some time to look over

4     these exhibits.  They start on page 13 and end on

5     page 21 and then we could come back in -- do you

6     need maybe 15, 20 minutes?

7           A.    I would rather not.  I'd rather

8     continue.

9                 MR. VOYLES:  Take a 5-minute

10          break?

11                MS. WASHINGTON:  Yeah, let's

12          do five minutes, then.

13             (Recessed, 10:43 a.m.)

14             (Reconvened, 10:56 a.m.)

15    BY MS. WASHINGTON:

16          Q.    We're back on the record.  Thank you.

17                Okay.  Mr. Stepanovich, have you taken a

18    look at Exhibits -- the pages 13 to 21 in Exhibit

19    B?

20          A.    Yes, ma'am.

21          Q.    And did you create these documents?

22          A.    Yes.  Not all of them.

23          Q.    Okay.  Which one did you create?

24          A.    I did not create Exhibit D, page 19.

25          Q.    Do you know who created that one?

Page 109

```
 1         A.   I assume it was either Mr. or
 2    Mrs. Corbett.
 3         Q.   And let's -- I guess we can start with
 4    that one.  So what is that document?
 5         A.   That is what we get shown for our yearly
 6    compensation.
 7         Q.   Okay.  So that's on page 19.  Is that
 8    yearly compensation for 2017?
 9         A.   It looks like '16, '17.
10         Q.   Okay.  So growing -- here, where it says
11    growing year 2016, but the date is April 26, 2017.
12    Was that the date you received it?
13         A.   I'm not sure which date I received it.
14         Q.   Do you know what that date April 26th,
15    2017 refers to?
16         A.   I assume the date that she did the
17    document or whoever did the document.
18         Q.   Do you remember the date you received
19    it?
20         A.   No, ma'am, I don't.
21         Q.   So this "spring 1 percent of net
22    collected."  What does that mean?
23         A.   That was the amount owed me for 1
24    percent of the -- that was my sales commission for
25    the spring product.
```

Jeffrey Stepanovich                              January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 110

1        Q.    Spring of 2016, right?

2        A.    I'm guessing, yes.

3        Q.    And what about the spring broker

4    product, 50 percent of net collected, what does

5    that refer to?

6        A.    Product we buy outside of what the farm

7    raised.  Product we would literally go buy and

8    then resell.

9        Q.    Okay.  And the product that you buy and

10   resell, do you sell that at a higher amount than

11   what you bought it for?

12       A.    Usually 50 cents to a dollar more

13   depending on what we can do.

14       Q.    So that's called a brokered product?

15       A.    Correct.

16       Q.    And how much do you get paid on brokered

17   product?

18       A.    We get 50 percent of whatever the profit

19   is.

20       Q.    Okay.  Fifty percent of the profit.  And

21   "fall, 1 percent of net collected," is that from

22   the fall -- your portion of the profit from the

23   fall 2016 season?

24       A.    Where -- the fall brokerage?

25       Q.    The fall --

Page 111

1           A.   The fall --

2           Q.   One percent.  Yes.

3           A.   One percent, yes.

4           Q.   Okay.  Tell me -- can you explain what

5      that is, again?

6           A.   It's just the commission paid on

7      products sold for that season.

8           Q.   And fall brokered product, is that the

9      same as spring brokered product, but for the fall

10     2016?

11          A.   Yes.

12          Q.   Okay.  And the total would be all these

13     numbers added together?

14          A.   Correct.

15          Q.   So for 2016 salary paid, your salary was

16     $162,500?

17          A.   My commission.

18          Q.   Commission.  Not salary.  But it says

19     salary here, right?

20          A.   Correct.

21          Q.   But it was commission?

22          A.   Correct.

23          Q.   In 2017 the $7,000, what does that refer

24     to?

25          A.   I'm guessing that was what was carried

Jeffrey Stepanovich                                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 112

1     over, but we just weren't paid until '17.  I can't

2     answer that, specifically.

3          Q.   Okay.  So you say here -- I'm just

4     looking at page 28 of the Exhibit 2.  "We were

5     never given" -- I'm sorry.  I'll let you get

6     there.  Tell me when you're there.

7                    MS. WASHINGTON:  Oh, Noah, are

8          you on?

9                    MR. STORCH:  I've been on.

10                    MS. WASHINGTON:  Oh, I'm

11          sorry.  I should have checked

12          earlier.

13    BY MS. WASHINGTON:

14         Q.   Page 28, "We were to accept this and not

15    question anything or she would get very upset."

16    I'm sorry.  Withdraw that question.

17              "We were never given any detail or

18    backup as to how or what we were compensated on."

19    So there was no detail besides this statement?

20         A.   Correct.

21         Q.   But you input your own numbers into

22    Famous, right?

23         A.   For most sales companies that I have

24    worked for in produce, at the end of each month or

25    quarter everything you've done, you're given an

Jeffrey Stepanovich                                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 113

1     itemized statement so you can review it and

2     approve it before you're paid on anything.  We

3     were never given detailed information on anything.

4          Q.   Okay.  But you received this -- you

5     received a statement?

6          A.   We received this, yes.

7          Q.   How often did you receive this?

8          A.   I think once a year.

9          Q.   Was it normally in April?

10         A.   No.

11         Q.   Or was that only because you were

12    terminated?

13         A.   It's because I was terminated I'm sure.

14         Q.   Okay.  All right.  Let's go back to

15    Exhibit A which would be page 13 of that exhibit,

16    Exhibit 2.

17              Just to clarify for the record, this is

18    page -- this is actually in Defendant's Exhibit 2

19    but it states Exhibit A.  That's the title at the

20    top of this page 13.  So let's look at Exhibit A

21    on page 13.  So you say here in your -- and I'm

22    referring to two different things because it's

23    your comments in your letter that are referring to

24    your exhibits to the letter.

25              So look at page 27.  Two things at the

Page 114

1    same time.  Page 27 and then page 13 at the same

2    time.  All right.  So tell us about Exhibit A.

3    What are we looking at here in Exhibit A?

4         A.   Exhibit A was just some yearly totals on

5    dollar amounts.

6         Q.   For all three salesmen, right?

7         A.   Correct.

8         Q.   Okay.  And when did you generate this

9    report?

10        A.   I assume sometime after season 2016

11   since that's the last that was listed.

12        Q.   Okay.  So you were able to pull up data

13   from 2011 and 2016 when you ran this report;

14   right?

15        A.   Correct.

16        Q.   Okay.  And why did you run this report?

17        A.   It's just something I --

18             MR. STORCH:  To the extent --

19        to the extent it calls for anything

20        discussed between counsel, that he

21        can't answer.

22             MS. WASHINGTON:  Right.  And

23        he would have ran this while he was

24        still employed with Ken Corbett

25        Farms, so ...

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 115

1             MR. STORCH:  Understood.  I

2         just wanted to make sure that

3         anything that was discussed about it

4         or about a reason with me or my firm

5         is not discussed.  That's all.  I'm

6         well aware of that.

7    BY MS. WASHINGTON:

8         Q.   Yeah, I'm not asking for you to reveal

9    anything you discussed with them.  Only at the

10   time when you ran this report, why you ran it.

11        A.   Just as a reference point for the three

12   of us in the office.

13        Q.   Did you -- what -- a reference point for

14   what?

15        A.   Just so we kind of knew where we all

16   stood.

17        Q.   Did you share the document with the

18   other two salesmen?

19        A.   Yes.

20        Q.   Did you have a conversation with them

21   about it?

22        A.   I'm sure we did.

23        Q.   Do you recall what you discussed?

24        A.   Not in specific, no.

25        Q.   Now, this -- for example, for the year

Page 116

1      2011 we have Eric and there's the number 193,508?

2           A.    Uh-huh.

3           Q.    And then -- what does that refer to?

4           A.    I'm going to assume it was packages.

5           Q.    Packages sold?

6           A.    Correct.

7           Q.    What is a package?

8           A.    A box of product.

9           Q.    So it contained more than one -- for

10     example, pepper, it would be more than one pepper?

11          A.    Correct.

12          Q.    How many peppers would it be?

13          A.    Depending on what type of pepper and

14     what size it was.  If it was an extra large

15     pepper, there would be 50 to 55 in a box.  If it

16     was jumbo, there would generally be 30 to 40 in a

17     box.  So it was just a package.

18          Q.    Okay.  So this 21 percent, what does

19     that refer to next to this number that we just

20     discussed?

21          A.    It was in reference to 21 percent of the

22     packages sold.

23          Q.    So the packages sold total between

24     everybody, so between 100 percent?

25          A.    Roughly.  I mean, these were just rough

Jeffrey Stepanovich                                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 117

1    numbers.  This wasn't anything used for anything

2    other than for us to look at.

3         Q.   So this 21 percent refers to -- I don't

4    understand what the percentage was relative --

5    what it was based on.

6         A.   The 929,441 packages sold on the far

7    right.

8         Q.   Okay.  So these are total packages sold

9    by him?  I mean by -- by the three of you?

10        A.   By the three of us.

11        Q.   Oh, okay.  So the total packages sold by

12   the three of you for 2011 were 929,441?

13        A.   Roughly.  It would adjust a little bit

14   if some things change, but roughly, yes.

15        Q.   So in this case you sold 44 percent of

16   those 929,441 packages in 2011?

17        A.   Correct.

18        Q.   And Jed sold 329,877 packages or 36

19   percent of those total packages?

20        A.   That's correct.

21        Q.   Okay.  Now, it says "total US."  Does

22   that mean that you sold in the country?

23        A.   No, that was just total us.  There was

24   additional packages that could be sold for cash or

25   something else so that was just as the report came

Page 118

1    up as I remember for the three of us.

2          Q.   So the difference -- it looks like

3    there's a slight difference between the total US

4    packages and the total -- total US and then the

5    total packages.

6          A.   Actually "total us" meaning the three of

7    us.  Not US.

8          Q.   Oh, this has nothing to do with United

9    States.  Okay.  So where do these other packages

10   come from in the total packages category?

11         A.   I guess they could have just been in as

12   cash or they could have been in as samples or they

13   could have been in as some other items, so ...

14         Q.   Were they not calculated for purposes of

15   that percentage?

16         A.   It didn't matter.  It wasn't enough of

17   them.  It was just a number.

18         Q.   Okay.  So I see below Eric's name for

19   2011 there's $2,336,925 and under "total us" it's

20   $10,802,696.  So isn't that the same -- those are

21   the same calculations, but for the actual money

22   that you brought in?

23         A.   Correct.

24         Q.   So the percentages, for example, for

25   Eric of 22 percent, he brought in 22 percent of

Page 119

1    your total sales?

2         A.   Of revenue, yeah.

3         Q.   Of revenue.  In 2011.

4         A.   Again, these are rough numbers.  That's

5    all they were.

6         Q.   And what do you mean by rough numbers?

7         A.   I mean, I just ran a quick report based

8    on salesman and product.  I'm sure that's what I

9    ran.  So I didn't verify anything, I didn't see if

10   anything changed later.  These were just numbers

11   on the day I ran them.

12        Q.   Okay.  So it was subject to -- those

13   numbers were subject to being changed at a later

14   date?

15        A.   They probably weren't going to change

16   much, but they could be, yes.

17        Q.   And what would that change be based on

18   if it was?

19        A.   If there was an adjustment on an order

20   or if something was moved -- I don't know.  They

21   could just change on occasion.  I could run a

22   report one day and it could be a little different

23   the next day.  I didn't deal with the accounting

24   side, so I can't answer that, specifically.

25        Q.   All right.  Let's look at -- oh, you've

Jeffrey Stepanovich                                     January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 120

1    made a statement, so let's look at page 27 in the

2    last sentence under the heading Exhibit A.  "Jed

3    moved a lot of product to New York in 2016 which

4    was above average or normal."  What does that

5    mean?

6         A.   Well, just based on his numbers, as you

7    can see, New York was mainly one customer which

8    was Jetro, which was -- they just pulled a lot --

9    they bought a lot of product which was above

10   normal for that year.  That's why his number had

11   increased so much.

12        Q.   Now, has -- have you ever sold product

13   to Jetro?

14        A.   No, I didn't sell to Jetro.

15        Q.   Okay.  Was Jetro a customer that you

16   could have acquired?

17        A.   We sold Jetro at Florida Specialties.

18   Yes.

19        Q.   But you never sold for them at Ken

20   Corbett?

21        A.   I didn't sell them because Jed had a

22   better relationship with Jetro, so he sold them.

23        Q.   Let's move on to Exhibit B which would

24   be page 15 -- no.  Sorry.  Page 14.

25        A.   14?

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 121

1      Q.   Yes.  And can you explain to us what
2   this -- what these numbers show in Exhibit B?  And
3   I'll -- let me withdraw that question.  For
4   Exhibit B, did you run this report on the same day
5   that you ran the one that we've discussed in
6   Exhibit A?
7      A.   Probably not.
8      Q.   Do you remember when you ran the report?
9      A.   No, I do not.
10      Q.   Is it safe to say that it was before
11   2016 because the last dates we see here are 2014?
12      A.   It had to be.
13      Q.   Okay.  So for spring of 2011 here,
14   packages, so this number is the same type of
15   number that we saw in the previous report?
16      A.   Without remembering what I put in these
17   numbers, no.
18      Q.   Okay.  Well, what does it -- tell me
19   what it represents, Exhibit B.
20      A.   All it represented was whenever this was
21   done, package count, again under packages, average
22   dollars sold, meaning all of the packages divided
23   by the revenue that was created for those
24   packages, and then the percentages.
25      Q.   Okay.  So, for example, for spring 2011,

Jeffrey Stepanovich                           January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

                                                    Page 122

1      for Eric, he sold 103,003 packages, right?

2            A.    Correct.

3            Q.    So this average dollar amount, this was

4      the average amount that his packages sold for?

5            A.    $10.89.

6            Q.    Okay.

7            A.    Yeah.

8            Q.    So these -- will this package number be

9      divided by this average number to come up with the

10     sales number?

11           A.    The package number should be divided

12     into the sales number, yeah, to come up with the

13     average.  Without going through and checking it,

14     yeah, I believe that was how it was done.  And,

15     again, these were just for a point of reference

16     for the three of us in the office.  This was all

17     this was for.

18           Q.    Did you, Jed, and Eric, have regular

19     meetings amongst -- have meetings amongst

20     yourselves regularly?

21           A.    Yes.

22           Q.    Okay.  In person?

23           A.    Yes.

24           Q.    And did you generate these reports for

25     use at your meetings?

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 123

1          A.    They were for us to discuss, yes.

2          Q.    Did they ever generate reports for use

3      at the meeting?

4          A.    Not that I know of.

5          Q.    You only recall you doing it?

6          A.    That's why I had these, yes.  They may

7      have had some, and I may not have seen them or

8      have them.

9          Q.    Okay.  Well, let's move on to the

10     Exhibit C, page 16.  Actually, let's go back to

11     Exhibit B, again.  I have a question about

12     something you said in your letter.  And take a

13     look at page 27 at the same time.  So on page 17

14     there's a headline Exhibit B, pages 1 and 2, the

15     last sentence is, "I sold a lot of the lower-grade

16     products as I had those contacts to do when we had

17     lower quality product to sell."  What does that

18     mean?

19         A.    Generally, in reference to an item like

20     bell pepper, if there was a lot of choice pepper

21     which was less than number one retail pepper.  So

22     if number one retail pepper was $16 a box, choice

23     would roughly be $12 a box.  So I've sold a lot

24     more of the off-grade product.

25         Q.    And why did you sell a lot of the

Page 124

1      off-grade product?

2          A.   That was part of my customer base and

3      the other two didn't have that part of their

4      customer base as much, so ...

5          Q.   So the customers that purchased the

6      lower-grade product, you had more of those

7      customers than Jed or Eric?

8          A.   Based on the numbers, yes.

9          Q.   What do you mean "based on the numbers"?

10         A.   Well, based on the percentage of the

11     average box cost, yes.  Without any detail, I'm

12     just making assumptions based on what the numbers

13     are.

14         Q.   So based on the numbers that you

15     generated here in these reports, you're making

16     assumptions based on that?

17         A.   Part of it is an assumption because

18     there's nothing specific about what type product

19     it was, any of those things.  That's correct.

20         Q.   So all we have here are the average

21     prices and how much you sold?

22         A.   Correct.  On all of the packages.  It

23     wasn't run just on jumbos, it wasn't run just on

24     choice.  It was on everything.  And, again, these

25     were just for our discussions.  That's all these

Page 125

1    were generated for.

2         Q.   Okay.  All right.  Now we can move to

3    Exhibit C.

4              (Defendant's Exhibit No. C was marked

5              for identification.).

6    BY MS. WASHINGTON:

7         Q.   Was this report -- do you remember when

8    you generated this report?

9         A.   No, I do not.

10        Q.   And what does this report show?

11        A.   All that shows is the top, our top

12   customers of -- that the three of us sold and the

13   dollar amounts that were generated by each one for

14   each year.

15        Q.   So you have -- well, there's a number.

16   So, for example, let's look at from 2011, there's

17   a handwritten number 5 here.  Did you write that?

18        A.   I believe I did.

19        Q.   And there's -- it looks like some of

20   these names are highlighted.

21        A.   Yes, they are.

22        Q.   Like Fresh Start, Windsor, Custom Pack,

23   Tavilla and Marano.  Did you do that?

24        A.   Yes.

25        Q.   Okay.  Why did you -- what does this 5

Page 126

1    refer to?

2         A.   That I sold five of the top customers in

3    the company.  That was just my reference point.

4         Q.   And are these -- do these highlighted

5    customers, does that refer -- the 5 refer to that?

6         A.   That refers to my -- yes, the five that

7    I sold.

8         Q.   And when you say "top customers," what

9    does that mean?

10        A.   Revenue-generating customers.

11        Q.   What does "top" mean?

12        A.   Meaning, for example, under Exhibit C,

13   page 2 of 3, page 17, 2013 Pero (phonetic) did

14   $1,711,147.85.  They bought more product than

15   anybody else that year.

16        Q.   Okay.

17        A.   So they were the number one customer for

18   the year.

19        Q.   Do you remember what the price per

20   package was for those?

21        A.   No.  That's not what this was run for.

22   This was just to show who the top customers were.

23        Q.   Okay.  And Pero, is Pero your -- is that

24   highlighted?  Is Pero your customer in 2013?

25        A.   No.  That's Eric's customer.

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 127

1          Q.    But for 2013, Custom Pack was your

2     customer?

3          A.    Yes.

4          Q.    Fresh Start?

5          A.    Yes.

6          Q.    Windsor?

7          A.    Yes.

8          Q.    Tavilla?

9          A.    Tavilla.

10         Q.    And Marano?

11         A.    And Marano.

12         Q.    So that's five.  Okay.  So this list --

13    I mean, the lists -- so let's look at 2013.  The

14    104 customers, so there are more -- this is only a

15    short list of all of the customers?

16         A.    It's just the top customers.  Yes.

17         Q.    Top, okay.

18         A.    It's the top 10 customers.

19         Q.    Okay.  And were any of these customers

20    that you've highlighted here, so for 2013 Custom

21    Pack, Fresh Start, Windsor, Tavilla and Marano,

22    are any of those brokered customers?

23         A.    When you say brokered, referencing what?

24         Q.    That you would buy and sell those

25    products -- that you would buy those products for

Page 128

1    them and sell them?

2           A.    No.   For the most part these were all

3    customers that bought product from Ken Corbett

4    Farms.   Grown product, not brokered product.

5           Q.    And when you say for the most part, what

6    does that mean?

7           A.    That the majority of the product we sold

8    was farm grown products, not brokered product.

9           Q.    So is there any of these highlighted

10   customers here that was -- that were only broker

11   relationships?

12          A.    Without having the detail, I would

13   assume no.

14          Q.    Okay.   And, actually, let's talk more

15   about that broker relation -- those broker

16   relationships.   Explain to me what this broker --

17   if you were a broker for a particular product,

18   what happened there?

19          A.    I'm not sure what you're asking me.

20          Q.    So if you were -- you referred in your

21   letter here about brokered product and how Kim

22   Corbett didn't discourage those types of

23   relationships.   What does that mean?   What is a

24   brokered product relationship?

25          A.    If we were to go out and buy product

Page 129

1      from another farm and resell it.

2              Q.    So that was discouraged by Kim Corbett?

3              A.    Back then it was, yes.

4              Q.    Do you know why she dis -- why it was

5      discouraged?

6              A.    No, ma'am.

7              Q.    So she never told you?

8              A.    Nope.

9              Q.    And you said that that's not the case

10     now?

11             A.    No.

12             Q.    Okay.   What has changed?

13             A.    I assume their philosophy on how they

14     wanted to run their business.

15             Q.    So they're encouraging broker products

16     now?

17             A.    Yes.

18             Q.    How do you know that?

19             A.    Because of the business that they're

20     doing now versus the business we were doing then.

21             Q.    So you have personal experience of what

22     they're doing as part of their business since you

23     left?

24             A.    Yeah.   There's no secrets in the produce

25     business.

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 130

1       Q.   Were you able to generate the majority

2    of your sales from selling broker product?

3       A.   No.

4       Q.   Hold on one second.  We're going to

5    shift gears now to talk about your employment

6    after you left Ken Corbett Farms.  You testified

7    earlier that you had surgery in 20 -- excuse me.

8    In June -- withdraw that question.

9            You testified earlier that you had

10   surgery for your cancer in June of 2017; right?

11      A.   I believe so, yes.

12      Q.   And you started working for Windsor

13   sometime around October of 2017?

14      A.   Yes.

15      Q.   Now, let's look at your interrogatory

16   responses and that's Exhibit 4, I believe.  Yes,

17   Defendant's Exhibit 4.  And go to page 3, bottom

18   of page 3.  All right.  Sorry about that.

19           So in your interrogatories in Exhibit 4,

20   let's go down to 2017 Unemployment income from

21   July 24 to September 28, State of Georgia.  The

22   amount is $4,220; right?

23      A.   Yes.

24      Q.   Okay.  Let me mark as Exhibit -- I'm

25   going to mark this as Exhibit 11, our return here.

Page 131

1              MS. WASHINGTON:  Noah, we're

2         looking at the tax return, Mr.

3         Stepanovich's tax return from 2017.

4              MR. STORCH:  Are you going to

5         mark them all individually or are you

6         just going to do it as a composite?

7              MS. WASHINGTON:  We can --

8              MR. STORCH:  I don't care.  I

9         mean, I was --

10             MS. WASHINGTON:  Well, I

11        wasn't going to introduce all of

12        them.  There's only a couple of them

13        that I had questions about, so

14        let's -- we'll just do them one at a

15        time.

16   BY MS. WASHINGTON:

17        Q.   So this is Exhibit 11.  And take a look

18   at that and let me know if you can recognize it.

19        A.   Okay.

20             (Defendant's Exhibit No. 11 was marked

21             for identification.)

22   BY MS. WASHINGTON:

23        Q.   All right.  Can you take a look at

24   page -- well, these are not numbered but just look

25   at the second page of your 2017 tax return.

Jeffrey Stepanovich                                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 132

1           A.    Okay.

2           Q.    And just to make sure we have the same

3      thing, does it say 1040 US Individual Income Tax

4      Return 2017?

5           A.    Yes.

6           Q.    Okay.   Look at line 19.   What numbers

7      does that say?   What number does that say?

8           A.    Line 19?

9           Q.    Yes.

10          A.    4,620.

11          Q.    Okay.   So your interrogatory -- so is it

12     $4,620 that you received in Unemployment or

13     $4,220?

14          A.    I don't know.   I'd have to go back and

15     pull the data and see.

16          Q.    What do you see on your tax return here?

17          A.    4,620.

18          Q.    Okay.   So is this more reliable than

19     what you listed in your interrogatories?

20          A.    The interrogatory, I can't answer.   It

21     could be a typo.   I don't know.

22          Q.    Okay.

23          A.    I would assume my accountants have it

24     correct.

25          Q.    And that's in your tax return; right?

Page 133

1          A.   Yes, ma'am.

2          Q.   Perfect.

3               And what -- I'm sorry.  When I asked you

4     if you recognize this document, but what is the

5     document that you just looked at, Exhibit 11?

6          A.   Exhibit 11?

7          Q.   Yes.

8          A.   The first page is a W2.

9          Q.   Okay.

10         A.   The second page is the first -- is my --

11    two pages of my tax returns, page 2 and 3.

12         Q.   Okay.  Thank you.  And you produced this

13    to us as a part of your response to our request

14    for production of documents?

15         A.   I believe so.

16         Q.   Thank you.  Okay.  So tell us about how

17    you came to be employed at Windsor Distributing in

18    2017.

19         A.   John offered me the job, I took the job.

20         Q.   What's John's last name?

21         A.   John Karalekus.

22         Q.   How do you spell that?  C or K?

23         A.   K.

24         Q.   What else?

25         A.   K-A-R-A-L-E-K-U-S, I believe.

Jeffrey Stepanovich                                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 134

1          Q.    And how long did you work there?

2          A.    I'd have to confirm the dates.

3          Q.    Do you still work there?

4          A.    No.

5          Q.    Okay.  Would you have received a W2 only

6     this time period that you worked there?

7          A.    Yes.

8          Q.    Okay.  We'll go through that, then.

9     Anybody else you worked for besides Windsor since

10    you left Ken Corbett?

11         A.    No, ma'am, I don't believe so.  Other

12    than Florida Specialties.

13         Q.    How long have you been at Florida

14    Specialties?

15         A.    I went back there -- I think in April or

16    May it will be two years.

17         Q.    So April or May of 2018?

18         A.    I believe so.

19         Q.    So it was about a year after you left

20    Ken Corbett.  Okay.

21               And let's go through your compensation

22    from 2011 until now, and I'll probably introduce

23    some of these tax returns and we'll look at your

24    interrogatory as well.  So for 2011 your

25    interrogatory says that you made $128,775 at

Page 135

```
 1    Ken -- with Ken Corbett?

 2         A.   Yes, ma'am.

 3         Q.   And then Growers Direct, $38,250?

 4         A.   Yes, ma'am.

 5         Q.   So was this a job -- Grower Direct was a

 6    job that you had during the off season from Ken

 7    Corbett?

 8         A.   During the winter, yes, ma'am.

 9         Q.   Okay.  And did your -- since 2011 has

10    your wife ever had a W2 -- I saw that you were

11    married filing jointly; right?

12         A.   Yes.

13         Q.   Okay.  Did your wife ever have a W2, any

14    income that she -- let me withdraw that.

15              Did your wife ever contribute any income

16    that was taken into account in your taxes?

17         A.   She owns a small business.

18         Q.   But there was no W2 that she would have

19    had considered in taxes?

20         A.   I don't believe so.

21         Q.   Okay.  So for 2012, your interrogatories

22    say that through Ken Corbett Farms you made

23    $153,369.52; right?

24         A.   Okay.

25         Q.   And I'm going to hand you what I've
```

Jeffrey Stepanovich                                January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 136

1    marked as Defendant's Exhibit 6.

2                    MS. WASHINGTON:   This is

3            Mr. Stepanovich's 2012 tax return.

4            (Defendant's Exhibit No. 6 was marked

5            for identification.)

6    BY MS. WASHINGTON:

7        Q.   All right.  Do you recognize this

8    document, Mr. Stepanovich?

9        A.   Yes.

10       Q.   And what is it?

11       A.   It's my W2s from Ken Corbett and Growers

12   Direct.

13       Q.   What about the other two pages?

14       A.   As well as my tax return for 2012.

15       Q.   Thank you.  And did you produce this

16   document in response to our document request?

17       A.   Yes.

18       Q.   Thank you.  So let's take a look at the

19   W2 on the first page for Ken Corbett.

20       A.   Okay.

21       Q.   What number do you see there in the --

22   in box number one, wages, tips and other

23   compensation?

24       A.   153,769.52.

25       Q.   Okay.  Is that different from what your

Page 137

1     interrogatories say?

2          A.   Yes, it is.

3          Q.   Which one is accurate?

4          A.   I would assume my tax return.

5          Q.   Okay.  Thank you.

6               Now, your other two here is -- your

7     other W2 here in Exhibit 6 is from Growers Direct?

8          A.   Yes, ma'am.

9          Q.   And you were employed with Growers

10    Direct during the off season from Ken Corbett

11    Farms?

12         A.   During the winter season.

13         Q.   The winter season.  Okay.  Let's move on

14    to your compensation in 2014 -- excuse me.  2013.

15    For 2013, your pay from Ken Corbett Farms was

16    143,000 and there's the numbers 1560441.

17         A.   Okay.

18         Q.   What -- there has to be numbers --

19    there's an extra number here, right?

20         A.   It looks like it.

21         Q.   Okay.  Let's look at the 2013 tax

22    return.

23               MS. WASHINGTON:  I am marking

24          this as Exhibit 7, Defendant's

25          Exhibit 7.  And this is Mr.

Page 138

1          Stepanovich's 2013 tax return.

2                    THE WITNESS:  Okay.

3                    MS. WASHINGTON:  Exhibit 7.

4               (Defendant's Exhibit No. 7 was marked

5               for identification.)

6     BY MS. WASHINGTON:

7          Q.   And, Mr. Stepanovich, let me know if you

8     had a chance to look at that.

9          A.   I have.

10         Q.   You recognize it?

11         A.   Yes, I do.

12         Q.   What is it?

13         A.   My W2s from Ken Corbett Farms and

14    Growers Direct for 2013 and my tax return for

15    2013.

16         Q.   Thank you.  And did you produce this in

17    response to our document production request?

18         A.   Yes.

19         Q.   Thank you.  So for 2013 what does --

20    what does it say in box 1 for Ken Corbett's W2?

21         A.   143,150.41.  So, obviously, there's a

22    typo.

23         Q.   So that 6 shouldn't be there it looks

24    like, right?

25         A.   I would assume so.  Correct.

Page 139

1      Q.   And Growers Direct, you were paid

2    $33,340 for the winter season, right?

3      A.   Correct.

4      Q.   Okay.  So let's move on to 2000 -- okay.

5    The next line it says 2104 but that's 2014, right?

6      A.   I would assume so.

7      Q.   Okay.  KCF gross and the amount was

8    $154,269.97?

9      A.   Okay.

10     Q.   So Enterprise -- okay.  Let me give you

11   your set of exhibits.

12              MS. WASHINGTON:  I'm marking

13          this as Defendant's Exhibit 8 and

14          this is Mr. Stepanovich's 2014 tax

15          return.  Exhibit 8.

16          (Defendant's Exhibit No. 8 was marked

17           for identification.)

18   BY MS. WASHINGTON:

19     Q.   And let me know when you've had a chance

20   to look at it.

21     A.   Okay.

22     Q.   Do you recognize that document?

23     A.   Yes, ma'am.

24     Q.   What is it?

25     A.   W2 from Ken Corbett 2014 and Enterprise

Page 140

1    HR for 2014.

2          Q.    And what about the other two pages?

3          A.    Tax returns for 2014.

4          Q.    And you produced these in response to

5    our document production request?

6          A.    Yes, ma'am.

7          Q.    Thank you.  So your interrogatories

8    state that there was Unemployment compensation for

9    38 -- excuse me.  $3,850, right?

10         A.    Okay.

11         Q.    And why did you file for Unemployment

12   that year?

13         A.    During the off season, the winter

14   season, Growers Direct was no longer bringing in

15   product from Mexico so I filed Unemployment

16   against Growers Direct in the off season.  I

17   believe that's what it was.

18         Q.    Okay.  So you -- so you can -- you were

19   drawing Unemployment.  Did you have to state that

20   you weren't -- that you had no job during --

21         A.    I assume so.  And state that I had been

22   hopefully looking for employment, as well, I'm

23   assuming.  I met all of the standards for

24   Unemployment.

25         Q.    Okay.  So were you -- but you were still

Page 141

1    employed by Ken Corbett Farms; is that right?

2        A.   I was still seasonally employed by Ken

3    Corbett, yes.

4        Q.   So explain to me what "seasonally

5    employed" means.

6        A.   In the spring and the fall.

7        Q.   So you were not an employee during those

8    other seasons?

9        A.   No, ma'am.

10       Q.   So you were rehired every season?

11       A.   I never did paperwork that I remember,

12   no, ma'am.  I just -- you know, it was a seasonal

13   job, so ...

14       Q.   So when you were -- you attended a

15   convention in March of 2017; right?

16       A.   I believe so.

17       Q.   And were you employed with Ken Corbett

18   Farms at that time?

19       A.   I was assuming I was coming back for my

20   spring employment, yes.  Was I getting a paycheck?

21   No.

22       Q.   You didn't sell -- you didn't make any

23   sales in 2017?

24       A.   When we started back with squash, yes.

25       Q.   And when did you start back with squash?

Page 142

1          A.   I don't know the exact dates.  It was

2     sometime I think the first part of April.

3          Q.   Okay.  And you made a sale?

4          A.   I can't recall.  I made, I would think,

5     at least one or two sales, yes.

6          Q.   Got it.  So back to 2014, Enterprise --

7     I don't see Enterprise HR -- Enterprise HR2 listed

8     in your interrogatories here.

9          A.   Well, I'm assuming -- I don't know.  I

10    don't recall what that is, so I don't know.

11         Q.   This is a W2 from them, right, for 2014?

12         A.   It is.

13         Q.   So -- and that was included in your

14    wages, salaries and tips in your tax return;

15    right?

16         A.   Okay.

17         Q.   But it wasn't -- but you didn't include

18    it here in your interrogatories?

19         A.   I don't -- I don't know why.  I can't

20    answer that.

21         Q.   Okay.  Who is Enterprise 2HR?  What is

22    that?

23         A.   I don't know.  I honestly don't know.  I

24    mean, I would have to go back in my records and

25    look.

Jeffrey Stepanovich                     January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

                                                    Page 143

1          Q.    Okay.  We'll talk -- it looks like that

2     name comes up again in 2000 --

3          A.    So if it was part of Big Red, then that

4     may have been who they did their payroll through.

5          Q.    Okay.  So you -- so, yeah, next in 2015

6     it says Enterprise HR, Big Red.

7          A.    Okay.

8          Q.    So Big Red is Enterprise 2?

9          A.    It must be, yeah.

10         Q.    Okay.

11         A.    That must be their payroll group.

12         Q.    Okay.  All right.  Let's move on to

13    2015.  Let's mark this as Defendant's Exhibit 9.

14    And tell me if you recognize it.

15         A.    Yes.

16              (Defendant's Exhibit No. 9 was marked

17              for identification.)

18    BY MS. WASHINGTON:

19         Q.    What is it?

20         A.    Tax returns for 2015.

21         Q.    No W2 is here; right?

22         A.    I don't see any.

23         Q.    And you submitted this document to us in

24    response to our Request for Production of

25    Documents?

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 144

1          A.   Yes.

2          Q.   You said that you don't -- do you have

3     W2s for 2015?

4          A.   I'm assuming we don't; otherwise, I

5     probably would have submitted them.  There would

6     be no reason for me not to.

7          Q.   It says here that your -- in your

8     interrogatories that you made $164,933.50 at Ken

9     Corbett Farms.

10         A.   Okay.

11         Q.   And then Big Red, $37,500.  So how are

12    you able to tell that from this document if you

13    don't have the W2s?

14         A.   I would have to go back and look.  I

15    can't answer that.

16         Q.   All right.  Let's move on to 2016.  So

17    it says here that you made with Ken Corbett

18    $180,990.53 and then through Windsor $25,608.32.

19         A.   Okay.

20         Q.   All right.  We've talked about 2017.

21    Okay.  So for 2018 tell us how you came to be

22    employed at Florida Specialties in 2018.

23         A.   New ownership at Florida Specialties,

24    they approached me to come back to work for them;

25    I accepted their offer.

Page 145

1          Q.   Okay.  And you're still working for

2     them; right?

3          A.   Correct.

4          Q.   Any other -- and in 2018, you were still

5     working for -- you still worked for Windsor;

6     right?

7          A.   At the beginning of 2018; correct.

8          Q.   So you're no longer with Windsor

9     anymore?

10          A.   No, ma'am.

11          Q.   Okay.  And so far this year -- well,

12     this is 2020 now, but in 2019 you only worked for

13     Florida Specialties?

14          A.   Correct.

15          Q.   Do you know what your salary was for

16     2019?

17          A.   I think 132,000.  That was my salary.

18          Q.   So you were paid at -- since you went

19     back to work for Florida Specialties in 2018, what

20     was your compensation structure?

21          A.   Salary, bonus and commission.

22          Q.   What is your salary?  Just the salary

23     portion.

24          A.   The 132.

25          Q.   Okay.  Commission, what is that?  What

Page 146

1    was that for 2019?

2           A.    Last year?  Without seeing my W2s, it

3    was somewhere in the 20,000 range, I believe.

4           Q.    Okay.  And what about your bonus?

5           A.    At least another 10.

6           Q.    And in -- through -- and since the

7    beginning of this year you've been working for

8    them, you haven't -- you've still been

9    continuously working for them?

10          A.    Correct.

11          Q.    Okay.  Thank you.

12                I have one more question for you about

13   your document production so if you could take a

14   look at Exhibit 1.  It's entitled Plaintiff's

15   Responses to Defendant's First Request for

16   Production.  And let's take a look at page -- it

17   says 7 at the bottom, but at the very top it's

18   number 1.

19                And in that --

20          A.    I'm sorry.  Which one are we looking at?

21          Q.    This is Exhibit 1 and the first page of

22   it says Plaintiff's Responses to Defendant's First

23   Request for Production.  And if you thumb through,

24   it looks like the third page but it says number 7

25   at the bottom.

Page 147

1          A.    Exhibit 1?

2          Q.    Yes.

3          A.    Since mine aren't numbered.

4          Q.    Yeah.  It looks like this.  Plaintiff's

5     Responses to Defendant's First Request for

6     Production.  It's not that one.

7          A.    Not that one.

8          Q.    Should be that very last one.

9          A.    Okay.  Which page?

10          Q.    All right.  Let's thumb through the

11     third page and we're going to look at number 1.

12          A.    Okay.

13          Q.    And we request here "nonattorney/client

14     privileged documents referring to or relating to

15     or upon which Plaintiff has relied or now relies

16     on in support of any of his allegations in the

17     complaint, including, but not limited to, any

18     diaries, notebooks, journals, calendars,

19     appointment books or diaries, tape recordings,

20     emails, letters, text messages, messages of any

21     type on social networking sites such as Facebook

22     or Twitter, blog, posts or other documents created

23     or maintained by or on behalf of Plaintiff."  Do

24     you see that?

25          A.    Yes, ma'am.

Jeffrey Stepanovich                          January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 148

1      Q.   Okay.  And you see your response down

2    there?

3      A.   Yes, ma'am.

4      Q.   So have you produced -- let me withdraw

5    that question.

6           You testified earlier that you'd have to

7    look at your calendar, your personal calendar to

8    verify some of the dates I asked about; right?

9      A.   See if they're in my phone.  Yes, ma'am.

10      Q.   And you haven't produced those to us

11    yet; right?

12      A.   I'm not sure which dates you're asking

13    for.

14      Q.   Okay.  But there are some calendar

15    entries that you could look up in your phone?

16      A.   For my personal stuff?  For like

17    doctor's appointments and things?

18      Q.   Yes.  And then --

19      A.   Some of them are in my phone, but I

20    don't know how far back it goes.

21      Q.   And what about the dates that you had in

22    conversation with Eric Bolesta and Jed Hunter?

23      A.   No, I wouldn't put any of that in my

24    calendar.

25      Q.   You didn't testify earlier that you

Page 149

1      could verify when you had that conversation with

2      them about your cancer if you looked on your

3      calendar?

4             A.   Because I was going to reference the

5      conference you referenced earlier in March, when

6      it was, because I couldn't remember the dates.

7      That's all it was.

8                  MS. WASHINGTON:  Okay.  So,

9             Noah, this is just a request for

10            whatever -- I can -- we'll go back,

11            and any of those dates that are --

12            that allegations were made about any

13            specific dates about treatment or

14            dates that he disclosed details to

15            anyone associated with Ken Corbett

16            Farms, if he has some that would be

17            responsive to our request.

18                  MR. STORCH:  To the extent

19            that he has them because he said that

20            he doesn't know how far his phone

21            goes back.  So he may not have them.

22            But to the extent he does, certainly

23            we'll get it.

24                  MS. WASHINGTON:  Okay.  All

25            right.  And that's all -- those are

Jeffrey Stepanovich                              January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 150

1          all the questions I have.

2                 Noah, do you have any

3          questions for Mr. Stepanovich?

4                 MR. STORCH:  Yes, but I'm

5          going to take about 10 minutes to

6          gather my notes.

7                 MS. WASHINGTON:  Okay.  And I

8          just will reserve the right after

9          Mr. Storch asks his questions to ask

10          any follow-up questions.  Thank you.

11                 So should we take 10 minutes?

12                 MR. STORCH:  Yes.

13                 MS. WASHINGTON:  Okay.  Thank

14          you.

15             (Recessed, 11:56 a.m.)

16             (Reconvened, 12:19 p.m.)

17                   EXAMINATION

18     BY MR. STORCH:

19        Q.   Mr. Stepanovich, were you ever told

20     during your employment with Ken Corbett Farms that

21     you were not producing up to par?

22        A.   No.

23        Q.   Did anyone from Ken Corbett Farms ever

24     discuss with you your job performance at all?

25        A.   No.

Jeffrey Stepanovich                                      January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

                                                        Page 151

1           Q.   Were you ever told that you were

2      deficiently performing your job?

3           A.   Say that again.

4           Q.   Were you ever told that you were

5      deficiently performing your job at Ken Corbett

6      Farms?

7           A.   No.

8           Q.   Were you ever told by anyone at Ken

9      Corbett Farms that your production was low?

10          A.   No.

11          Q.   Were you ever told by anyone at Ken

12     Corbett Farms that you didn't have the commitment

13     to the operations of Ken Corbett Farms?

14          A.   No.

15          Q.   In 2015 and 2016, were you made aware

16     that Ken Corbett Farms allegedly sustained

17     financial hardships?

18          A.   No.

19          Q.   Now, at some point you were diagnosed

20     with cancer; correct?

21          A.   Yes.

22          Q.   And you informed Ken Corbett Farms of

23     your cancer diagnosis; correct?

24          A.   Yes.

25               MS. WASHINGTON:   Object to

Page 152

1          form.

2                    MR. STORCH:  He already

3          answered, but okay.

4     BY MR. STORCH:

5          Q.   Did you specifically tell Ken Corbett

6     about your cancer diagnosis?

7          A.   I don't recall.

8          Q.   Do you recall who you told?

9          A.   Not everybody, no, not specifically.  I

10    know -- other than Eric and Jed, I discussed --

11    other than that, I can't specifically say, no.

12         Q.   What about Justin?

13         A.   I don't remember if I specifically told

14    Justin or not, or if Eric told him.

15         Q.   When you say "you can't recall," are you

16    saying that you may have told Justin, you may have

17    told Ken, you're just not able to say right now

18    with a hundred percent certainty?

19                    MS. WASHINGTON:  Object to

20          form.

21                    MR. STORCH:  You can answer.

22                    THE WITNESS:  That's correct.

23    BY MR. STORCH:

24         Q.   And prior to April of 2017, were you --

25    were you ever spoken to about your average selling

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

                                                    Page 153

1    price?

2         A.   No.

3         Q.   Prior to April of 2017, were you ever

4    spoken to about the growth of your business?

5         A.   No.

6         Q.   How many other salesmen were working

7    with you in 2017 at Ken Corbett Farms?

8         A.   Two.

9         Q.   Did either one of those individuals have

10   cancer to your knowledge?

11        A.   No.

12        Q.   And were either one of those individuals

13   terminated?

14        A.   No.

15        Q.   Did you ever abandon Ken Corbett Farms?

16        A.   No.

17        Q.   And did anyone at Ken Corbett Farms ever

18   speak with you about your sales efforts?

19        A.   No.

20        Q.   How long after you disclosed your cancer

21   to Ken Corbett Farms were you terminated?

22                   MS. WASHINGTON:  I object to

23          form.

24                   MR. STORCH:  You can answer.

25                   THE WITNESS:  Less than two

Page 154

```
 1        months.
 2    BY MR. STORCH:
 3        Q.   Did you hear my question, Mr.
 4    Stepanovich?
 5        A.   Oh, I said less than two months.
 6        Q.   Oh, I'm sorry.  I didn't hear that.
 7        A.   Sorry.
 8        Q.   And you believe that you were terminated
 9    as a result of your disclosure of your disability
10    to Ken Corbett Farms?
11                MS. WASHINGTON:  Object to
12           form.
13    BY MR. STORCH:
14        Q.   You can answer.
15        A.   Yes.
16                MR. STORCH:  I have no further
17           questions.
18                MS. WASHINGTON:  I don't have
19           any either.
20                MR. STORCH:  We will read.
21           (Discussion held off the record.)
22                MS. WASHINGTON:  Before we go
23           off the record, I wanted to just make
24           sure that we have these exhibits
25           numbered right.
```

Page 155

1              (Discussion held off the record.)

2                  MS. WASHINGTON:   All right.

3        The Exhibit Number 1 is Plaintiff's

4        Responses to Defendant's First

5        Request for Production.   Defendant's

6        Exhibit 2 is the document production,

7        Plaintiff's document production.

8        Defendant's Exhibit -- okay.   Exhibit

9        3 should be -- do you have the

10       complaint?   Okay.   Defendant's

11       Exhibit 3 is the complaint in this

12       case.   Defendant's Exhibit 4 is

13       Plaintiff's answers to Defendant's

14       interrogatories.   Defendant's

15       Exhibit -- there's no Exhibit 5.

16       Defendant's Exhibit 6 is Mr.

17       Stepanovich's 2012 taxes and W2s.

18       Defendant's Exhibit 7 is Mr.

19       Stepanovich's 2013 W2s and taxes.

20       Defendant's Exhibit 8 is Mr.

21       Stepanovich's 2014 W2 and taxes.

22       Exhibit Number 9 is Mr. Stepanovich's

23       2015 tax return.   Exhibit 11 --

24       there's no Exhibit 10.   Exhibit 11 is

25       Mr. Stepanovich's 2017 W2s and tax

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 156

1        returns.  And no further exhibits.

2                Okay.  Well, with that we have

3        nothing else and I guess we can go

4        off the record.

5            (Thereupon, the deposition was concluded

6             at 12:29 p.m. and signature was

7             reserved.)

8                     -   -   -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 157

1                          DISCLOSURE
2       STATE OF GEORGIA:
3       COUNTY OF THOMAS:
4
                Pursuant to Article 10.B of the Rules and
5       Regulations of the Board of Court Reporting of the
        Judicial Council of Georgia, I make the following
6       disclosure:
7               I am a Georgia Certified Court Reporter
        reporting for Baker Realtime Reporters, Montgomery,
8       Alabama. (888) 253-3377.
9               I am not disqualified for a relationship of
        interest under the provisions of O.C.G.A. 9-11-28(c).
10
                I was contacted by the offices of Baker
11      Realtime to provide court reporting services for this
        deposition.
12
                I will not be taking this deposition under
13      any contract that is prohibited by O.C.G.A. 15-14-37
        (a) and (b).
14
                I have no exclusive contract to provide
15      reporting services with any party to the case, any
        counsel in the case, or any reporter or reporting
16      agency from whom a referral might have been made to
        cover this deposition.
17
                I will charge my usual and customary rates
18      to all parties in the case, and a financial discount
        will not be given to any party to this litigation.
19
                A review of the transcript was requested.
20
21
22
23
24
25

Jeffrey Stepanovich                    January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

                                                    Page 158

1                          CERTIFICATE

2      STATE OF GEORGIA:

3      GEORGIA, THOMAS:

4            I, Julie Robinson-Lawrence, Certified Court

5      Reporter, State of Georgia, Certificate No. B-1865,

6      CERTIFY that acting in such capacity, I reported the

7      testimony herein, and on the foregoing pages have

8      transcribed a true and correct transcript thereof.  A

9      review of the transcript was requested.

10           I FURTHER CERTIFY that I am not counsel for,

11     nor am I related to any party to the above case; nor

12     am I interested in the event or outcome.

13           WITNESS my hand and official seal as Certified

14     Court Reporter, State of Georgia, Certificate No.

15     B-1865, this 29th day of January 2020.

16

17

18                    _Julie Robinson-Lawrence_

19

20                    Julie Robinson-Lawrence

21                    Certificate No. 1865

22

23

24

25

Page 159

1    NOAH E. STORCH

2

3                        January 30, 2020

4    RE:    Stepanovich, Jeffrey v. Ken Corbett Farms, LLC

5         1/23/2020, Jeffrey Stepanovich (#3848590)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   litsup-ga@veritext.com

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                   Yours,

23                   Veritext Legal Solutions

24

25

Page 160

```
1    Stepanovich, Jeffrey v. Ken Corbett Farms, LLC

2    Jeffrey Stepanovich (#3848590)

3              E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   Jeffrey Stepanovich                             Date

25
```

Jeffrey Stepanovich                          January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

Page 161

1    Stepanovich, Jeffrey v. Ken Corbett Farms, LLC

2    Jeffrey Stepanovich (#3848590)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Jeffrey Stepanovich, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11    _____    _____

12    Jeffrey Stepanovich                         Date

13    *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                    _____ DAY OF _____, 20____.

16

17

18                    _____

19                    NOTARY PUBLIC

20

21

22

23

24

25

Jeffrey Stepanovich
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC
January 23, 2020

**[& - 20th]**

Page 1

**&**

**&**   51:9,10,11,22
52:19

**0**

**0001**   41:9
**00186**   1:6

**1**

**1**   4:3 21:6 37:3,6,7
37:8 40:1,12,23
44:12 49:22
109:21,23 110:21
123:14 138:20
146:14,18,21
147:1,11 155:3
**1,711,147.85.**
126:14
**1/23/2020**   159:5
**10**   11:15 41:12
127:18 146:5
150:5,11 155:24
**10,802,696**   118:20
**10.89.**   122:5
**10.b**   157:4
**100**   18:17 55:20
56:1 75:19 116:24
**100,000**   22:14
**1008**   1:13
**101**   4:6
**103**   2:5
**103,003**   122:1
**10368**   2:5
**104**   127:14
**1040**   132:3
**10651**   11:5
**10:43**   108:13
**10:56**   108:14
**10th**   91:16,22,25
93:4
**11**   4:11 130:25
131:17,20 133:5,6

155:23,24
**1100**   10:23
**11235**   158:19
**11:56**   150:15
**12**   123:23
**128,775**   134:25
**12:19**   150:16
**12:29**   1:16 156:6
**13**   90:24 106:25
108:4,18 113:15
113:20,21 114:1
**131**   4:11
**132**   145:24
**132,000**   145:17
**136**   4:7
**138**   4:8
**139**   4:9
**14**   120:24,25
**143**   4:10
**143,000**   137:16
**143,150.41.**   138:21
**15**   87:10 88:19
108:6 120:24
**15-14-37**   157:13
**150**   3:5
**153,369.52**   135:23
**153,769.52.**   136:24
**154,269.97**   139:8
**1560441**   137:16
**16**   109:9 123:10,22
**162,500**   111:16
**164,933.50**   144:8
**17**   109:9 112:1
123:13 126:13
**18**   12:14
**180**   18:18
**180,990.53**   144:18
**1865**   158:5,15,21
**19**   107:5 108:24
109:7 132:6,8

**1900**   2:11
**193,508**   116:1
**1983**   13:14,15
**1992**   13:19

**2**

**2**   4:4 39:16,17
40:13 44:13 78:24
79:10 87:18 89:7
91:7 95:18 106:20
112:4 113:16,18
123:14 126:13
133:11 143:8
155:6
**2,336,925**   118:19
**20**   41:12 78:23
79:2,6,7 80:6,8
81:21 108:6 130:7
161:15
**20,000**   146:3
**200,000**   18:18
**2000**   32:11 139:4
143:2
**2001**   20:12 21:9
**2002**   21:22 22:3
**2004**   22:11
**2006**   22:11 23:9
24:12,18 25:11
**2009**   27:3,7
**2011**   25:5,8 32:12
32:13 34:12 50:14
50:18 101:24
114:13 116:1
117:12,16 118:19
119:3 121:13,25
125:16 134:22,24
135:9
**2012**   4:7 135:21
136:3,14 155:17
**2013**   4:8 126:13,24
127:1,13,20
137:14,15,21

138:1,14,15,19
155:19
**2014**   4:9 121:11
137:14 139:5,14
139:25 140:1,3
142:6,11 155:21
**2015**   4:10 143:5,13
143:20 144:3
151:15 155:23
**2016**   96:20 99:5
104:14 109:11
110:1,23 111:10
111:15 114:10,13
120:3 121:11
144:16 151:15
**2017**   4:11 57:18
58:12,22 60:5,14
60:19 74:11 77:15
91:22,25 92:3
93:4,16,18 96:24
97:2,15 99:2
102:6,7 104:16,19
105:19 106:4
109:8,11,15
111:23 130:10,13
130:20 131:3,25
132:4 133:18
141:15,23 144:20
152:24 153:3,7
155:25
**2018**   84:15 134:17
144:21,22 145:4,7
145:19
**2019**   145:12,16
146:1
**2020**   1:15 145:12
158:15 159:3
**206-9855**   11:11
**20th**   92:3 93:16,18
100:24 102:17

Case 7:18-cv-00186-HL   Document 26-1   Filed 03/02/20   Page 165 of 259

Jeffrey Stepanovich
January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

[21 - agent]
Page 2

**21**   79:7,7 81:5
108:5,18 116:18
116:21 117:3
**2104**   139:5
**22**   42:6,9 45:6
49:21,22 84:12
107:8,11,25
118:25,25
**23**   1:15 52:5 53:5
54:2,19 62:14
**239**   11:11
**24**   65:4 73:14
82:10 83:14 87:18
106:10 130:21
**25**   80:25
**25,608.32.**   144:18
**253-3377**   157:8
**26**   71:8 109:11
**26th**   109:14
**27**   113:25 114:1
120:1 123:13
**27117th**   2:11
**28**   42:9,9 85:7
89:11 106:10
112:4,14 130:21
**28th**   106:15
**29th**   158:15
**2hr**   142:21

**3**

**3**   4:5 21:5 57:2
86:15,16 87:1,11
90:9,21 106:1
126:13 130:17,18
133:11 155:9,11
**3,850**   140:9
**30**   116:16 159:3,17
**30363**   2:11
**31**   40:1,12
**31691**   1:14
**329,877**   117:18

**33,340**   139:2
**33324**   2:6
**34104**   10:24
**36**   117:18
**37**   4:3
**37,500**   144:11
**38**   140:9
**38,250**   135:3
**3848590**   159:5
160:2 161:2

**4**

**4**   4:6 73:15 101:3
101:4,13 105:24
130:16,17,19
155:12
**4,220**   130:22
132:13
**4,620**   132:10,12,17
**40**   116:16
**404**   2:12
**44**   117:15

**5**

**5**   21:5 101:20,20
108:9 125:17,25
126:5 155:15
**5-3-1**   21:4 26:8
**50**   110:4,12,18
116:15
**55**   116:15

**6**

**6**   4:7 29:5,7,9,11
41:18,22 91:5,7
136:1,4 137:7
138:23 155:16
**65**   20:22

**7**

**7**   3:4 4:8 41:22
101:21 137:24,25
138:3,4 146:17,24

155:18
**7,000**   111:23
**7/24**   106:5
**75,000**   20:22
**759-4981**   2:12
**79**   4:4
**7:18**   1:6
**7:18cv00186**   5:6
**7th**   84:15

**8**

**8**   4:9 139:13,15,16
155:20
**84**   2:5
**87**   4:5
**888**   157:8
**8:09**   1:15

**9**

**9**   4:10 143:13,16
155:22
**9-11-28**   157:9
**9/28**   106:5
**903-7475**   2:7
**929,441**   117:6,12
117:16
**954**   2:7
**9:25**   62:9
**9:35**   62:10
**9th**   20:12 21:9

**a**

**a.m.**   1:15 62:9,10
108:13,14 150:15
**abandon**   153:15
**ability**   9:2 100:13
**able**   54:8 63:25
64:2,5 114:12
130:1 144:12
152:17
**accept**   112:14
**accepted**   24:7
144:25

**accommodate**
74:23
**account**   135:16
**accountants**
132:23
**accounting**   119:23
**accuracy**   159:9
**accurate**   45:12
83:18 84:18 85:12
88:17 92:18,22
106:8 137:3
**accurately**   8:4
**acknowledgement**
161:3
**acknowledgment**
159:12
**acquired**   120:16
**acting**   158:6
**action**   1:6 86:11
**actual**   39:20 62:16
68:14 118:21
**add**   7:25 81:14
**added**   25:20 70:21
111:13
**adding**   60:3
**additional**   36:11
117:24
**additions**   161:6
**address**   10:22
102:2
**adjust**   117:13
**adjustable**   26:14
**adjustment**
119:19
**advice**   93:14
**affect**   68:21
100:13
**agency**   157:16
**agent**   27:11,23
28:16 31:15

Jeffrey Stepanovich                                      January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

| | | | **b** |
|---|---|---|---|
| **ago** 45:20 83:3 | **antonio** 12:18 | 77:20 80:18 84:10 | **b** 5:23 19:19 107:3 |
| **agree** 32:18 33:1 | **anybody** 51:16,18 | 84:22 102:11 | 107:8 108:19 |
| 38:15 65:22 | 60:23 61:4 126:15 | 109:1,16 114:10 | 120:23 121:2,4,19 |
| **agreed** 28:25 | 134:9 | 116:4 128:13 | 123:11,14 157:13 |
| **agreement** 6:4 | **anymore** 15:10 | 129:13 132:23 | 158:5,15 |
| 29:12 50:3 | 23:19 145:9 | 137:4 138:25 | **bachelor's** 13:13 |
| **ahead** 57:16 96:5 | **appearing** 2:3,8 | 139:6 140:21 | **back** 15:24 23:8 |
| 105:13 | **appended** 161:7 | **assuming** 80:3 | 24:15,17,22 25:11 |
| **aide** 14:20 | **applicable** 159:8 | 83:20 85:13 89:22 | 47:11 60:17 62:4 |
| **alabama** 157:8 | **appointment** | 98:12 140:23 | 65:10 73:14 74:9 |
| **alaska** 14:19,20 | 94:12,17 147:19 | 141:19 142:9 | 81:2,20 82:10 |
| 15:1 16:15 | **appointments** | 144:4 | 84:12 89:7 93:9 |
| **alcoholic** 9:5 | 94:19 102:21,24 | **assumption** | 95:17 96:15,16 |
| **allegations** 147:16 | 103:22 104:6 | 124:17 | 98:7,20 99:11 |
| 149:12 | 148:17 | **assumptions** | 103:9,15 104:5,9 |
| **allege** 92:5 | **approach** 23:15 | 124:12,16 | 104:16,18,21 |
| **allegedly** 151:16 | **approached** 33:6 | **atlanta** 2:11 | 106:14,20 108:5 |
| **allotted** 159:20 | 45:9 47:17 144:24 | **attached** 107:24 | 108:16 113:14 |
| **amount** 33:12,18 | **approve** 113:2 | 159:11 | 123:10 129:3 |
| 36:4 53:21 68:17 | **april** 48:15 57:18 | **attachments** 107:5 | 132:14 134:15 |
| 109:23 110:10 | 58:12,22 60:5,14 | **attended** 13:22 | 141:19,24,25 |
| 122:3,4 130:22 | 60:19 74:10 77:15 | 102:24 141:14 | 142:6,24 144:14 |
| 139:7 | 109:11,14 113:9 | **attention** 41:18 | 144:24 145:19 |
| **amounts** 114:5 | 134:15,17 142:2 | 73:19,23 106:4 | 148:20 149:10,21 |
| 125:13 | 152:24 153:3 | **attorney** 2:14 5:21 | **background** 45:8 |
| **answer** 7:18 8:23 | **arrangement** 29:3 | 10:5,13 38:10,17 | **backup** 112:18 |
| 34:2 38:8 43:9,15 | 32:7 | 38:22 40:21 | **backwards** 32:12 |
| 43:15,17,17 44:1 | **article** 157:4 | 159:13 | 79:3,4 |
| 46:22 53:25 56:8 | **asked** 19:9 23:21 | **attorney's** 93:14 | **baker** 157:7,10 |
| 63:8 67:20 88:5 | 26:16,18 80:24 | **attorneys** 44:2 | **balance** 66:7 |
| 102:4 107:23 | 83:11 84:7 85:9 | **audible** 74:4 | **bankruptcy** 14:10 |
| 112:2 114:21 | 92:15 107:23 | **available** 105:8 | 19:1,3 |
| 119:24 132:20 | 133:3 148:8 | 159:6 | **banter** 98:6 |
| 142:20 144:15 | **asking** 7:19 10:12 | **average** 120:4 | **base** 29:23 30:12 |
| 152:21 153:24 | 80:20 84:5 88:11 | 121:21 122:3,4,9 | 31:20,25 52:11,20 |
| 154:14 | 115:8 128:19 | 122:13 124:11,20 | 52:25 53:6,9 |
| **answered** 8:22 | 148:12 | 152:25 | 56:16,17,21 69:8,9 |
| 152:3 | **asks** 150:9 | **aware** 115:6 | 69:17 71:7,24 |
| **answers** 88:3 | **associated** 149:15 | 151:15 | 72:9 124:2,4 |
| 155:13 | **assume** 40:24 50:5 | | |
| | 50:23 59:4 76:8 | | |

Case 7:18-cv-00186-HL   Document 26-1   Filed 03/02/20   Page 167 of 259

Jeffrey Stepanovich
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

January 23, 2020

[based - care]

Page 4

**based** 21:3,4 40:24
55:6 56:1 62:21
64:1 69:2 79:21
95:22 96:3 117:5
119:7,17 120:6
124:8,9,10,12,14
124:16
**basically** 18:3 34:2
36:6,10 48:15
53:11,12 70:9
82:7
**bates** 39:24,25
40:12
**bathroom** 51:19
**bean** 47:25
**beans** 30:23 31:6
48:1
**becoming** 34:1
**bed** 16:12
**began** 48:6
**beginning** 55:16
66:3 67:23 73:16
145:7 146:7
**behalf** 1:12 2:3,8
147:23
**believe** 20:12 27:1
27:22 29:6,13
32:12,23 34:11,13
37:15 40:19 42:24
42:25 45:25 46:1
47:1,5 53:23 60:2
60:13 77:6 78:2
78:19 82:23 94:20
102:17 103:14
106:16 108:1
122:14 125:18
130:11,16 133:15
133:25 134:11,18
135:20 140:17
141:16 146:3
154:8

**bell** 48:3 123:20
**benefit** 5:15 22:19
54:16 82:9
**best** 70:5,11
**bethea** 19:17,18
20:3
**better** 120:22
**beverages** 9:5
**big** 143:3,6,8
144:11
**bigger** 72:18,19
**bills** 55:7
**biopsies** 103:17
**biopsy** 103:16
**bit** 10:21 49:20
57:17 64:24 69:23
71:6 81:21 96:6
98:21 106:19
117:13
**blog** 147:22
**board** 157:5
**bolesta** 45:12,24
46:21 47:2 50:16
52:6 65:15 67:6
92:1,5 93:3
148:22
**bonus** 145:21
146:4
**books** 147:19
**boston** 18:23
**bottom** 49:22
71:10 83:15 87:11
91:21 101:20
105:25 130:17
146:17,25
**bought** 52:2
110:11 120:9
126:14 128:3
**box** 25:23 116:8
116:15,17 123:22
123:23 124:11

136:22 138:20
**brand** 52:8
**break** 8:19,24
51:16,19 62:6
107:14,19 108:3
108:10
**briefly** 74:11
**bring** 71:22 82:2,3
**bringing** 74:8,13
74:23 140:14
**broker** 110:3
128:10,15,15,16
128:17 129:15
130:2
**brokerage** 110:24
**brokered** 110:14
110:16 111:8,9
127:22,23 128:4,8
128:21,24
**brought** 47:9
52:11 53:7 73:19
73:22 74:18
118:22,25
**building** 33:2
**built** 25:22
**business** 12:7,8
15:5,10,25 16:1
17:3 18:20 19:7
22:25,25 23:2,23
45:12,19,19,24
46:2,4,21 47:2,4
50:6 51:24,24
53:11,14,15 69:1
81:25 82:3,5
129:14,19,20,22
129:25 135:17
153:4
**busy** 81:14
**buy** 69:14 110:6,7
110:9 127:24,25
128:25

**c**

**c** 2:1 5:23 6:1 9:14
21:17 107:4
123:10 125:3,4
126:12 133:22
157:9
**calculated** 118:14
**calculations**
118:21
**calendar** 93:8,9
102:10 103:24
104:11 148:7,7,14
148:24 149:3
**calendars** 147:18
**call** 14:22 16:7,9
16:12 36:3,5,13
42:18 58:1,11,22
60:14,19,22,24
61:22 62:2 74:10
77:14,15,19 78:14
78:21 83:19
**called** 14:21 15:4
23:17 30:8 63:20
82:18,22 83:16
110:14
**calling** 53:13
81:13 101:11
**calls** 10:4 94:13
114:19
**cancer** 89:18 90:2
90:4,13 91:11
92:2,6 93:4 96:7
98:11,21,22 99:12
100:3,7 102:6,23
103:7,20 130:10
149:2 151:20,23
152:6 153:10,20
**capacity** 81:12
158:6
**care** 102:1 131:8

Case 7:18-cv-00186-HL   Document 26-1   Filed 03/02/20   Page 168 of 259

Jeffrey Stepanovich
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

January 23, 2020

[carolina - condition]

Page 5

carolina 17:15,15
carried 111:25
carry 65:8,12 68:2
68:3
carrying 67:6,14
carter 80:18
case 5:6 37:22
42:3 86:18 87:7
117:15 129:9
155:12 157:15,15
157:18 158:11
cash 117:24
118:12
catch 8:12
category 118:10
cause 83:16,21
85:15,17,18,25,25
86:5,10
caveat 45:11,15
cell 11:11,12
celler 2:5 43:25
44:21
cents 110:12
certain 17:9 33:12
33:16,17,18,18
47:20 53:20 55:4
55:12 70:2 80:21
81:1
certainly 88:14
149:22
certainty 152:18
certificate 158:1,5
158:14,21
certifications 14:4
certified 1:17
157:7 158:4,13
certify 158:6,10
cetera 30:22
chain 71:24
chair 98:1,16

chairs 98:7
chance 138:8
139:19
change 33:22,24
34:24,24 35:17
79:20,22 117:14
119:15,17,21
160:4,7,10,13,16
160:19
changed 34:21
35:20 119:10,13
129:12
changes 81:15
159:10 161:6
charge 41:25 42:1
43:5 64:15 91:8
91:11 157:17
cheaper 72:5
check 55:3 103:23
checked 112:11
checking 122:13
checks 80:15
children 12:12
choice 70:19
123:20,22 124:24
chop 70:19,23
71:18 72:6,8,10
chris 29:16
circle 11:5 12:4
60:17
city 27:13
civil 1:6,13 6:6
claimant's 39:24
39:25
clarification 7:16
clarify 52:21 58:3
113:17
classes 13:21
client 10:5 29:22
30:11 31:20,25
32:1 38:10,17

42:18 53:6,9
69:17 71:24 72:9
147:13
clients 31:13,17,23
31:24 72:5,17,24
72:24 73:4,9
clmt 41:9
coaching 19:4
collected 55:7
80:10 109:22
110:4,21
college 14:16,18
14:19 47:4
collier 21:14,15,16
21:18 22:1,9,20,22
23:1,6,19,23 53:16
combination 57:1
73:1
come 15:24 20:4
45:17 62:4 89:1
104:9,12,16,18,21
108:5 118:10
122:9,12 144:24
comes 107:3,3
143:2
coming 15:1 42:19
49:11 141:19
comments 113:23
commission 18:9
18:15 20:22 21:3
21:5 26:3,13 29:5
29:8 34:16,19
35:2 54:5 55:12
55:20 56:1 74:20
74:22,22 75:19
78:6 109:24 111:6
111:17,18,21
145:21,25
commissions 78:9
80:2

commitment
151:12
communicated
45:15,16
communicating
29:22
companies 112:23
company 1:8
14:21 15:4 17:6
19:1,2,15,20 54:11
54:12,14 126:3
compensated 18:7
54:21 55:2 112:18
compensation
18:8 20:19 22:13
25:15,17 34:15
35:20 55:5,15
76:13 77:12 78:6
79:20 109:6,8
134:21 136:23
137:14 140:8
145:20
complaint 4:5
86:18 87:5,24
88:4 89:5 90:8,11
91:6 92:11,18,19
92:21 147:17
155:10,11
complete 161:8
completed 159:17
completely 7:8
component 26:4
composite 131:6
computer 81:18
concern 86:5
concierge 12:9
concluded 1:16,18
156:5
condition 91:17
101:25 102:3

**[conditioned - customers]**
Page 6

conditioned  45:23
  47:1
conditions  101:23
conference  149:5
confirm  102:11
  134:2
confirmed  96:17
  97:1 104:1
conflict  49:9
confrontational
  79:15
connected  64:16
connection  43:4
  60:6 64:14 94:21
considered  32:1
  135:19
consist  71:5
consistent  71:14
construction
  14:16
contacted  24:5
  157:10
contacts  30:9
  53:10,18 95:9
  123:16
contained  116:9
continue  33:7
  36:21 108:8
continuing  33:14
continuously
  19:24 146:9
contract  34:3,6
  44:16 50:7 157:13
  157:14
contribute  135:15
convention  141:15
conversa  78:5
conversation  20:3
  28:2,22 46:23,24
  47:12 57:25 59:16
  60:3,5 61:3 74:10

75:14,17,22 76:11
77:22 80:4 82:24
84:17 92:20 98:3
115:20 148:22
149:1
conversations
  10:13 76:9 77:2
  80:13 105:6
copies  62:22
  159:14
corbett  1:7 2:15
  5:5,7,21,22,22
  21:10 24:18,25
  26:17,22 27:11,19
  28:8,16 31:8,15
  33:6 34:5,10 35:5
  35:18 36:15 42:2
  45:10,15,17,23
  46:19 47:13,17,18
  47:21 48:7 50:7
  50:15,22 58:9,21
  59:6 60:11,21,24
  61:1,3 62:1,20
  64:10,20 65:1,24
  67:5,13,22 75:2
  76:10 78:18 79:9
  79:25 81:10 82:12
  82:17 83:2,19
  84:17,22 89:24
  90:12 91:2,12,19
  92:7,12,14,20,21
  94:2,7 95:22 96:3
  97:24 98:10
  100:14 104:5
  105:3,10 109:2
  114:24 120:20
  128:3,22 129:2
  130:6 134:10,20
  135:1,7,22 136:11
  136:19 137:10,15
  138:13 139:25

141:1,3,17 144:9
144:17 149:15
150:20,23 151:5,9
151:12,13,16,22
152:5 153:7,15,17
153:21 154:10
159:4 160:1 161:1
corbett's  31:12
  32:4 35:14 48:10
  49:10 73:20 75:8
  78:4,8 138:20
corner  41:8
  106:22
correct  7:25 10:11
  17:24 22:7 26:24
  26:25,25 28:11,21
  29:1 31:10,22
  34:8,20 35:15
  50:12 52:9 53:2,4
  55:13 56:15 58:10
  65:3 66:25 70:25
  73:13 74:19,24
  78:22 93:20 96:4
  96:25 97:8,16,19
  99:3,6,13 102:11
  103:11 104:3
  110:15 111:14,20
  111:22 112:20
  114:7,15 116:6,11
  117:17,20 118:23
  122:2 124:19,22
  132:24 138:25
  139:3 145:3,7,14
  146:10 151:20,23
  152:22 158:8
  161:8
corrections  161:6
correctly  26:12
  29:4
correspondence
  65:2

cost  62:16 124:11
council  157:5
counsel  6:4 114:20
  157:15 158:10
  159:14
count  121:21
counting  103:21
country  17:21
  117:22
county  157:3
couple  41:13
  48:24 71:9 131:12
course  7:24 76:10
  93:15
court  1:1,17 5:8
  5:18 8:4,10 9:12
  157:5,7,11 158:4
  158:14
cover  157:16
create  108:21,23
  108:24
created  41:3
  108:25 121:23
  147:22
current  10:21
  11:10
currently  11:17
  13:1
custom  125:22
  127:1,20
customary  157:17
customer  52:11,20
  52:22,25 56:16,17
  56:21 69:7,9 70:2
  70:23 71:6 120:7
  120:15 124:2,4
  126:17,24,25
  127:2
customers  30:17
  31:17 35:24 36:7
  36:8,9,11,12 52:6

Case 7:18-cv-00186-HL  Document 26-1  Filed 03/02/20  Page 170 of 259

Jeffrey Stepanovich

January 23, 2020

Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

[customers - discuss]

Page 7

53:3,6,8,14,19,20
53:21,22,24 54:3,9
69:3,14 70:6,16,18
71:4,11 72:18,19
72:21 81:13 95:9
124:5,7 125:12
126:2,5,8,10,22
127:14,15,16,18
127:19,22 128:3
128:10
**cut** 74:17 80:1
**cuts** 70:20,20
**cutting** 78:5,9
**cv** 1:6

**d**

**d** 15:8 107:4
108:24
**data** 63:14 114:12
132:15
**date** 1:18 20:13
63:4 65:20 81:1
84:13 90:6 96:18
100:22,22,23,24
102:10 104:10
105:12 109:11,12
109:13,14,16,18
119:14 160:24
161:12
**dated** 39:6
**dates** 18:13 51:1
67:9,17 81:1
105:22 121:11
134:2 142:1 148:8
148:12,21 149:6
149:11,13,14
**davie** 2:6
**day** 27:21 30:1,3
36:4,5,14 50:21
77:12 78:15,20
82:18 85:9 89:17
105:14 119:11,22

119:23 121:4
158:15 161:15
**days** 78:16 159:17
**dc** 17:16
**deal** 119:23
**dealing** 53:21
**dealt** 53:15
**december** 20:25
48:17
**decided** 80:14
**decision** 50:6
83:10,17 84:2,6,9
84:11,21,23 85:11
**declare** 161:4
**decrease** 61:12,15
61:17
**decreased** 65:23
**decreasing** 61:24
74:22
**deemed** 161:6
**defendant** 1:9 2:8
5:5
**defendant's** 4:1
37:5,8,20 39:15,17
78:24 79:10 86:15
87:1 101:3,11,13
101:17 113:18
125:4 130:17
131:20 136:1,4
137:24 138:4
139:13,16 143:13
143:16 146:15,22
147:5 155:4,5,8,10
155:12,13,14,16
155:18,20
**defendants** 1:12
**deficiently** 151:2,5
**define** 92:19
**defined** 35:12
**definition** 58:5

**degree** 13:20
**demand** 73:9 87:5
**demanded** 73:4
**depending** 110:13
116:13
**deponent** 159:13
161:3
**deposed** 9:21
38:24
**deposing** 159:13
**deposition** 1:11
6:3 7:24 9:23 10:1
10:18 93:12 156:5
157:11,12,16
**description** 4:2
**desk** 98:8
**destiny** 2:10 5:4
**detail** 36:21 61:8
69:24 105:2
112:17,19 124:11
128:12
**detailed** 113:3
**details** 28:1,4
60:17 75:21,24
76:4 149:14
**determine** 63:25
64:2,5 102:22
**develop** 30:16
31:16 52:17
**developed** 36:12
52:12,14
**diagnosed** 96:6
100:3,16 103:1,7
151:19
**diagnosis** 94:22
96:12,16,22 97:1
97:10 99:1 100:6
100:9 103:25
151:23 152:6
**diaries** 147:18,19

**dictated** 70:1
**difference** 85:21
85:22,24 87:24
88:11 118:2,3
**different** 7:8 25:17
30:17,23 41:7
56:22,23 69:3,20
81:1 87:15,20
100:11 113:22
119:22 136:25
**differently** 100:2
**digits** 41:13,13
**direct** 41:17 106:4
135:3,5 136:12
137:7,10 138:14
139:1 140:14,16
**directly** 25:1,4
34:4 36:18 48:7
58:16,17 90:12
**director** 21:20
**dis** 129:4
**disability** 98:22
154:9
**disagreed** 76:7
**disciplinary** 86:11
**disclosed** 91:11,16
92:10 149:14
153:20
**disclosure** 154:9
157:1,6
**discontinuing**
75:18 76:12
**discount** 157:18
**discourage** 128:22
**discouraged** 129:2
129:5
**discrimination**
41:25
**discuss** 10:6 61:23
76:1 123:1 150:24

Case 7:18-cv-00186-HL   Document 26-1   Filed 03/02/20   Page 171 of 259

Jeffrey Stepanovich
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

January 23, 2020

[discussed - eric's]

Page 8

**discussed** 10:6 27:10 57:4,7,10,12 58:12,15 61:7 65:2 74:12 114:20 115:3,5,9,23 116:20 121:5 152:20

**discussing** 74:11

**discussion** 33:21 59:19 60:6,8 76:3 154:21 155:1

**discussions** 75:11 124:25

**disqualified** 157:9

**distributing** 49:1 49:8 54:24 105:11 133:17

**district** 1:1,2 5:8,9

**divided** 121:22 122:9,11

**division** 1:3

**doctor** 94:21 97:11,13

**doctor's** 94:12 100:20 102:21,24 103:5 148:17

**doctors** 97:7

**document** 7:22 36:25 37:2,14,18 38:6,21 39:20 40:16 41:21 42:21 43:20,21 64:14,19 64:25 84:13,14 88:8 91:6 100:23 101:10 109:4,17 109:17 115:17 133:4,5 136:8,16 136:16 138:17 139:22 140:5 143:23 144:12 146:13 155:6,7

**documents** 9:25 10:8,14 36:24 37:22 39:22,25 40:6,20,23 41:2,2 66:22 107:17 108:21 133:14 143:25 147:14,22

**doing** 16:18 57:14 123:5 129:20,20 129:22

**dollar** 110:12 114:5 122:3 125:13

**dollars** 121:22

**domestic** 56:25

**doubt** 77:4

**draft** 43:19

**drafted** 43:3,24 88:13

**drawing** 140:19

**drew** 105:18

**driver's** 14:2,6

**driving** 75:25

**due** 77:8 79:22

**duly** 7:2

**duties** 18:2 35:10 35:12,16,16

**dwashington** 2:12

**e**

**e** 2:1,1,4 5:23,23 5:23,25 6:1 9:13 9:14,19,19 15:8,8 15:9,9 19:19,19 21:17 27:17,17,18 27:18 32:22,23 85:8 89:14 133:25 159:1 160:3,3,3

**earlier** 26:15 28:15 35:25 47:19 65:18,19 66:10 74:11 75:1 76:15

80:12 99:4 100:17 106:13 107:6 112:12 130:7,9 148:6,25 149:5

**east** 15:16 17:10 17:23

**eastern** 17:7,8 18:5

**economic** 87:14 88:21,23

**education** 13:8,11 13:13

**eeoc** 42:2 43:4,5 43:18 64:15 91:8 91:11

**effect** 57:13

**efficient** 81:16

**efforts** 153:18

**eggplant** 30:22 48:3

**either** 21:5 109:1 153:9,12 154:19

**else's** 48:21 83:17 84:3,21

**email** 4:4 77:2,13 77:18 78:17 79:8 82:11,16

**emails** 10:9 147:20

**employ** 44:2

**employed** 20:25 32:5 35:8 98:10 114:24 133:17 137:9 141:1,2,5,17 144:22

**employee** 25:4 34:1 49:2 50:22 141:7

**employers** 56:17

**employment** 14:12 34:22 35:17 44:15 45:22 47:1 52:16

65:24 67:4,13,19 67:22 76:11 82:19 130:5 140:22 141:20 150:20

**encompass** 17:9 17:11

**encouraging** 129:15

**ended** 77:14

**engaged** 36:1

**enter** 63:13,14,16

**entered** 63:21

**enterprise** 139:10 139:25 142:6,7,7 142:21 143:6,8

**entire** 50:1,9 73:17 95:21

**entitled** 146:14

**entries** 148:15

**entry** 63:4

**environment** 94:11

**equal** 65:8,13 67:6 67:14 68:2

**equipment** 15:22 16:8,9 18:25

**eric** 45:12,23 46:2 46:7,10,21 47:3 50:16,19,22 52:6 53:5,8,10,18,20,24 59:15 69:8 72:14 72:16 73:6,7 74:7 77:21,22,24 78:11 92:1,5 93:3,21,25 98:12,18 116:1 118:25 122:1,18 124:7 148:22 152:10,14

**eric's** 69:15 118:18 126:25

errata 159:11,13
159:17
esquire 2:4,10
establish 53:13
estate 12:9,10
estimate 49:17
et 30:22
event 75:20
158:12
everybody 5:17
54:16 65:12 72:12
72:14 116:24
152:9
exact 18:13 45:21
47:13 51:1 66:15
67:9,17 76:20
90:6 105:12,14
142:1
exactly 46:24 76:5
83:7 96:18 106:13
examination 3:4,5
7:4 150:17
examinations 3:1
example 44:12
69:6,12,24 70:23
115:25 116:10
118:24 121:25
125:16 126:12
examples 70:22
exception 8:21
exchanged 10:8
exclusive 157:14
excuse 17:3 61:22
78:6 130:7 137:14
140:9
executone 14:21
14:23,24 15:2
16:6,16 17:2,4
exhibit 4:2,3,4,5,6
4:7,8,9,10,11 37:3
37:6,7,8 39:15,15

39:17 40:1,13,23
41:6 62:23 78:24
79:10 85:8 86:15
86:16 87:1,18
89:7,14 90:9 91:7
95:18 101:4,13
105:24 106:20,25
107:2,3,4,4,8
108:18,24 112:4
113:15,15,16,18
113:19,20 114:2,3
114:4 120:2,23
121:2,4,6,19
123:10,11,14
125:3,4 126:12
130:16,17,19,24
130:25 131:17,20
133:5,6 136:1,4
137:7,24,25 138:3
138:4 139:13,15
139:16 143:13,16
146:14,21 147:1
155:3,6,8,8,11,12
155:15,15,16,18
155:20,22,23,24
155:24
exhibits 4:1 36:23
67:2 106:23
107:24 108:4,18
113:24 139:11
154:24 156:1
existing 29:22
30:11
expected 92:2
experience 75:10
129:21
experienced 76:18
experiencing
100:6
explain 26:11
32:17 50:4 53:9

54:3,12 62:19
68:6,18,19 87:23
111:4 121:1
128:16 141:4
explained 35:25
expound 44:9
extent 10:4 43:8
43:13 114:18,19
149:18,22
extra 116:14
137:19

**f**

f 1:16 5:25,25 9:13
9:13,19,19 15:8
facebook 147:21
facility 27:24 33:3
103:5
fact 79:22
fails 159:19
failure 18:24
fair 42:16 47:15
fall 24:11,12 48:13
48:16 110:21,22
110:23,24,25
111:1,8,9 141:6
familiarize 107:16
famous 63:20,24
112:22
far 33:14 34:3
117:6 145:11
148:20 149:20
farm 57:3,6,7,19
58:12,18,21 59:4,5
59:8,19,25 69:2,11
70:11 79:23 80:1
110:6 128:8 129:1
farmer 19:5,12
30:7 36:3
farmers 31:3,4
36:13

farming 22:23
farms 1:7 5:5,7
21:10 24:18,25
26:17,22 27:12
35:18 42:2 45:10
45:23 47:18,21
48:7 50:7,15,22
65:24 67:5,13,22
95:22 96:3 98:10
100:14 105:3,10
114:25 128:4
130:6 135:22
137:11,15 138:13
141:1,18 144:9
149:16 150:20,23
151:6,9,12,13,16
151:22 153:7,15
153:17,21 154:10
159:4 160:1 161:1
father 19:5
fda 18:23,25
february 96:17,24
97:2 99:2
federal 1:12 6:6
feel 43:15 54:17
65:14 89:17 100:2
field 76:2
fifty 110:20
file 140:11
filed 14:10 42:1
88:13 140:15
filing 135:11
fill 16:4
financial 17:5
151:17 157:18
fine 8:15,23 39:11
39:11 41:1 54:18
finest 48:24 49:8
53:17 54:23 56:13
56:20

**[finish - going]** Page 10

**finish** 8:18,23
**finished** 8:8
**fired** 23:24 32:19
  83:6,12,16 84:1
  85:10 86:5 90:2
  100:19
**firing** 85:18,19
  86:12
**firm** 115:4
**first** 7:2 20:24
  21:1 28:2 34:14
  36:25 37:2,5,20
  41:17 57:3 59:3
  62:15 73:17 79:13
  99:14,17,23 103:8
  105:4,9 106:16
  133:8,10 136:19
  142:2 146:15,21
  146:22 147:5
  155:4
**five** 11:3 108:12
  126:2,6 127:12
**florida** 2:6 10:23
  11:5 12:22 14:9
  15:2,3,6 16:3,15
  16:15,24 17:12
  18:20 19:10,13,14
  21:8,10,23,25 22:5
  22:16,18 23:8
  24:15,17 25:7,11
  27:8,14,20 28:16
  29:11 30:18,24
  31:1,2,3,6,11 32:5
  32:9 33:13,19,25
  34:5 36:1,9 45:8
  48:8 49:25 50:5
  52:13,14,18 53:7
  53:15 75:25 95:6
  95:12 97:5,7
  120:17 134:12,13
  144:22,23 145:13

145:19
**floridaovertimel...**
  2:6
**fluid** 15:4,4,7 17:4
  17:5 18:6,11,21,22
**fluids** 15:21
**follow** 41:14 97:17
  150:10
**following** 77:12
  78:16 157:5
**follows** 7:3
**food** 25:22
**foods** 53:16
**footnote** 91:21
**ford** 2:10
**fordharrison.com**
  2:12
**foregoing** 158:7
  161:5
**form** 63:7 92:24
  152:1,20 153:23
  154:12
**formal** 7:12 9:16
**formed** 76:22
**forms** 40:19
**forward** 79:17
  85:6
**found** 30:3 89:19
  89:20
**four** 12:13 22:10
  22:19 61:13,14
  81:6,8,21
**fourth** 61:17 77:10
  81:22
**frame** 73:17
**framework** 64:16
**free** 43:15
**frequency** 55:25
**fresh** 52:8 125:22
  127:4,21

**fresher** 84:19
**front** 17:19 18:12
  66:16 107:1
**full** 71:10,22 81:22
  85:8
**functional** 81:11
**further** 49:20
  54:19 99:12
  154:16 156:1
  158:10
**future** 45:11 46:20

**g**

**ga** 159:15
**garrett** 12:19,24
**gather** 150:6
**gears** 10:21
  106:18 130:5
**general** 14:17
  35:16
**generally** 18:14
  30:1 71:3 73:12
  75:4,7 104:12
  116:16 123:19
**generate** 114:8
  122:24 123:2
  130:1
**generated** 124:15
  125:1,8,13
**generating** 126:10
**georgia** 1:2,8,14
  1:18 2:11 5:9
  17:12 30:17,21,24
  31:1,9 76:1 95:2,4
  95:14 96:14,16
  104:8,9,15,18
  106:6 130:21
  157:2,5,7 158:2,3
  158:5,14
**gestures** 8:11
**getting** 50:1,9,10
  66:5 81:13 82:9

104:21 141:20
**girls** 19:4
**give** 18:13 53:22
  53:24 54:3,6,9
  67:9,17 69:12
  76:20 90:6 103:6
  107:15 108:3
  139:10
**given** 30:1 112:5
  112:17,25 113:3
  157:18 161:9
**go** 19:6 21:25
  22:17 23:7 24:21
  29:20 32:14,17
  36:21 41:12 44:24
  49:20 50:2 52:5
  54:19 62:15 68:13
  68:15 70:2,9 74:5
  74:7 80:5 82:10
  83:14 85:8 89:4,7
  89:13 93:9 94:12
  96:13,14 98:20
  105:13 106:20,24
  106:25 107:22
  110:7 113:14
  123:10 128:25
  130:17,20 132:14
  134:8,21 142:24
  144:14 149:10
  154:22 156:3
**goes** 68:15 70:15
  70:19 148:20
  149:21
**going** 20:6 33:11
  33:12 36:20,20
  38:7,8 40:10 41:6
  41:7,17 42:15
  43:13 44:6,9,24
  47:7,11 51:18
  54:6 57:16 61:16
  63:6 68:7 74:9,17

**[going - including]**

75:5,6 79:3 80:1,8
81:14,23 82:2,3,4
88:1 104:5 106:18
106:23 107:14
116:4 119:15
122:13 130:4,25
131:4,6,11 135:25
147:11 149:4
150:5
**good**   5:3 26:20
44:5 52:4 107:18
**grade**   69:20 70:7
70:24 71:1,13
72:25 73:4,9
123:15,24 124:1,6
**grades**   70:13
**graduate**   13:9,18
13:20
**graduated**   13:14
14:13,18 47:3
**grasp**   79:17
**green**   30:23 31:6
47:24,25 48:1,4
**greg**   5:20
**gregory**   2:14
**grew**   30:23,25
31:6,8
**grocery**   70:10,10
70:14
**gross**   139:7
**group**   143:11
**grow**   30:21,25
48:1
**grower**   19:14
135:5
**growers**   48:24
49:8 53:16 54:23
56:12,20 135:3
136:11 137:7,9
138:14 139:1
140:14,16

**growing**   48:5
93:19 96:2 109:10
109:11
**grown**   128:4,8
**growth**   153:4
**guess**   5:14 7:19
8:7 17:1 20:21,24
24:3 26:20 27:4
42:8,11 48:19
66:16,23 76:23
81:3 97:23 109:3
118:11 156:3
**guessing**   110:2
111:25
**guys**   38:3

### h

**h**   5:23 6:1 9:14
19:19 32:23,25
160:3
**half**   17:21
**hampshire**   17:16
**hand**   5:11 41:8
106:21 135:25
158:13
**handing**   37:3
39:14 86:14
**handle**   27:23
**handling**   33:19
**handwritten**
125:17
**happen**   82:16
**happened**   33:4
77:2,17 82:11,14
82:15 99:24
128:18
**happy**   49:25 88:15
**harder**   67:23
**hardships**   151:17
**harrison**   2:10
**he'll**   88:14

**head**   8:11
**heading**   85:7
120:2
**headline**   123:14
**health**   102:1
**hear**   8:10 43:11
154:3,6
**heard**   57:5 58:25
59:12
**held**   16:5 58:11
154:21 155:1
**help**   7:22
**hereto**   161:7
**high**   13:9,12 14:13
14:14 71:17 72:1
72:17,24 99:22
103:15
**higher**   73:10,12
110:10
**highest**   66:18,20
71:1
**highlighted**
125:20 126:4,24
127:20 128:9
**hired**   20:14 34:14
35:5 50:14,17,25
**hiring**   47:12 60:7
**history**   99:24
**hl**   1:6
**hold**   24:22 35:7
39:2,2 61:19
130:4
**holiday**   10:23 12:2
**homes**   12:9,10
**honestly**   142:23
**hooked**   15:20
**hopefully**   140:22
**hospital**   15:21
16:11
**house**   70:20,23
72:8

**houses**   71:18 72:7
72:10
**houston**   12:19
**hr**   140:1 142:7
143:6
**hr2**   142:7
**huh**   71:12 116:2
**hundred**   26:1
88:16 152:18
**hunter**   50:24
65:15 67:5 92:1,6
93:3 148:22

### i

**idea**   65:7
**identification**   37:9
39:18 79:11 87:2
101:14,24 125:5
131:21 136:5
138:5 139:17
143:17
**identify**   101:22
**illinois**   17:18
**illness**   98:1,15
101:25 102:3
**illnesses**   101:23
**immediately**   105:5
**immokalee**   27:15
27:22
**impact**   68:9
**impacted**   82:6
**implementation**
18:4
**implied**   47:14
**inaccurate**   45:1
**inaudible**   88:13
**include**   84:20
142:17
**included**   31:24
142:13
**including**   101:24
102:1 147:17

**income**  54:15
106:5 130:20
132:3 135:14,15
**increase**  68:20
**increased**  120:11
**index**  3:1 4:1
**indicated**  99:11
**individual**  132:3
**individually**  131:5
**individuals**  153:9
153:12
**information**  63:22
64:10,13 113:3
**informed**  74:6,7
74:12 92:1,5
151:22
**infusion**  15:14,19
18:4
**ingredient**  70:21
**injuries**  101:22
**injury**  101:25
102:3
**input**  112:21
**insurance**  22:20
**interest**  157:9
**interested**  158:12
**interfere**  9:2
**interrogatories**
4:6 88:3,7 101:6
101:12,17 130:19
132:19 135:21
137:1 140:7 142:8
142:18 144:8
155:14
**interrogatory**
105:25 130:15
132:11,20 134:24
134:25
**interrupt**  8:2,3,3
**introduce**  5:17
36:23 131:11

134:22
**introduction**  20:5
**invasive**  103:16
**iowa**  17:19
**issue**  90:1,1
**issues**  32:19 89:23
**item**  123:19
**itemized**  113:1
**items**  48:4 64:11
64:13 70:21 73:19
73:22 75:11
118:13

**j**

**j**  5:25 9:13,19
**january**  1:15
48:20 158:15
159:3
**jed**  50:24 51:8
52:10,17 53:18,22
53:24 59:15 72:14
72:15,23 74:8
77:21,24 78:1,3,7
78:13 92:1,5 93:3
93:21,22 117:18
120:2,21 122:18
124:7 148:22
152:10
**jed's**  69:9,15
**jeff**  5:24 9:13,15
**jeffrey**  1:4,11 3:3
5:6 7:1 9:15,16,16
9:18 159:4,5
160:1,2,24 161:1,2
161:4,12
**jerry**  12:18,24
**jessica**  12:20,22
**jetro**  120:8,13,14
120:15,17,22
**jim**  19:21 20:8
23:13

**job**  19:9 20:6,9,11
23:16 24:7 25:12
52:4,8 54:21,22
95:22 96:3 97:21
100:14 105:4,9
133:19,19 135:5,6
140:20 141:13
150:24 151:2,5
**jobs**  16:5 21:9,11
24:14,16,20,21
25:6 56:12 98:7
**john**  9:17 133:19
133:21
**john's**  133:20
**joiner**  19:21 20:8
20:8 23:12,13
24:4 27:11
**jointly**  135:11
**joke**  98:6
**journals**  147:18
**judicial**  157:5
**julie**  1:16 158:4,20
**july**  48:16,19 92:3
93:16,18 100:24
102:17 106:10
130:21
**jumbo**  116:16
**jumbos**  124:23
**june**  48:15 84:15
102:6,7,18 130:8
130:10
**jury**  87:5
**justin**  27:8 28:7,8
30:7 36:15 97:25
98:3,9,14 152:12
152:14,16

**k**

**k**  5:23 27:16,17,18
133:22,23,25,25
**karalekus**  133:21

**kcf**  50:3,11 52:7
77:9 81:7 91:18
139:7
**kcf's**  50:9
**kcfs**  50:1
**keep**  51:18 106:24
**ken**  1:7 5:5,7,21
21:10 24:18,24
26:17,21 27:8,19
28:15 31:8 32:4
34:5,10 35:5,14,18
42:2 45:9,10,22
47:17,18,21 48:7
48:10 49:9 50:7
50:15,22 51:7
59:16,22 65:24
67:5,13,22 74:5,7
77:13,18 79:9
80:18 83:16 90:21
92:6,12,14,20,21
94:2,7 95:22 96:3
98:10 100:14
105:3,10 107:13
114:24 120:19
128:3 130:6
134:10,20 135:1,1
135:6,22 136:11
136:19 137:10,15
138:13,20 139:25
141:1,2,17 144:8
144:17 149:15
150:20,23 151:5,8
151:11,13,16,22
152:5,17 153:7,15
153:17,21 154:10
159:4 160:1 161:1
**ken's**  29:6 34:2
94:23,24
**kenneth**  2:15 5:22
**kentucky**  17:18

**kids** 22:20
**kim** 80:18,18
128:21 129:2
**kind** 10:20 12:8
22:25 31:19 63:9
73:16 98:5 115:15
**knew** 20:6 24:4
36:8 46:16,16
98:6,9 115:15
**know** 7:18,20,23
8:1,9,21 11:15
23:18 32:8 33:14
34:3 40:6,11 43:8
43:17,24 45:1
46:2,3,6,9 50:25
51:1,17,20,23
58:15 59:20 60:23
60:25 61:4 64:17
75:15 78:15 82:1
82:25 85:22 86:24
88:15 89:2,8,9
90:14 100:16
101:8 105:7,12
107:13 108:25
109:14 119:20
123:4 129:4,18
131:18 132:14,21
138:7 139:19
141:12 142:1,9,10
142:19,23,23
145:15 148:20
149:20 152:10
**knowing** 5:16
**knowledge** 34:6
82:15 153:10
**known** 46:10
**knows** 43:14

**l**

**l** 11:20,21 15:8
21:17,17 27:16,17
27:18 32:22,23,23

32:25 51:9,10,11
51:22 52:19
133:25
**lab** 103:18
**laid** 24:2,3,4 32:15
**lane** 10:23 12:2
**large** 116:14
**larger** 25:19
**law** 2:14 33:8
45:11,19 46:21
**lawrence** 1:17
158:4,20
**lawsuit** 98:23
**lawyer** 10:17
**lay** 16:12
**learn** 47:7 81:24
**leave** 17:2,3 22:16
22:22 32:9,13
**leaving** 15:1
**left** 15:3,4 21:25
23:6 45:8 105:10
129:23 130:6
134:10,19
**legal** 2:5 40:19
85:22 159:23
**legislative** 14:20
**letter** 43:3 64:21
69:23 87:16,17,17
87:25 89:7 95:20
106:19 107:5,25
113:23,24 123:12
128:21
**letters** 147:20
**letting** 105:7
**liability** 1:8
**license** 14:2,6
**licenses** 14:1
**limited** 1:8 147:17
**line** 22:24 71:22
72:2 81:12 132:6
132:8 139:5 160:4

160:7,10,13,16,19
**lines** 81:9
**list** 127:12,15
**listed** 73:20
114:11 132:19
142:7
**lists** 127:13
**literally** 110:7
**litigation** 157:18
**litsup** 159:15
**little** 10:21 49:20
56:22 57:17 64:24
69:23 71:6 81:20
96:6 98:21 104:25
106:19 117:13
119:22
**live** 11:4,8,25
12:22,24 13:1
**lived** 12:2
**living** 19:22
**llc** 1:7 159:4 160:1
161:1
**llp** 2:10
**load** 65:8,13 67:6
67:14 68:2,3
**located** 27:14 33:3
**logistics** 81:6
**long** 11:2,8,14,23
22:8 32:3 51:6
75:23 76:2 83:3
134:1,13 153:20
**longer** 15:8 50:1,9
140:14 145:8
**look** 40:5,9 41:8
41:12 42:8 44:10
44:12 62:16 78:23
79:13 81:5 84:12
85:6,7 86:24
87:10 90:8,15,16
91:5 101:8,19
102:10,17 104:11

105:22,24 107:16
108:3,18 113:20
113:25 117:2
119:25 120:1
123:13 125:16
127:13 130:15
131:17,23,24
132:6 134:23
136:18 137:21
138:8 139:20
142:25 144:14
146:14,16 147:11
148:7,15
**looked** 133:5
149:2
**looking** 27:22
28:18 43:22 45:5
93:8 112:4 114:3
131:2 140:22
146:20
**looks** 92:4 109:9
118:2 125:19
137:20 138:23
143:1 146:24
147:4
**lora** 11:20,25
**lose** 80:8
**losing** 57:14,20
79:23 80:1,24
**loss** 57:10
**losses** 57:4,6,7
58:12,19,21 59:19
77:9
**lost** 57:5 58:25
59:8,8,18,24,25
60:4,10
**lot** 38:2 79:15,18
120:3,8,9 123:15
123:20,23,25
**lots** 89:8

Jeffrey Stepanovich                                          January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

**[low - myles]**                                                      Page 14

| | | | |
|---|---|---|---|
| **low** 72:3,6 151:9 | **mark** 37:3,6 | 83:22 86:8 95:25 | **mine** 147:3 |
| **lower** 18:17 70:6,7 | 130:24,25 131:5 | 118:6 121:22 | **minute** 108:9 |
| 70:24 123:15,17 | 143:13 | 126:12 | **minutes** 108:6,12 |
| 124:6 | **marked** 37:8 | **means** 32:17 59:8 | 150:5,11 |
| | 39:17 40:13 79:10 | 68:3 70:8,9 86:6 | **missing** 17:18 |
| **m** | 87:1 101:13 125:4 | 141:5 | **mississippi** 15:15 |
| **m** 27:16,17,17,18 | 131:20 136:1,4 | **meant** 65:9 | 17:10,23 |
| 27:18 32:22,23 | 138:4 139:16 | **measurement** 73:8 | **misunderstood** |
| 51:9,10,11,22 | 143:16 | **medical** 12:21 | 59:6 |
| 52:19 | **market** 45:10 | 15:22 91:17 94:7 | **monday** 74:5,7 |
| **ma'am** 62:13 | 47:18,21 | 99:24 | **money** 54:7 57:5 |
| 108:20 109:20 | **marketing** 21:20 | **medication** 9:2 | 57:14,20 59:1,8,9 |
| 129:6 133:1 | 23:3,5 | 102:3 | 59:18,24,25 60:4 |
| 134:11 135:2,4,8 | **marking** 39:14 | **meet** 10:17 70:15 | 60:10 65:6,15,16 |
| 137:8 139:23 | 86:15 101:2 | **meeting** 57:17,21 | 79:23 80:1,9 82:9 |
| 140:6 141:9,12 | 137:23 139:12 | 57:22 58:2,6,7,13 | 118:21 |
| 145:10 147:25 | **married** 11:17,23 | 60:18 61:20,21 | **montgomery** |
| 148:3,9 | 135:11 | 123:3 | 157:7 |
| **madison** 12:21 | **maryland** 17:16 | **meetings** 57:9 | **month** 22:2 34:9 |
| **maine** 17:16 | **material** 25:24 | 122:19,19,25 | 49:18 56:7 104:12 |
| **maintained** | **math** 68:12,18,18 | **member** 13:3 | 112:24 |
| 147:23 | **matter** 75:4,7 | **members** 77:12 | **monthly** 55:8,17 |
| **majority** 128:7 | 118:16 | **memorize** 38:4 | **months** 48:14 51:5 |
| 130:1 | **mean** 18:1 27:20 | **mention** 90:7 | 55:4 56:9 154:1,5 |
| **making** 8:10 65:6 | 30:19 33:10,17 | 91:10 | **moore** 1:13 |
| 65:14 75:18 78:3 | 35:13 49:13 52:7 | **mentioned** 100:17 | **morning** 5:3 9:6 |
| 81:10 82:8 94:13 | 57:8,9,11 58:17 | **messages** 77:5 | 30:4 83:16 |
| 124:12,15 | 63:1 66:1,22 | 147:20,20 | **motors** 14:17 |
| **manage** 16:21 | 72:14 80:11 81:25 | **met** 20:8 27:9,24 | **move** 17:2,4 70:7 |
| **management** | 83:8,21 86:10 | 140:23 | 73:14 79:17 |
| 16:23 90:20 91:18 | 87:17 89:19 94:10 | **mexican** 56:21,25 | 120:23 123:9 |
| 92:9,11,15,16,19 | 95:1 96:20 99:19 | **mexico** 140:15 | 125:2 137:13 |
| **manager** 16:22 | 100:1 109:22 | **michigan** 13:14,18 | 139:4 143:12 |
| **manufactured** | 116:25 117:9,22 | 17:17 | 144:16 |
| 15:14 18:23 69:2 | 119:6,7 120:5 | **mid** 71:18 | **moved** 16:14,24 |
| **map** 17:19 | 123:18 124:9 | **middle** 1:2 5:9 | 100:19,20 119:20 |
| **marano** 125:23 | 126:9,11 127:13 | 8:22 45:7 72:1 | 120:3 |
| 127:10,11,21 | 128:6,23 131:9 | 79:14 | **moving** 57:2 |
| **march** 48:20 | 142:24 | **mind** 62:5 75:5,8 | **multiple** 52:23 |
| 91:16,22,25 93:4 | **meaning** 58:8,18 | 76:16,16 90:1 | **myles** 32:21 |
| 96:17 97:2 99:2 | 59:15 82:1,7 | | |
| 141:15 149:5 | | | |

**[n - okay]**  Page 15

**n**

**n**  1:14 2:1 5:23,23
6:1 9:14 15:8,9
**name**  5:4,18 9:12
9:15,16 11:19
19:16 32:20 44:10
102:1 118:18
133:20 143:2
**names**  12:16
125:20
**naples**  10:23 11:5
19:23,24
**necessarily**  38:15
39:8 68:5
**necessary**  161:6
**necessitating**
91:17
**need**  8:19 20:6
40:8 81:7 108:6
**needed**  81:15 94:3
94:11,12,18 97:21
97:22 98:1,16
99:11
**needing**  71:11
**needs**  51:16,19
**negative**  96:15
99:17,18 103:9
**negotiated**  25:19
**nephew**  19:15
**net**  109:21 110:4
110:21
**networking**
147:21
**never**  46:7 59:15
60:11 83:12 86:4
112:5,17 113:3
120:19 129:7
141:11
**new**  17:16,17 18:4
27:22 30:14,15,16
31:16,17,23 32:18

33:2 36:12 52:8
53:11 60:7 74:8
74:13,18,23 77:10
81:23 82:3,4
120:3,7 144:23
**noah**  2:4,6 5:15
37:1 38:21 39:23
86:17 101:4 112:7
131:1 149:9 150:2
159:1
**nod**  8:11
**nonattorney**
147:13
**nonverbal**  8:11
**nope**  129:8
**normal**  99:7 120:4
120:10
**normally**  113:9
**north**  17:15
**notary**  161:13,19
**note**  159:10
**notebooks**  147:18
**noted**  161:7
**notes**  18:12 150:6
**notice**  6:4
**notified**  30:2
**notify**  30:5 93:21
93:22
**november**  48:17
104:13,15
**number**  11:10,14
17:9 46:10,17
51:4 53:14 68:14
90:22,23,24 96:12
101:21 102:2
116:1,19 118:17
120:10 121:14,15
122:8,9,10,11,12
123:21,22 125:15
125:17 126:17
132:7 136:21,22

137:19 146:18,24
147:11 155:3,22
**numbered**  131:24
147:3 154:25
**numbers**  41:7
62:18,19,21,21
63:1,2,3 64:9 65:1
65:1 66:16 68:13
95:18 106:21
111:13 112:21
117:1 119:4,6,10
119:13 120:6
121:2,17 124:8,9
124:12,14 132:6
137:16,18
**nurse**  14:22 16:7,9
16:12
**nw**  2:11

**o**

**o**  5:23 6:1 9:14
11:20,21 21:17
27:16,17,18 32:23
32:25
**o.c.g.a.**  157:9,13
**oath**  7:10
**object**  10:3 38:8
42:16 43:7,13
63:7 88:2 151:25
152:19 153:22
154:11
**objection**  92:24
**obviously**  88:2
89:25 138:21
**occasion**  52:22
119:21
**occasions**  44:11
52:23 76:18,19,21
76:23
**occupation**  12:6
**occupations**  12:17

**occurring**  69:13
**october**  48:16,20
104:13,15 106:17
130:13
**offer**  144:25
**offered**  20:7,9
22:21 133:19
**office**  10:7 15:2
16:15,20 29:17
62:23 95:3,4
103:5 115:12
122:16
**offices**  157:10
**official**  96:8
158:13
**oh**  85:2 92:17
104:18 112:7,10
117:11 118:8
119:25 154:5,6
**oil**  12:19
**okay**  5:2 6:2 7:8
7:17,21 8:6,14,19
8:25 9:8,11,18,20
10:11,17,20 11:4
12:12 13:17 14:25
15:19,22 16:2,14
17:1,8,23,25 18:14
19:12 20:2,19,23
21:7,13,16,18 22:2
23:3,15,18 24:7,14
25:6,10,15 26:8,15
27:6,18 28:1,8,12
28:20 29:7,20
30:11 31:8,16
32:25 33:9,16,22
33:24 34:9,21
35:4 36:7,17,20
37:13,16,21 38:5
38:19 39:4,13
40:5,15 41:1,5,11
41:14,15,21 42:5,8

**[okay - paid]**

43:19,24 44:5,20
44:23 45:4,14,22
46:19,25 47:15,16
47:24 48:2,6,12
49:7,17,24 50:13
50:18,21,24 51:12
51:22 52:3,10,17
52:20,25 53:5
54:19 55:1,10,24
56:19 58:2,11,20
58:24 59:2,11
60:10 61:2,11,19
62:4 64:8,13,19,23
65:4 66:8 67:1,12
67:18 68:6,25
69:5,12,17,22
70:12,22,22 71:4,8
71:16,20 72:5,9,16
73:14 74:16,21
76:6 77:7,16 79:5
79:6,21,24 80:5,7
80:20 81:4,17
83:14 84:16,20
85:2,6,14,21 86:6
86:9,14,23 87:10
87:12,19,20,23
88:22 89:3,6,12,13
89:15 90:7,10,22
91:5,9,14,20,23
92:4,9,17 93:2,5
93:13,18 95:3,11
95:17,20 96:5,19
96:22 97:4,9
98:14,20 99:1,14
101:16,19 102:8
103:4,19 104:4
106:2,7,12,18,23
106:24 107:20
108:2,17,23 109:7
109:10 110:9,20
111:4,12 112:3

113:4,14 114:8,12
114:16 116:18
117:8,11,21 118:9
118:18 119:12
120:15 121:13,18
121:25 122:6,22
123:9 125:2,25
126:16,23 127:12
127:17,19 128:14
129:12 130:24
131:19 132:1,6,11
132:18,22 133:9
133:12,16 134:5,8
134:20 135:9,13
135:21,24 136:20
136:25 137:5,13
137:17,21 138:2
139:4,4,7,9,10,21
140:10,18,25
142:3,16,21 143:1
143:5,7,10,12
144:10,19,21
145:1,11,25 146:4
146:11 147:9,12
148:1,14 149:8,24
150:7,13 152:3
155:8,10 156:2

**once**   14:18 30:3
53:1 56:7 80:9
100:19 103:8
113:8
**ones**   66:24 82:8
**ongoing**   98:5
**opened**   15:2 16:15
16:20
**operations**   22:23
151:13
**opinion**   61:23,24
75:2 76:22
**opportunity**   17:5
19:6 20:4,4,7 54:7

69:10
**opposed**   69:14
80:22
**order**   119:19
**orders**   63:23
**organizations**   13:4
13:6
**original**   50:20
60:8 65:11 100:22
**originally**   100:21
102:16
**outcome**   158:12
**outside**   18:23
93:19 96:2 110:6
**overlap**   49:11,13
49:18
**owed**   109:23
**owned**   11:2
**owner**   12:7 19:15
19:20 23:13 28:23
28:25 32:18 84:10
84:23
**ownership**   144:23
**owns**   135:17

**p**

**p**   2:1,1 6:1 9:14
**p.a.**   2:5
**p.m.**   1:16 150:16
156:6
**pacific**   21:14,14
21:18 22:1,9,20,22
22:25 23:6,19,22
**pack**   125:22 127:1
127:21
**package**   22:19
73:8,11 116:7,17
121:21 122:8,11
126:20
**packages**   68:8
116:4,5,22,23
117:6,8,11,16,18

117:19,24 118:4,5
118:9,10 121:14
121:21,22,24
122:1,4 124:22
**page**   3:2 4:2 40:1
41:7,12,18,22 42:6
42:9,9 45:6 49:21
49:22,22 50:2
52:5 54:2,19
62:14 65:4 71:8
73:14 74:6 78:23
79:2,6,7,7 80:6
81:5,21 82:10
83:14 84:12 85:7
87:11,18 89:4,11
90:21 91:5,7,21
95:18 101:20
106:1,4,21,25
107:2,3,4,8,10,25
108:4,5,24 109:7
112:4,14 113:15
113:18,20,21,25
114:1,1 120:1,24
120:24 123:10,13
123:13 126:13,13
130:17,18 131:24
131:25 133:8,10
133:11 136:19
146:16,21,24
147:9,11 160:4,7
160:10,13,16,19
**pages**   40:12 71:9
108:18 123:14
133:11 136:13
140:2 158:7
**paid**   29:7,9,10,11
55:5,7,11,21,21
56:4 65:11 66:5
80:9,13,17,19 81:2
110:16 111:6,15
112:1 113:2 139:1

Case 7:18-cv-00186-HL   Document 26-1   Filed 03/02/20   Page 180 of 259

Jeffrey Stepanovich
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

January 23, 2020

[paid - president]

Page 17

145:18
pamphlet 66:23
paper 87:22
papers 89:8
paperwork 38:2
  141:11
par 150:21
paragraph 45:7,8
  57:2 62:15 71:10
  73:15,16 79:14
  80:6 81:5,22
  83:15 85:9 87:10
  88:19 89:16 90:22
  90:23
paragraphs 44:12
  71:9
part 17:6 33:7,9
  45:9 47:6,12,17,22
  60:2 74:20,21
  83:17,21 89:19
  106:16 124:2,3,17
  128:2,5 129:22
  133:13 142:2
  143:3
particular 30:21
  63:16 64:6 71:4
  73:3 128:17
parties 157:18
parts 69:3
party 157:15,18
  158:11
patterson 1:14
pay 55:4 61:12,15
  61:17,17 65:7
  70:24 73:10 77:9
  80:9,14,25 81:1
  137:15
paycheck 141:20
paychecks 55:8,9
  80:21

payments 55:25
payroll 143:4,11
pecchio 43:25
  44:21
pennsylvania
  12:20 17:17
people 5:14 30:12
  31:18,21 53:13
  105:7
pepper 70:19,20
  116:10,10,13,15
  123:20,20,21,22
peppers 30:22
  48:3 116:12
percent 21:5,6,6
  29:5,7,9,11 55:20
  56:1 75:19 80:8
  80:25 88:16
  109:21,24 110:4
  110:18,20,21
  111:2,3 116:18,21
  116:24 117:3,15
  117:19 118:25,25
  152:18
percentage 65:17
  66:18,20,21 68:9
  68:15,16,21 77:10
  77:11 117:4
  118:15 124:10
percentages
  118:24 121:24
perception 67:21
perfect 5:3 133:2
performance
  62:18 63:25 64:9
  64:25 65:23 74:3
  89:24 150:24
performing 151:2
  151:5
period 30:20
  48:25 49:3 66:17

101:25 105:21
  106:9 134:6
pero 126:13,23,23
  126:24
person 28:10 58:2
  58:14 60:20 81:23
  93:7,10 122:22
personal 5:21
  82:15 93:9 103:23
  129:21 148:7,16
personally 29:15
  43:19 63:21
perspective 81:6
pete 12:21,23
philosophy 129:13
phone 2:4 11:10
  11:11,12 30:8
  31:18 42:18 53:12
  58:1,22 59:14,17
  60:14,19,22,24,25
  61:22 62:2 74:10
  77:19 78:14,20
  80:4 81:8,13 85:9
  148:9,15,19
  149:20
phonetic 126:13
phrase 60:10
physical 96:13
  99:5,7 101:22
  104:2
physically 60:21
  100:2,11
piece 18:24 33:11
  64:11
pittsburg 12:20
pizza 70:20
plaintiff 1:5 2:3
  87:14 88:20 102:5
  147:15,23
plaintiff's 4:3,6
  37:4,19 101:5,11

146:14,22 147:4
  155:3,7,13
plan 50:20
players 19:5
please 5:11 7:16
  7:19,23 8:20
  24:19 37:6 90:19
plentiful 69:19
plus 20:22 55:11
point 7:16 8:1,20
  8:24 19:2,25
  33:25 34:7,21
  35:21 44:3,23,24
  50:6 51:17 55:8
  55:12 57:3,6
  59:25 60:12 65:7
  65:12 67:4,10,12
  67:24 68:2 77:14
  80:4,21 90:5
  98:11 105:18
  115:11,13 122:15
  126:3 151:19
policies 86:3
portion 50:10
  110:22 145:23
position 18:2
  20:14,17 35:4,7
  73:21
posts 147:22
potential 31:24
  53:3
preparation 10:1
prepare 9:23,24
  10:15,18 38:5
prepared 38:13,16
  38:20,21
prescription 102:2
present 2:14 61:5
president 15:15
  17:7 18:1

Jeffrey Stepanovich
January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

[pretty - randomly]
Page 18

**pretty** 17:21 29:4
72:13
**previous** 52:16
75:11 121:15
**previously** 50:5
**price** 73:8,10
126:19 153:1
**priced** 73:12
**prices** 124:21
**primarily** 95:8
**prior** 89:25 100:6
152:24 153:3
**privilege** 10:5
38:10,18
**privileged** 147:14
**probably** 11:16
18:18 24:11 73:7
93:10 107:18
119:15 121:7
134:22 144:5
**procedure** 1:13
6:6 103:17
**proceeding** 7:12
**process** 29:24
35:25 36:22 63:5
94:14 96:10 103:8
103:10
**processing** 33:2
**produce** 15:5,25
16:1 17:3 18:20
19:6 23:2,4,5,23
28:20 35:14 36:14
45:24 46:7 51:12
51:22 53:11 56:14
68:20 71:11
112:24 129:24
136:15 138:16
**produced** 7:2 30:2
30:6 39:21 40:21
40:21 69:11
133:12 140:4

148:4,10
**produces** 69:3
70:11
**producing** 150:21
**product** 18:22
19:13 27:23 28:19
29:6,8,15,15,17,21
30:2,5,21 32:4,4
33:7,10,20 35:11
35:13,23 52:12,14
56:22 64:6 66:6
66:10,19 68:14
69:2,21 70:2,7,11
70:14,24 71:2,14
71:18,23 72:1,3,6
72:17,25 73:5,10
73:12 94:14
109:25 110:4,6,7,9
110:14,17 111:8,9
116:8 119:8 120:3
120:9,12 123:17
123:24 124:1,6,18
126:14 128:3,4,4,7
128:8,17,21,24,25
130:2 140:15
**production** 30:20
33:12,13,17 36:4
37:6,20,22 39:6,21
39:22 40:22 45:10
47:18,23,25 48:2
50:2,9,10 56:20,21
68:7 69:4 74:1
88:9 104:22
133:14 138:17
140:5 143:24
146:13,16,23
147:6 151:9 155:5
155:6,7
**products** 47:20
48:8,10,21,23 49:7
49:10,14 72:24

111:7 123:16
127:25,25 128:8
129:15
**professional** 13:6
**profit** 57:10
110:18,20,22
**profitable** 32:7
**profiting** 57:14
**program** 25:22
95:21,23
**prohibited** 157:13
**prostate** 92:2,6
93:3 96:7 98:11
98:22 99:12 100:3
100:7 102:6,23
103:7
**provide** 157:11,14
**provider** 11:12
**providers** 102:1
**provisions** 157:9
**psa** 99:20,21,22
103:14,15
**psychiatric** 101:22
**public** 161:19
**pull** 101:1 114:12
132:15
**pulled** 120:8
**pump** 15:14,19
18:4
**purchase** 31:14
69:19
**purchased** 31:11
124:5
**purchasing** 25:23
**purpose** 81:9
83:12
**purposes** 6:5
118:14
**pursuant** 1:12 6:3
157:4

**push** 104:5
**pushed** 102:12
**put** 83:9 89:4
121:16 148:23

q

**quality** 70:1,6
123:17
**quantify** 66:14
**quarter** 77:11
112:25
**question** 7:19 8:22
10:4 26:16 38:9
42:17,22,25 43:1
59:7 63:8 68:19
85:4 101:19,21
107:23 112:15,16
121:3 123:11
130:8 146:12
148:5 154:3
**questions** 7:13
16:5 42:12,13,19
131:13 150:1,3,9
150:10 154:17
**quick** 62:6 119:7
**quite** 45:20
**quote** 89:23

r

**r** 2:1 5:23 9:19
11:20,21 21:17
32:23,25 133:25
160:3,3
**raise** 5:11
**raised** 42:12,13
110:7
**ran** 96:15 114:13
114:23 115:10,10
119:7,9,11 121:5,8
**random** 80:22
**randomly** 56:4

**[range - request]**                                                    Page 19

**range** 65:20 71:18
72:1 146:3
**ranged** 72:9
**rates** 157:17
**read** 64:12,19,20
64:21 65:2 90:17
91:14,24 154:20
159:9 161:5
**reading** 87:18
107:6
**ready** 40:7 62:12
104:21
**really** 28:3 35:11
42:22 62:18 83:10
**realtime** 157:7,11
**reason** 9:8 80:14
83:11,12,23,24
85:10,11,17,17,18
85:25 86:6,7,8
87:16 115:4 144:6
159:11 160:6,9,12
160:15,18,21
**reasons** 87:15
88:21,24 94:8
**recall** 7:23 28:3
44:8,25 46:23
53:25 55:17,18
56:8 57:15 58:20
61:11 62:3 74:25
75:1 76:4,6,25
77:22 78:3,7,10,12
83:6 85:2 93:24
94:1,5 101:18
106:13 115:23
123:5 142:4,10
152:7,8,15
**recap** 21:7
**receipt** 159:18
**receive** 55:3,4,15
113:7

**received** 49:5 97:9
106:9 109:12,13
109:18 113:4,5,6
132:12 134:5
**recessed** 62:9
108:13 150:15
**recognize** 37:13
40:11,16 41:1,21
64:25 86:25 87:3
101:10 131:18
133:4 136:7
138:10 139:22
143:14
**recollection** 84:16
**recommend** 52:3
97:13
**recommendation**
97:10,18
**recommended**
51:6 97:14
**reconvened** 62:10
108:14 150:16
**record** 8:4 42:5
108:16 113:17
154:21,23 155:1
156:4
**recordings** 147:19
**records** 142:24
**recovery** 95:25
96:1 104:23
105:16,21
**red** 143:3,6,8
144:11
**refer** 31:21 41:7
44:18,20 64:9
65:1 66:23 72:6
86:9 110:5 111:23
116:3,19 126:1,5,5
**reference** 64:17
65:10 83:8 90:20
91:2 115:11,13

116:21 122:15
123:19 126:3
149:4
**referenced** 107:25
149:5 159:6
**referencing**
127:23
**referral** 157:16
**referred** 128:20
**referring** 28:6
52:15 54:23 59:12
65:20 70:3 73:23
79:8,19 80:17
86:10 89:21 92:10
98:4 113:22,23
147:14
**refers** 109:15
117:3 126:6
**regent** 11:5 12:4
**region** 17:7,8
**regular** 55:25
122:18
**regularly** 122:20
**regulated** 18:22
**regulations** 157:5
**rehired** 141:10
**related** 158:11
**relating** 147:14
**relation** 128:15
**relationship**
120:22 128:24
157:9
**relationships**
128:11,16,23
**relative** 117:4
**released** 104:20
**relevant** 42:25
**reliable** 132:18
**relied** 147:15
**relies** 147:15

**remember** 18:14
20:10,23 21:1
22:2,15 24:9
26:12,18 29:4
34:9,17 47:12
51:4 55:24 60:1
61:7 74:14,16
75:21,24,25 76:24
83:5 85:1 93:6
98:17,19 105:14
109:18 118:1
121:8 125:7
126:19 141:11
149:6 152:13
**remembering**
121:16
**repeat** 78:7
**rephrase** 43:1
**report** 114:9,13,16
115:10 117:25
119:7,22 121:4,8
121:15 125:7,8,10
**reported** 18:24
158:6
**reporter** 1:17 5:19
8:4,10 9:12 157:7
157:15 158:5,14
**reporters** 157:7
**reporting** 157:5,7
157:11,15,15
**reports** 122:24
123:2 124:15
**represent** 5:5
**representation**
83:18
**represented**
121:20
**represents** 121:19
**reprimanded** 86:2
**request** 37:5,20,22
39:6,22 40:22

[request - salesperson]                                        Page 20

94:6 133:13
136:16 138:17
140:5 143:24
146:15,23 147:5
147:13 149:9,17
155:5
**requested** 157:19
158:9
**required** 161:13
**resell** 110:8,10
129:1
**reserve** 150:8
**reserved** 156:7
**resign** 23:25
**responded** 37:23
**response** 4:3,6
37:19,21 38:16
39:21 40:22 74:4
78:4,8 84:5 85:3
101:11 102:5
106:3 133:13
136:16 138:17
140:4 143:24
148:1
**responses** 37:4
39:5 42:11 101:5
101:16 105:25
130:16 146:15,22
147:5 155:4
**responsibilities**
25:20
**responsible** 18:3
25:23 65:16,17
66:2
**responsive** 149:17
**rest** 33:15,20
106:19
**restaurants** 71:23
**result** 154:9
**retail** 71:13 73:6
123:21,22

**retailer** 70:5
**retailers** 71:1,5
72:10
**return** 4:7,8,9,10
4:11 130:25 131:2
131:3,25 132:4,16
132:25 136:3,14
137:4,22 138:1,14
139:15 142:14
155:23 159:13,17
**returns** 133:11
134:23 140:3
143:20 156:1
**reveal** 10:12,12
115:8
**revenue** 54:5
119:2,3 121:23
126:10
**review** 9:25 113:1
157:19 158:9
159:7
**reviewed** 10:14
**rhyme** 80:14
**richard** 2:5 43:25
44:21
**right** 5:11 8:24
15:24 18:19 31:23
38:6,22 41:8,17
45:2,5 49:23
50:11 52:8,15
55:12,22 56:14
57:18,20 60:19
62:14 67:2 68:4
72:1 77:7,15
79:13 81:4 82:10
86:14 87:16,21
88:8,21 92:7,22
93:11,19 94:22
95:9 97:18 98:20
98:24 99:5 102:9
103:12 105:19,20

106:15,21 107:6,9
107:9 110:1
111:19 112:22
113:14 114:2,6,14
114:22 117:7
119:25 122:1
125:2 130:10,18
130:22 131:23
132:25 135:11,23
136:7 137:19
138:24 139:2,5
140:9 141:1,15
142:11,15 143:12
143:21 144:16,20
145:2,6 147:10
148:8,11 149:25
150:8 152:17
154:25 155:2
**righty** 107:10
**river** 17:10,23
**robert** 43:25 44:20
**robinson** 1:16
158:4,20
**room** 5:14
**rough** 62:22 66:22
116:25 119:4,6
**roughly** 11:3,15
22:10,12 23:10
27:4 32:6 116:25
117:13,14 123:23
**rules** 1:13 6:6
157:4
**run** 96:23 114:16
119:21 121:4
124:23,23 126:21
129:14

**s**

**s** 2:1,10 6:1 9:14
15:8,8,9,9 32:22
32:23,23,25
133:25 160:3

**safe** 121:10
**safety** 25:22
**salaries** 142:14
**salary** 18:9,15
25:19,25 34:16,19
35:1 55:11,15
61:24 74:17,19
75:12,18 76:12
111:15,15,18,19
145:15,17,21,22
145:22
**sale** 33:20 142:3
**sales** 15:15,17
16:22 18:3 20:16
27:23 29:17 30:17
31:15,18 36:22
45:24 52:8 54:11
54:12,14 55:22,23
56:14 57:4,7,9
62:18,23 63:14,22
63:23 64:3,8,25
65:18,22 66:2
77:11 109:24
112:23 119:1
122:10,12 130:2
141:23 142:5
153:18
**salesman** 20:17
21:8 35:6 50:15
51:12 58:8 59:5
59:13 119:8
**salesmen** 50:19
59:21 60:22 61:13
61:14 68:2 114:6
115:18 153:6
**salesmen's** 78:9
**salespeople** 53:12
54:6,7 61:16 81:7
**salesperson** 50:17
54:2 60:3,7 61:18
74:9,13,18,23

Jeffrey Stepanovich
January 23, 2020

Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

77:10 81:15
salespersons 82:8
samples 103:6
 118:12
san 12:18
saw 121:15 135:10
saying 7:15 8:8,17
 44:8 45:1 66:8
 73:21 78:7 85:15
 92:18 152:16
says 37:19 57:2
 73:18 77:8 83:15
 87:21 88:20
 101:21 105:25
 106:25 109:10
 111:18 117:21
 134:25 139:5
 143:6 144:7,17
 146:17,22,24
sba 12:21
scan 90:18
schedule 100:21
 102:16
scheduled 92:2
 93:16
school 13:9,12,22
 13:24 14:13,14
seaboard 18:5
seal 18:24 158:13
searching 105:4
season 48:11,12,13
 48:18,19 50:17
 55:2,6 93:19 96:3
 110:23 111:7
 114:10 135:6
 137:10,12,13
 139:2 140:13,14
 140:16 141:10
seasonal 141:12
seasonally 141:2,4

seasons 49:9 54:22
 141:8
second 44:13
 54:20,22 61:19
 65:5 71:8,10
 73:16,18 79:14
 81:4,22 85:8
 89:16 95:19
 105:23 130:4
 131:25 133:10
secrets 129:24
see 32:11 41:9
 44:10,13 62:17
 89:13 90:23,25
 91:20 101:20
 118:18 119:9
 120:7 121:11
 132:15,16 136:21
 142:7 143:22
 147:24 148:1,9
seeing 40:24 146:2
seen 37:15 38:1,2
 38:3 123:7
self 18:24
sell 28:18 30:20
 32:3 33:7,15
 35:11 36:5 47:21
 48:20 52:1,7,18
 56:16 66:6 68:14
 68:15 69:10 70:14
 71:23 94:14
 110:10 120:14,21
 123:17,25 127:24
 128:1 141:22
selling 14:22 23:5
 25:3 26:17,21,23
 27:7 29:20 30:4
 33:20 48:8 49:7
 50:11 52:12,14
 66:9,17 130:2
 152:25

send 78:17
sense 15:4,5,7 17:4
 17:5 18:6,11,21,22
sent 38:16 43:4,18
 77:13,18 79:8
 82:11,16 103:18
 159:14
sentence 44:13
 49:21 57:3 58:24
 62:16 65:5 73:18
 73:18 77:8 79:14
 81:22 89:17 120:2
 123:15
september 20:12
 20:25 21:9 96:14
 96:19,20 99:5
 106:10,15 130:21
serious 91:17
services 157:11,15
set 54:10,13,14
 95:21 96:1 99:15
 139:11
seven 11:24
seventeen 11:9
share 62:1 115:17
sheet 159:11
shell 12:19
shift 10:20 130:5
short 13:21 108:3
 127:15
show 64:24 121:2
 125:10 126:22
showed 27:21
 28:10
shown 109:5
shows 31:19
 125:11
shut 18:25 22:23
side 89:5 119:24
sign 159:12

signaling 8:13
signals 81:14
signature 156:6
 158:19
signed 39:7 159:20
silly 42:22,24
sites 147:21
six 104:25
size 116:14
skeeter 19:17 20:6
skip 42:5 57:16
 81:20 85:6
skipping 96:5
slight 118:3
small 12:7 135:17
social 13:3 147:21
softball 19:4
software 63:17
sold 16:7 21:4 29:6
 29:8,14,15,17
 30:12,14,18 31:12
 31:21 32:2 35:23
 36:7 46:7 49:10
 49:14 52:2,19,22
 53:1 55:6 64:6
 68:16,21 111:7
 116:5,22,23 117:6
 117:8,11,15,18,22
 117:24 120:12,17
 120:19,22 121:22
 122:1,4 123:15,23
 124:21 125:12
 126:2,7 128:7
solutions 159:23
somebody 82:4
somewhat 48:16
 65:8
son 27:8,21 28:5,7
 33:8 45:11,18,19
 46:21 97:25

**[sorry - sure]**                                                                      Page 22

**sorry**   23:21 59:6
    105:13 112:5,11
    112:16 120:24
    130:18 133:3
    146:20 154:6,7
**sound**   83:18
**south**   15:2 17:15
**southern**   16:22
**speak**   77:24 78:1
    78:13 153:18
**speaking**   77:20
**speaks**   42:21
**specialties**   15:6
    16:3 18:20 19:10
    19:13,14 21:8,10
    21:24,25 22:5,17
    22:18 23:8 24:16
    24:17 25:8,11
    27:9,14,20 28:16
    29:11 30:24 31:2
    31:3,11 32:5,10
    33:14,19,25 34:5
    36:1,9 45:9 48:8
    49:25 50:6 52:13
    52:15,18 53:7,15
    120:17 134:12,14
    144:22,23 145:13
    145:19
**specific**   28:3 40:8
    65:21 69:16 74:15
    91:18 115:24
    124:18 149:13
**specifically**   36:24
    44:6 64:17 74:14
    77:23 83:4 84:25
    88:12 90:21 91:3
    98:18,19 112:2
    119:24 152:5,9,11
    152:13
**spell**   5:18 9:11,18
    15:7 19:18 21:16

133:22
**spoke**   28:12
**spoken**   152:25
    153:4
**spring**   34:11 48:13
    48:15 50:14,18
    109:21,25 110:1,3
    111:9 121:13,25
    141:6,20
**sprint**   11:13
**squash**   48:3,4
    104:22 141:24,25
**sr**   2:5
**st**   12:21,23
**staff**   57:4,7 58:7,8
    77:11
**staffing**   24:1
**stamped**   39:25
    40:1,12
**standard**   29:5
**standards**   70:15
    140:23
**start**   24:24 30:4
    53:13,21 105:4,9
    108:4 109:3
    125:22 127:4,21
    141:25
**started**   18:19
    20:10 21:8,22
    24:9,15,17 26:17
    26:21 27:6 33:21
    34:4,10 42:2
    50:17,21 52:6,8
    53:18,19 104:21
    105:6 130:12
    141:24
**starting**   45:6
    91:21 106:9
**starts**   71:10 73:17
    107:8

**startup**   15:3
**state**   1:18 14:8
    92:4 102:4 106:5
    130:21 140:8,19
    140:21 157:2
    158:2,5,14
**stated**   50:5 92:10
**statement**   45:6
    50:4 54:20 58:18
    58:21 59:24 60:4
    60:11 65:11 69:25
    73:21,25 78:5,8
    81:10 84:21 85:3
    112:19 113:1,5
    120:1
**statements**   57:5
    57:13 58:25 59:11
    73:24
**states**   1:1 17:9,14
    18:5 87:13 113:19
    118:9
**stepanovhich**   4:11
**stepanovich**   1:4
    1:11 3:3 4:7,8,9
    4:10 5:7,10,25 7:1
    7:6,6,7 9:13 11:21
    40:5 43:3,8,14
    62:12 86:23 88:4
    88:19 91:16,25
    107:15,22 108:17
    136:8 138:7 150:3
    150:19 154:4
    159:4,5 160:1,2,24
    161:1,2,4,12
**stepanovich's**
    131:3 136:3 138:1
    139:14 155:17,19
    155:21,22,25
**stood**   115:16
**storch**   2:4 3:5 10:3
    38:7,14,23 39:2,5

39:12 40:3 42:15
    43:7,12 63:6
    86:19,21 88:1,10
    92:24 112:9
    114:18 115:1
    131:4,8 149:18
    150:4,9,12,18
    152:2,4,21,23
    153:24 154:2,13
    154:16,20 159:1
**store**   63:2 70:10
    70:14
**stores**   70:10 71:24
**straight**   26:13
**street**   1:14 2:11
**strolh**   32:21
**structure**   56:2
    74:20 145:20
**stuff**   148:16
**subheading**   73:15
    89:14
**subject**   93:14
    98:23 119:12,13
**submitted**   64:11
    64:12,14,20 66:24
    143:23 144:5
**subscribed**   161:14
**subsidize**   81:23
**substitute**   14:19
**successful**   54:16
**suffered**   101:24
**suite**   2:5,11
**summer**   14:17
    22:4
**supplied**   19:12
**support**   147:16
**sure**   37:23 42:14
    43:6,18 60:15
    61:25 62:20,25
    68:10 76:22 77:25
    83:8,11 84:7 90:5

**[sure - thumb]** Page 23

96:18 105:6
109:13 113:13
115:2,22 119:8
128:19 132:2
148:12 154:24
**surgery**  91:18
92:2 93:16,23
94:4 95:25 96:1
97:11 100:17,18
102:5,7 104:24
105:16 130:7,10
**sustained**  151:16
**switch**  55:19 95:17
106:18
**sworn**  5:12 7:2
88:3 161:14
**symptoms**  100:5
**system**  81:8
**systems**  14:22,22
16:7

**t**

**t**  5:23,23,23 6:1
9:14 19:19 32:23
32:25 160:3,3
**take**  8:24 36:22
45:9 47:17 62:6
69:3 71:17,25,25
72:2,3 86:24
87:10 90:8 93:22
94:11 101:8
103:10 105:24
107:14,19 108:2,9
123:12 131:17,23
136:18 146:13,16
150:5,11
**taken**  1:11,13 6:3
9:1 86:11 108:17
135:16
**takes**  71:13
**talk**  13:8 20:7
31:20 36:23 41:5

41:6 60:16,18
67:1 69:23 98:21
105:1 106:19,23
128:14 130:5
143:1
**talked**  27:9 53:19
69:22 144:20
**talking**  8:2,17 82:2
88:7 106:22
**tape**  147:19
**tavilla**  125:23
127:8,9,21
**tax**  4:7,8,9,10,11
131:2,3,25 132:3
132:16,25 133:11
134:23 136:3,14
137:4,21 138:1,14
139:14 140:3
142:14 143:20
155:23,25
**taxes**  135:16,19
155:17,19,21
**teach**  45:11,18
46:20 47:6
**teacher**  14:19
**teaching**  45:23
47:2
**team**  19:4
**telephone**  14:22
16:7 82:20 95:8
102:2
**tell**  12:16 13:8,11
14:12 18:10,19
20:2 24:22 26:22
27:6,13 28:1 29:3
36:14 41:18 42:6
42:10 45:14,17
46:3,5,12,13,19
48:14 65:8 70:7
75:14 77:13 82:24
83:1,22 84:2

85:14 88:15 92:14
93:10,25 94:2
95:22 96:11 98:2
111:4 112:6 114:2
121:18 133:16
143:14 144:12,21
152:5
**telling**  90:12 91:2
**tend**  72:16 73:10
**tennessee**  17:19
**terminate**  50:3,7
**terminated**  23:24
33:5 34:3,5,6
57:19 82:18 87:14
88:21,23 102:13
105:3 113:12,13
153:13,21 154:8
**terms**  66:4
**test**  99:14 102:22
103:6,8,15
**testified**  7:3 26:15
28:15 55:11 75:1
76:15 99:4 106:12
130:6,9 148:6
**testify**  9:3,9 38:12
148:25
**testifying**  47:19
59:23 92:13
**testimony**  158:7
159:9,18 161:8
**testing**  97:6
**tests**  96:12,15,15
96:23 99:10,12,15
103:2,10
**texas**  12:24
**text**  77:5 147:20
**texted**  77:6
**thank**  9:11,20
40:14 41:5,16
45:4 87:4 89:3
108:16 133:12,16

136:15,18 137:5
138:16,19 140:7
146:11 150:10,13
**theirs**  49:2
**theory**  66:5
**thereof**  158:8
**thing**  16:18 81:18
85:18,19 90:17
132:3
**things**  22:21 31:19
44:7,8 69:19
71:23 73:20
113:22,25 117:14
124:19 148:17
**think**  15:9 17:20
20:21 32:6,24
39:8 42:16,20
62:22 66:4 69:22
77:21 83:9,25
105:12,23 113:8
134:15 142:2,4
145:17
**thinks**  42:19
**third**  65:5 66:6,9
89:16 146:24
147:11
**thomas**  157:3
158:3
**thoughts**  24:23
**thousand**  26:2
**three**  54:15 55:23
61:16 72:21 77:9
81:12,21,23 82:8
103:21,24 114:6
115:11 117:9,10
117:12 118:1,6
122:16 125:12
**thrown**  79:16,18
**thumb**  42:9
146:23 147:10

**[thursday - w2]**                                                  Page 24

**thursday** 1:15
**time** 9:12 19:22
 25:18 26:20 30:20
 35:8 36:18,22
 48:5,6,25 49:3,15
 50:13 55:12 61:19
 73:17 75:3 77:17
 83:3 84:18 93:22
 94:3,6,13 95:15,25
 96:2,23 98:1,16
 99:23 104:8,23
 107:15,19 108:3
 114:1,2 115:10
 123:13 131:15
 134:6 141:18
 159:19
**timeframe** 159:8
**times** 80:22
**tips** 136:22 142:14
**tired** 65:5
**title** 113:19
**today** 7:10 9:3,9
 10:15 87:8
**today's** 9:23 10:1
**told** 57:19 71:15
 76:6 83:24,25
 85:16 87:14 88:20
 90:2,4,6 93:2,15
 97:25 98:10,12,14
 98:17,18 129:7
 150:19 151:1,4,8
 151:11 152:8,13
 152:14,16,17
**top** 41:8 70:11
 71:13 72:25 73:4
 73:9 84:13 89:11
 91:7 95:19 106:21
 113:20 125:11,11
 126:2,8,11,22
 127:16,17,18
 146:17

**tortinato** 29:16,18
**total** 18:15 33:13
 68:17 111:12
 116:23 117:8,11
 117:19,21,23
 118:3,4,4,5,6,10
 118:19 119:1
**totals** 114:4
**toyota** 12:18
**tractor** 76:2
**trade** 13:22 31:19
**transcribe** 8:16
**transcribed** 158:8
**transcript** 157:19
 158:8,9 159:6,20
 161:5,8
**transition** 18:21
 26:21
**treating** 102:1
**treatment** 95:21
 95:23 149:13
**trial** 87:6
**tried** 77:20,24
**true** 62:18 102:9
 158:8 161:8
**truthfully** 9:9
**try** 53:13
**trying** 27:10 32:11
 79:15,16
**tuesday** 77:13
 78:19 79:9
**turn** 65:4,7 91:7
**twenty** 11:24
**twitter** 147:22
**two** 13:21 14:18
 27:1 32:6 41:13
 65:6 68:1 71:9
 81:21,24 96:15
 103:14 113:22,25
 115:18 124:3
 133:11 134:16

**136:13 137:6
 140:2 142:5 153:8
 153:25 154:5
type** 116:13
 121:14 124:18
 147:21
**types** 70:16,17
 72:21 128:22
**typo** 132:21
 138:22

**u**

**u** 15:8 133:25
**uh** 71:12 116:2
**uncle** 20:8
**unclear** 89:9
**understand** 7:9,13
 7:15 39:1 117:4
**understandable**
 8:20
**understanding**
 47:5,6,8
**understood** 115:1
**underwent** 102:5
 102:22
**unemployment**
 105:18 106:5,9
 130:20 132:12
 140:8,11,15,19,24
**united** 1:1 18:5
 118:8
**university** 13:14
**unquote** 89:23
**unusual** 54:2
**upper** 18:17,17
**upset** 112:15
**usage** 81:19
**use** 63:3,3 72:5
 122:25 123:2
**uses** 69:8
**usual** 157:17

**usually** 30:7 70:10
 80:19 96:13
 110:12

**v**

**v** 6:1 9:14 159:4
 160:1 161:1
**valdosta** 1:3,14
**varied** 26:7
**vary** 49:19
**vegetable** 33:17
**vegetables** 30:25
 30:25 31:7,8,12
**verbal** 44:16
**verbalize** 8:13
**verify** 119:9 148:8
 149:1 159:9
**veritext** 159:14,23
**veritext.com**
 159:15
**vermont** 17:17
**versus** 5:7 129:20
**vice** 15:15 17:6
 18:1
**virginia** 17:16
**visit** 103:5
**visited** 94:21
**vocational** 13:24
**voiced** 75:2
**voicing** 78:3
**volume** 33:18
**voyles** 1:13 2:14
 5:20,20 62:5
 108:9
**vs** 1:6

**w**

**w** 2:5
**w2** 49:5 133:8
 134:5 135:10,13
 135:18 136:19
 137:7 138:20

Jeffrey Stepanovich
January 23, 2020
Stepanovich, Jeffrey Vs. Ken Corbett Farms, LLC

**[w2 - young]**
Page 25

139:25 142:11
143:21 155:21
**w2s** 136:11 138:13
144:3,13 146:2
155:17,19,25
**wages** 136:22
142:14
**wait** 8:7,18 89:18
89:20,21
**walk** 29:24
**want** 7:25 58:3
68:17 69:18 81:20
90:16,19 98:6
107:13,14,18
**wanted** 16:3 19:9
27:11 28:16 36:22
47:4 69:25 72:17
72:25 115:2
129:14 154:23
**washington** 2:10
3:4 5:1,4,13 6:2
7:5 10:10 37:1,10
38:11,19,25 39:4
39:10,13,19,23
40:4 42:23 43:2
43:10,16 51:15,21
62:7,11 63:10,12
86:17,20,22 88:6
88:18 93:1 101:2
101:7 107:12,21
108:11,15 112:7
112:10,13 114:22
115:7 125:6 131:1
131:7,10,16,22
136:2,6 137:23
138:3,6 139:12,18
143:18 149:8,24
150:7,13 151:25
152:19 153:22
154:11,18,22
155:2

**way** 54:10 99:15
**we've** 106:22
121:5 144:20
**wednesday** 83:15
**week** 97:25
**weekly** 55:8,17
**weeks** 104:25
**went** 10:2 14:21
15:3,5,25 19:1,2
23:8 25:10 27:2
35:1 53:19 94:14
94:17 103:16
106:14 134:15
145:18
**western** 13:13,18
**wholesalers** 71:17
71:20,21,22 72:10
**wife** 135:10,13,15
**wife's** 11:19
100:20
**window** 30:18
**windsor** 48:25
49:8 53:17 54:23
56:13,24,25
105:11 106:14
125:22 127:6,21
130:12 133:17
134:9 144:18
145:5,8
**winter** 135:8
137:12,13 139:2
140:13
**wisconsin** 17:18
**wise** 70:21
**wishes** 100:20
**withdraw** 59:7
112:16 121:3
130:8 135:14
148:4
**witness** 5:12,24
107:20 138:2

152:22 153:25
158:13 159:8,10
159:12,19
**words** 45:21 47:13
85:24
**work** 14:21 15:6
19:10 21:23 22:1
25:7 27:2 32:11
45:18 46:20 48:7
63:5 67:23,24
93:23 94:3,6,11
95:3,6 97:22
106:14 134:1,3
144:24 145:19
**worked** 14:17
21:14 22:5 112:24
134:6,9 145:5,12
**working** 23:19
24:24 26:23 33:8
34:4,10 36:17
51:8 94:7 130:12
145:1,5 146:7,9
153:6
**works** 12:18,19,20
12:21
**worry** 97:25 98:15
**wright** 12:20
**write** 125:17
**writing** 29:12
**written** 44:15 86:1
**wrote** 64:21 88:16
89:22

**y**

**y** 9:19 32:23
**y'all** 107:12,17
**yeah** 10:11 15:9
27:4 39:12 40:3
79:1 86:21 106:16
108:11 115:8
119:2 122:7,12,14
129:24 143:5,9

147:4
**year** 18:16 20:24
21:1 22:6 24:25
64:3 81:24 99:8
109:11 113:8
115:25 120:10
125:14 126:15,18
134:19 140:12
145:11 146:2,7
**yearly** 96:13 109:5
109:8 114:4
**years** 11:3,9,15,24
14:18 18:10 22:10
27:1 32:6 46:11
46:17 48:24 62:17
65:18,19 66:10,11
66:12 75:12,20
134:16
**yellow** 48:3
**yesterday** 79:16
79:18
**york** 17:17 120:3
120:7
**young** 22:19

Georgia Code

Title 9, Chapter 11

Article 5, Section 9-11-30

(e) Review by witness; changes; signing.
If requested by the deponent or a party before
completion of the deposition, the deponent shall
have 30 days after being notified by the officer
that the transcript or recording is available in
which to review the transcript or recording and, if
there are changes in form or substance, to sign a
statement reciting such changes and the reasons
given by the deponent for making them. The officer
shall indicate in the certificate prescribed by
paragraph (1) of subsection (f) of this Code
section whether any review was requested and, if
so, shall append any changes made by the deponent
during the period allowed. If the deposition is not
reviewed and signed by the witness within 30 days
of its submission to him or her, the officer shall
sign it and state on the record that the deposition
was not reviewed and signed by the deponent within
30 days. The deposition may then be used as fully
as though signed unless, on a motion to suppress
under paragraph (4) of subsection (d) of Code

Section 9-11-32, the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

**CASE NO.: 7:18-cv-186 (HL)**

**JEFFREY STEPANOVICH,**

   **Plaintiff,**

**vs.**

**KEN CORBETT FARMS, LLC, A**
**GEORGIA LIMITED LIABILITY**
**COMPANY,**

   **Defendant.**
_____ /

### PLAINTIFF'S RESPONSES TO DEFENDANT'S
### FIRST REQUEST FOR PRODUCTION

  Plaintiff, JEFREY STEPANOVICH, by and through his undersigned counsel, pursuant to

the Local Rules for the Middle District of Georgia and the Federal Rules of Civil Procedure, hereby

serves his Responses to Defendant's First Request for Production.

  Dated:  July 10, 2019.

        Respectfully submitted,

        By:**/s/ Noah E. Storch**
        Noah E. Storch, Esq.
        Florida Bar No. 0085476
        RICHARD CELLER LEGAL, P.A
        10368 West State Road 84, Suite 103
        Davie, Florida 33324
        Telephone: (866) 344-9243 x111
        Facsimile: (954) 337-2771
        Email: noah@floridaovertimelawyer.com

        *Counsel for Plaintiff*

5



EXHIBIT D-1
WIT: Stepanovich
DATE: 1-23
Julie Lawrence, CCR

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of July, 2019, I sent the foregoing via E-mail to:

Jeffrey D. Mokotoff, Esq.
FORD & HARRISON, LLP
271 17th Street, NW
Suite 1900
Atlanta, Georgia 30363
Telephone: (404) 888-3821
Facsimile: (404) 888-3863
Email: jmokotoff@fordharrison.com

*Counsel for Defendant*

*/s/ Noah E. Storch*
Noah E. Storch, Esq.

6

## PLAINTIFF'S RESPONSES TO REQUESTS FOR PRODUCTION

1.      All non-attorney-client privileged documents referring or relating to or upon which Plaintiff has relied or now relies on in support of any of his allegations in the Complaint, including, but not limited to, any diaries, notebooks, journals, calendars, appointment books or diaries, tape recordings, e-mails, letters, text messages, messages on any type of social networking site such as Facebook or Twitter, blog posts, or other documents created or maintained by or on behalf of Plaintiff.

**RESPONSE: Plaintiff has conducted a good-faith search for any non-privileged, responsive documents, and agrees to produce all documents in his possession, custody, and/or control.**

2.      Any documents which were written by Plaintiff or that are in Plaintiffs possession, custody, or control (including, but not limited to, any and all diaries, appointment books, calendars, expense account records, reports, notebooks, notes, or other memoranda) that may be used by Plaintiff to remember any events related to any facts alleged in the Complaint.

**RESPONSE: Plaintiff objects to Request No. 2 on the grounds that it seeks information and/or documentation protected by the attorney-client privilege and/or work-product doctrine. Subject to, and without waiving the foregoing objections, RESPONSE: Plaintiff has conducted a good-faith search for any non-privileged, responsive documents, and agrees to produce all documents in his possession, custody, and/or control.**

3.     All documents relating to Plaintiffs employment with KCF, including but not limited to all offer letters, agreements, memoranda, policies, resumes, handbooks, job descriptions, job applications, performance reviews, performance improvement plans, warnings, disciplinary actions, termination notices, resignation letters, leave requests, accommodation requests, and/or reports, which Plaintiff believes has a relationship to this case.

**RESPONSE: Defendant is in possession of the information and/or documentation requested.  Plaintiff has conducted a good-faith search for any non-privileged, responsive documents, and agrees to produce all documents in his possession, custody, and/or control.**

4.     All documents, including emails, that reflect and/or refer to Plaintiffs communications with KCF, Ken Corbett, Kimberly Corbett, or any employee of KCF, regarding any of Plaintiffs alleged medical conditions during his employment with KCF.

**RESPONSE: Defendant is in possession of the information and/or documentation requested.  Plaintiff has conducted a good-faith search for any non-privileged, responsive documents, and agrees to produce all documents in his possession, custody, and/or control.**

5.      All documents relating to any medical services identified in response to Interrogatory 7, including but not limited to medical records, medical bills, insurance claim forms, prescriptions, doctor's reports or evaluations, test results, psychiatric notes, and referrals. **[Please sign, date and return the originals of the applicable releases in Exhibit "A," drafted in compliance with HIPAA, to permit Defendant to obtain your medical and psychological records from the healthcare providers named in your answers to Interrogatories. <u>Note:</u>**

**<u>Both releases are required per HIPAA.</u>]**

**RESPONSE: Defendant is in possession of the information and/or documentation requested.   Plaintiff has conducted a good-faith search for any non-privileged, responsive documents, and agrees to produce all documents in his possession, custody, and/or control.**

6.      All documents relating or referring to all of Plaintiffs attempts to obtain employment or earn any income identified in Interrogatory 5, including, but not limited to, employment applications, resumes, correspondence, notes, memoranda, and documents to or from prospective employers, contractors, or others from whom Plaintiff sought employment or income, particularly regarding interviews, applications, tests, offers of employment, and/or rejections of applications or offers of employment. **[Please sign, date and return the original of the applicable release in Exhibit "A," authorizing the release of your employment records to FordHarrison LLP].**

**RESPONSE: Defendant is in possession of the information and/or documentation requested.   Plaintiff has conducted a good-faith search for any non-privileged,**

**responsive documents, and agrees to produce all documents in his possession, custody, and/or control.**

7.    All documents substantiating any income Plaintiff has earned since 2011, including but not limited to all documents regarding income identified in Interrogatories 3 and 4 and pay stubs, W-2s, 1099s, and annual tax returns. **[Please sign, date and return the original of the applicable release form in Exhibit "A," authorizing the release of your tax return records to FordHarrison LLP.]**

**RESPONSE: Defendant is in possession of the information and/or documentation requested.   Plaintiff has conducted a good-faith search for any non-privileged, responsive documents, and agrees to produce all documents in his possession, custody, and/or control.**

8.    All documents showing, substantiating, referencing, or relating to alleged damages claimed by Plaintiff, including, but not limited to, any actual, liquidated, or punitive damages claimed to be owed to you by KCF.

**RESPONSE: Plaintiff has conducted a good-faith search for any non-privileged, responsive documents, and agrees to produce all documents in his possession, custody, and/or control.**

9.    All documents (including e-mails) which refer or relate to, or evidence, any communication between Plaintiff and Ken Corbett, Kimberly Corbett, or any employee of KCF regarding the subject matter of the Complaint

**RESPONSE: Defendant is in possession of the information and/or documentation requested.   Plaintiff has conducted a good-faith search for any non-privileged, responsive documents, and agrees to produce all documents in his possession, custody, and/or control.**

1

TOLL FREE
866-344-WAGE (9243)

TOLL FREE
877-435-WAGE (9243)

TAMPA
813-371-0799

ORLANDO
407-261-1920

SPACE COAST
321-206-4030

BROWARD
954-903-7475

DADE
305-351-2393

FT MYERS
239-567-5765

JACKSONVILLE
904-435-3310

GAINESVILLE
352-224-4200

## Celler Legal, P.A.

### PROTECTING EMPLOYEE RIGHTS
### SINCE 2003

**CLMT0001**
REPRESENTING EMPLOYEES
AGAINST EMPLOYERS
ACROSS THE UNITED STATES
IN CLAIMS FOR:

· Discrimination
· Harassment
· Overtime
· Retaliation
· Wrongful Termination
· Whistleblower Rights
· Unpaid Commissions
· Severance Negotiations
· Breach of Contract

July 31, 2017

**VIA UNITED STATES MAIL**
**AND FACSIMILE TO 229-559-9053**

Ken Corbett Farms, LLC.
Attn: Kristin Gyr
972 GA-376
Lake Park, GA. 31636

Re: Stepanovich, Jeffrey v. Ken Corbett Farms, LLC.

Dear Sir or Madam:

This firm represents Mr. Stepanovich in his claims against Ken Corbett Farms, LLC. ("KCF"), for breach of contract and unpaid wages, and for discrimination and retaliation in violation of the Americans with Disabilities Act ("ADA"). If we are unable to resolve this matter **by August 14, 2017**, we intend to proceed with litigation immediately on the breach of contract claim, and again once the EEOC finalizes their administrative investigations. Please notify your insurance carrier and legal counsel of these allegations. Additionally, please advise if any binding arbitration agreement is alleged to be in place.

The facts of this case are straightforward. Mr. Stepanovich worked as a Salesman at KCF from April 2011, until his unlawful termination on April 26, 2017. Mr. Stepanovich was an excellent employee who had no significant history of disciplinary, performance, or attendance issues. On March 10, 2017, Mr. Stepanovich disclosed a serious medical condition necessitating surgery to KCF management and approximately one month later, Mr. Stepanovich was terminated.[1] KCF will likely argue that Mr. Stepanovich was terminated due to the company's economic difficulties. However, such allegations are mere pretext, as owner, Ken Corbett, had recently expressed his intention to hire a 4th salesman just prior to this disclosure. It is clear that KCF saw Mr. Stepanovich's disability as an opportunity to get rid of an employee because it perceived/regarded him as disabled.

As you know, Mr. Stepanovich's condition is a protected disability under the ADA, *See* 42 U.S.C. § 12102, and KCF's actions unquestionably constitute disability discrimination in violation of the ADA. The ADA requires an employer to provide its ADA protected employees with a reasonable accommodation unless doing so would impose an undue hardship. This includes providing an employee with leave to treat his health condition. Given the circumstances

---

[1] On March 10, 2017, Mr. Stepanovich informed Eric Bolesta and Jed Hunter, of his prostate cancer, and expected surgery scheduled for July 20, 2017.

7450 Griffin Road | Suite 230 | Davie, FL 33314
Telephone 866-344-WAGE (9243) | Fax 954-337-2771 | richard@floridaovertimelawyer.com

www.FloridaOvertimeLawyer.com



EXHIBIT D-2
WIT: Stepanovich
DATE: 1-23
Julie Lawrence, CCR

CLMT0002

surrounding Mr. Stepanovich's termination, especially considering his documented medical condition and need for surgery, it is apparent KCF management took issue with his serious health condition and accommodation request. Instead of accommodating Mr. Stepanovich's leave request, as the law requires, KCF discarded a loyal and highly productive employee because it decided that the protective provisions of the ADA could be casually disregarded.

As for the breach of contract claim, Mr. Stepanovich is owed commissions for squash production beginning April 18, 2017, though his termination. Mr. Stepanovich has made several attempts to recover said commissions, but KCF has refused to pay same. This is illegal.

In light of the foregoing, we are confident a jury will find KCF's actions unacceptable and in direct violation of the law.  Thus, we intend to move forward with this case vigorously.  If we do not hear back from you with an appropriate offer to resolve this matter **by August 14, 2017**, we will move forward with litigation.

**PLEASE GOVERN YOURSELF ACCORDINGLY.**

Respectfully,

Richard Celler, Esq.

CLMT0003

| CHARGE OF DISCRIMINATION | | AGENCY | | CHARGE NUMBER |
|---|---|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act | | | FEPA | |
| | | X | EEOC | |
| State or local Agency, if any: X Georgia Commission on Equal Opportunity | | | S.S. No. | |

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) | |
|---|---|---|
| Mr. Jeffrey Stepanovich | c/o Richard Celler, Esq. 866-344-9243 | |
| STREET ADDRESS          CITY, STATE AND ZIP CODE | | DATE OF BIRTH |
| c/o Richard Celler Legal, P.A.   7450 Griffin Road, Suite 230, Davie, Florida 33314 | | 11/25/1960 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | | Telephone: |
|---|---|---|
| Ken Corbett Farms, LLC. | NUMBER OF EMPLOYEES, MEMBERS | 229-559-9051 |
| NAME | | Telephone: |
| | 300+ | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 972 HWY 376 | Lake Park, GA. 31636 | Lowndes |

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*

| | | | | | | | | DATE DISCRIMINATION TOOK PLACE: |
|---|---|---|---|---|---|---|---|---|
| | Race | Color | Sex | Religion | | Age | 4/26/17 | |
| , X | Retaliation | National Origin | X | Disability | | Other: | | |

Mr. Stepanovich worked as a Salesman at KCF from April 2011, until his unlawful termination on April 26, 2017. Mr. Stepanovich was an excellent employee who had no significant history of disciplinary, performance, or attendance issues. On March 10, 2017, Mr. Stepanovich disclosed a serious medical condition necessitating surgery to KCF management and approximately one month later, Mr. Stepanovich was terminated.[1] KCF will likely argue that Mr. Stepanovich was terminated due to the company's economic difficulties. However, such allegations are mere pretext, as owner, Ken Corbett, had recently expressed his intention to hire a 4th salesman just prior to this disclosure. It is clear that KCF saw Mr. Stepanovich's disability as an opportunity to get rid of an employee because it perceived/regarded him as disabled.

As you know, Mr. Stepanovich's condition is a protected disability under the ADA, *See* 42 U.S.C. § 12102, and KCF's actions unquestionably constitute disability discrimination in violation of the ADA. The ADA requires an employer to provide its ADA protected employees with a reasonable accommodation unless doing so would impose an undue hardship. This includes providing an employee with leave to treat his health condition. Given the circumstances surrounding Mr. Stepanovich's termination, especially considering his documented medical condition and need for surgery, it is apparent KCF management took issue with his serious health condition and accommodation request. Instead of accommodating Mr. Stepanovich's leave request, as the law requires, KCF discarded a loyal and highly productive employee because it decided that the protective provisions of the ADA could be casually disregarded.

---

[1] On March 10, 2017, Mr. Stepanovich informed Eric Bolesta and Jed Hunter, of his prostate cancer, and expected surgery scheduled for July 20, 2017.

**CLMT0004**

I want this charge filed with the EEOC, FCHR, and local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

| | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct. | |
| SIGNATURE OF COMPLAINANT | |
| Date  8\|1\|2017 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year)  Aug 01, 2017 |



CLMT0005

TOLL FREE
866-344-WAGE (9243)

TOLL FREE
877-435-WAGE (9243)

TAMPA
813-371-0799

ORLANDO
407-261-1920

SPACE COAST
321-206-4030

BROWARD
954-903-7475

DADE
305-351-2393

FT MYERS
239-567-5765

JACKSONVILLE
904-435-3310

GAINESVILLE
352-224-4200



# Celler Legal, P.A.

PROTECTING EMPLOYEE RIGHTS
SINCE 2003

REPRESENTING EMPLOYEES
AGAINST EMPLOYERS
ACROSS THE UNITED STATES
IN CLAIMS FOR:

• Discrimination
• Harassment
• Overtime
• Retaliation
• Wrongful Termination
• Whistleblower Rights
• Unpaid Commissions
• Severance Negotiations
• Breach of Contract

AUGUST 2, 2017

VIA CERTIFIED MAIL
7016 2140 0000 8784 7254

**EEOC DISTRICT OFFICE**
**Savannah Local Office**
**7391 Hodgson Memorial Drive**
**Suite 200**
**Savannah, GA 31406**

Re:  Jeffrey Stepanovich v. Ken Corbett Farms, LLC.

Dear Sir or Madam:

This firm has been retained by Jeffrey Stepanovich with regard to his claims for discrimination. Attached please find a copy of the Executed Charge of Discrimination on his behalf. Please direct any and all further correspondence to our firm regarding this case. Our contact information is above.

Respectfully,

Yohanna Leon, Legal Assistant to
**Richard Celler, Managing Partner**

/yl
Enclosure.

7450 Griffin Road | Suite 230 | Davie, FL 33314
Telephone 866-344-WAGE (9243) | Fax 954-337-2771 | richard@floridaovertimelawyer.com

www.FloridaOvertimeLawyer.com

CLMT0006

| CHARGE OF DISCRIMINATION | | AGENCY | | CHARGE NUMBER |
|---|---|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act | | | FEPA | |
| | | X | EEOC | |

| State or local Agency, if any: X Georgia Commission on Equal Opportunity | | S.S. No. | |
|---|---|---|---|
| NAME (Indicate Mr., Ms., Mrs.) | | HOME TELEPHONE (Include Area Code) | |
| Mr. Jeffrey Stepanovich | | c/o Richard Celler, Esq. 866-344-9243 | |
| STREET ADDRESS          CITY, STATE AND ZIP CODE | | | DATE OF BIRTH |
| c/o Richard Celler Legal, P.A.  7450 Griffin Road, Suite 230, Davie, Florida 33314 | | | 11/25/1960 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | | Telephone: |
|---|---|---|
| Ken Corbett Farms, LLC. | NUMBER OF EMPLOYEES, MEMBERS | 229-559-9051 |
| NAME | | Telephone: |
| | 300+ | |

| STREET ADDRESS          CITY, STATE AND ZIP CODE | | COUNTY |
|---|---|---|
| 972 HWY 376          Lake Park, GA. 31636 | | Lowndes |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

| | | | | | | | DATE DISCRIMINATION TOOK PLACE: |
|---|---|---|---|---|---|---|---|
| | Race | Color | Sex | | Religion | Age | 4/26/17 |
| . X | Retaliation | | National Origin | X | Disability | Other: | |

Mr. Stepanovich worked as a Salesman at KCF from April 2011, until his unlawful termination on April 26, 2017. Mr. Stepanovich was an excellent employee who had no significant history of disciplinary, performance, or attendance issues. On March 10, 2017, Mr. Stepanovich disclosed a serious medical condition necessitating surgery to KCF management and approximately one month later, Mr. Stepanovich was terminated.[1] KCF will likely argue that Mr. Stepanovich was terminated due to the company's economic difficulties. However, such allegations are mere pretext, as owner, Ken Corbett, had recently expressed his intention to hire a 4th salesman just prior to this disclosure. It is clear that KCF saw Mr. Stepanovich's disability as an opportunity to get rid of an employee because it perceived/regarded him as disabled.

As you know, Mr. Stepanovich's condition is a protected disability under the ADA, See 42 U.S.C. § 12102, and KCF's actions unquestionably constitute disability discrimination in violation of the ADA. The ADA requires an employer to provide its ADA protected employees with a reasonable accommodation unless doing so would impose an undue hardship. This includes providing an employee with leave to treat his health condition. Given the circumstances surrounding Mr. Stepanovich's termination, especially considering his documented medical condition and need for surgery, it is apparent KCF management took issue with his serious health condition and accommodation request. Instead of accommodating Mr. Stepanovich's leave request, as the law requires, KCF discarded a loyal and highly productive employee because it decided that the protective provisions of the ADA could be casually disregarded.

---

[1] On March 10, 2017, Mr. Stepanovich informed Eric Bolesta and Jed Hunter, of his prostate cancer, and expected surgery scheduled for July 20, 2017.

CLMT0007

I want this charge filed with the EEOC, FCHR, and local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY - (When necessary for State and Local Requirements)

I declare under penalty of perjury that the foregoing is true and correct.

SIGNATURE OF COMPLAINANT

Date   8/1/2017

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(Day, month, and year)   Aug 01, 2017



ALEXANDER WIEWIORA
NOTARY
My Comm. Expires
June 1, 2021
No. GG 110572
PUBLIC
STATE OF FLORIDA



**U.S. Equal Employment Opportunity Commission**
**Savannah Local Office**

**CLMT0008**

7391 Hodgson Memorial Drive
Suite 200
Savannah, GA 31406
(912) 920-4279
TDD: 1-800-669-6820
Fax: (912) 920-4484
1-800-669-4000

Respondent: KEN CORBETT FARMS, LLC
EEOC Charge No.: 415-2017-00814

Jeffrey Stepanovich
C/O Richard Celler, Legal P.A.
7450 Griffin Rd., Ste. 230
Davie, FL 33314

Dear Mr. Stepanovich:

This is to acknowledge receipt of the above-numbered charge of employment discrimination against the above-named respondent. Please use the "EEOC Charge No." listed above whenever you call us about this charge. The information provided indicates that the charge is subject to:

|     |     |
| --- | --- |
| [ ] | Title VII of the Civil Rights Act of 1964 (Title VII) |
| [ ] | The Age Discrimination in Employment Act (ADEA) |
| [X] | The Americans with Disabilities Act (ADA) |
| [ ] | The Equal Pay Act (EPA) |
| [ ] | The Genetic Information Nondiscrimination Act (GINA) |

You need do nothing further at this time. We will contact you when we need more information or assistance. A copy of the charge or notice of the charge will be sent to the respondent within 10 days of our receipt of the charge as required by our procedures.

The quickest and most convenient way to obtain the contact information and the status of your charge is to use EEOC's Online Charge Status System, which is available 24/7. You can access the system via this link (https://publicportal.eeoc.gov/portal) or by selecting the "My Charge Status" button on EEOC's Homepage (www.eeoc.gov). To sign in, enter your EEOC charge number, your zip code and the security response. An informational brochure is enclosed that provides more information about this system and its features.

While your charge is pending, please notify us of any change in your address, or where you can be reached if you have any prolonged absence from home. Your cooperation in this matter is essential.

Sincerely,

Taj O. Harrell
Investigator
(912) 920-4267

Office Hours: Monday – Friday, 8:30 a.m. - 5:00 p.m.
www.eeoc.gov

Enclosure(s):          cc:

CLMT0009



# WHAT YOU SHOULD DO
## AFTER YOU HAVE FILED A CHARGE WITH EEOC

### ➢ *KEEP YOUR DOCUMENTS – BOTH PAPER AND ELECTRONIC*

Now that you have filed an EEOC charge, you must keep anything that might be evidence related to your charge. This includes *all* documents, communications, and electronic information that are potentially related to your EEOC charge, including the harm caused by the discrimination, and all records of your communications with the EEOC. Even if you are not sure whether the information is relevant to your discrimination claim, please do not throw it away or delete it.

---

### ➢ *WHAT INFORMATION MUST YOU KEEP?*

- **Paper documents**, such as:
  - Employee manuals, pay stubs, work schedules
  - Letters, memos, your notes
  - Pictures, drawings, charts, whether or not they contain words
- **Electronic information**, such as:
  - E-mails, text messages, tweets, and social media posts and pictures
  - Voice messages, video and sound recordings
  - Word processing documents, electronic calendar entries
- **Electronic memory on devices or the devices themselves**, such as:
  - Memory on computers, laptops, tablets, cell phones
  - Computers, laptops, tablets, cell phones
  - Do not delete, replace, alter, "wipe," or "clear" your computer hard drive, electronic tablet, or cell phone, and do not change or remove Internet posts, without retaining an electronic copy. If you dispose of any old computers, phones or devices, make sure you make and keep an electronic copy of all potentially relevant information on the device.
- These are some examples and not a complete list.
- If you have questions about what you should or should not do, please contact your investigator.

---

*Why must you keep this information?* It might be evidence related to your charge. We are required by the courts to ensure that all potentially relevant information is retained. **Please note that failure to keep these records may cause you to lose your case, or to lose the right to recover money lost due to the discrimination.**

*What happens to your information?* Your investigator will discuss with you what information is needed by the EEOC to investigate your charge. Information that you provide that happens to be private or personal in nature will not be disclosed by the EEOC during its investigation, and if the EEOC files suit on your charge, we will do our best to keep such information out of the court proceedings.

*Please see page 2 for additional important information.*

CLMT0010

## ➤ *LOOK FOR WORK IF YOU ARE OUT OF WORK*

If you lost your job or were not hired due to discrimination, you may be entitled to the pay or wages you lost. However, you cannot receive lost wages unless you can show that you looked for another job to replace the one you lost or were denied due to discrimination. In order to prove you searched for work, you must keep copies of all letters, emails, or other evidence of your job search. If you succeed in finding a new job but it pays less than the job you lost, you may be entitled to the difference in pay. Therefore, it is necessary to keep all evidence of your job search even if you find another job.

In addition to looking for work, you should keep good records of your job search so you can prove that you have tried to find a comparable job. If you are out of work because of discrimination, be sure to save *all* documents and communications, including e-mails, relating to your job search.

---

### ➤ *WHAT ARE RECORDS OF YOUR JOB SEARCH?*

The following types of information can prove that you have tried to find work:

- copies of job applications and resumes

- a list of all the companies you contact about jobs by phone, letter or in-person

- copies of e-mails or letters that you send to or receive from companies where you have asked about work or submitted an application

- a list all of the places where you apply and for each one,
    a. the date of the application;
    b. the position you were seeking;
    c. the response you received from your application, such as rejection letters or invitations to interview;
    d. whether you were interviewed and the date of the interview;
    e. the results of the interview;
    f. whether you turned down a job offer, and if you did, why

- notes about what you did to look for work (for example, searching the newspaper or Internet or contacting employment agencies) and the dates that you conduct the search

- copies of your pay stubs or earnings records if you find another job.

If you have questions about what you are required to do, please contact your investigator.

---

### ➤ *KEEP US INFORMED*

Once you file a charge with the EEOC, you must tell us if you move or get a new address, telephone number, or e-mail address. We may need to talk to you to get more information. If the EEOC cannot reach you to get necessary information, your charge may be dismissed.

### ➤ *CALL IF YOU HAVE QUESTIONS*

Your investigator will discuss with you the documents and other evidence we need to investigate your charge. If you have any questions, or for inquiries about the status of your case, please contact your investigator directly or call 1-800-669-4000.

CLMT0011

# EEOC Online Charge Status System Tip Sheet

Find out about the status of your charge of discrimination any time, day or night, using the EEOC Online Charge Status System. The system is available for charges that were filed on or after September 2, 2015.

- Access the Online Charge Status System via this link https://publicportal.eeoc.gov/portal/ or select the "My Charge Status" button on www.eeoc.gov.

- Enter your assigned charge number (found in the upper right hand corner on your discrimination charge form) and your zip code (as it appears on your discrimination charge form) to sign in. (If you have provided a new address and zip code to EEOC, use the new zip code.) You will be asked to enter a security code displayed in a box on the sign-in screen that is provided to assure additional security for the system.

- After you have signed into the Online Charge Status System, you will see the screen display pictured below. The numbers on the screen shot refer to the features explained beneath it.*



1. A quick view of the stage in the process at which your charge is currently.
2. The name and contact information of the EEOC staff member assigned to your charge or a note that your charge is pending assignment.
3. The EEOC office (and its address) that is handling your charge.
4. The specific actions the EEOC has taken on your charge, numbered sequentially, and the date of each action. (hold cursor over each action to read further details about the task).
5. The general steps in the process, with additional explanations that display when you hold your cursor over a colored box.
6. The range of next steps possible in the investigative process, which pops up when the cursor is held over this box.
7. The flow of the overall investigative process, which comes up when you click on this box.
8. Ends your session on the Online Charge Status System.

*Not every stage of the enforcement process will display for every charge, as each charge follows the process most appropriate to the facts in the charge and the stages of the investigation.

**CLMT0012**

Keep in mind that the EEOC process takes time, so there will be gaps between entries about your charge in the Online Charge Status System. Even when you do not see any change in the status of your charge, EEOC staff are hard at work.

CLMT0013

# Exhibit A

| Year | Erick | % | Jed | % | Jeff | % | Total US | Total PKGS |
|---|---|---|---|---|---|---|---|---|
| 2011 | 193,508 | 21% | 329,877 | 36% | 406,055 | 44% | 929,441 | 929,490 |
|  | $ 2,336,925.00 | 22% | $ 3,890,503.00 | 36% | $ 4,575,267.00 | 42% | $ 10,802,696.00 | $ 10,802,696.00 |
| 2012 | 253,165 | 27% | 288,583 | 30% | 408,863 | 43% | 950,612 | 953,932 |
|  | $ 2,627,143.00 | 27% | $ 2,816,398.00 | 30% | $ 4,115,297.00 | 43% | $ 9,558,839.00 | $ 9,566,699.00 |
| 2013 | 476,382 | 35% | 352,166 | 26% | 541,029 | 40% | 1,369,578 | 1,374,602 |
|  | $ 5,543,989.00 | 39% | $ 3,404,996.00 | 24% | $ 5,346,457.00 | 37% | $ 14,295,443.00 | $ 14,298,587.00 |
| 2014 | 441,117 | 34% | 401,174 | 31% | 448,851 | 35% | 1,291,143 | 1,333,697 |
|  | $ 5,999,036.00 | 35% | $ 5,533,384.00 | 32% | $ 5,729,035.00 | 33% | $ 17,261,456.00 | $ 17,340,091.00 |
| 2015 | 684,182 | 36% | 603,045 | 32% | 610,874 | 32% | 1,898,102 | 1,954,148 |
|  | $ 7,370,787.00 | 38% | $ 5,852,934.00 | 31% | $ 5,948,248.00 | 31% | $ 19,171,970.00 | $ 19,198,630.00 |
| 2016 | 546,340 | 29% | 803,594 | 43% | 530,365 | 28% | 1,880,300 | 1,899,086 |
|  | $ 5,397,895.00 | 31% | $ 7,311,058.00 | 42% | $ 4,911,700.00 | 28% | $ 17,620,654.01 | $ 17,620,653.00 |
|  |  |  |  |  |  |  | 8,319,176 | 8,444,955 |
|  |  |  |  |  |  |  | $ 88,711,058.00 | $ 88,827,356.00 |

CLMT0014

Exhibit B   Page 1 of 2

| | Packages | AVG | Sales $'s | % of $'s | % of Pack |
|---|---|---|---|---|---|
| **Spring 2011** | | | | | |
| Eric | 103,003 | $ 10.89 | $ 1,121,720.21 | 0.25 | 0.24 |
| Jed | 135,564 | $ 10.48 | $ 1,421,175.70 | 0.32 | 0.32 |
| Jeff | 187,653 | $ 10.28 | $ 1,929,414.71 | 0.44 | 0.44 |
| TOTALS: | 426,220 | | $ 4,472,310.08 | | |
| | | | | | |
| **Fall 2011** | | | | | |
| Eric | 89,320 | $ 12.66 | $ 1,131,092.35 | 0.19 | 0.18 |
| Jed | 191,680 | $ 12.23 | $ 2,343,399.57 | 0.39 | 0.38 |
| Jeff | 217,422 | $ 11.38 | $ 2,475,245.40 | 0.42 | 0.44 |
| TOTALS: | 498,422 | | $ 5,949,737.32 | | |
| | | | | | |
| YTD | 924,642 | $ 11.27 | $ 10,422,047.40 | | |
| **Spring 2012** | | | | | |
| Eric | 126,782 | $ 11.00 | $ 1,394,501.00 | 0.27 | 0.26 |
| Jed | 150,695 | $ 10.12 | $ 1,525,188.00 | 0.29 | 0.31 |
| Jeff | 210,964 | $ 10.87 | $ 2,293,823.00 | 0.44 | 0.43 |
| TOTALS: | 489,218 | | $ 5,218,312.00 | | |
| | | | | | |
| **Fall 2012** | | | | | |
| Eric | 126,865 | $ 9.77 | $ 1,239,634.00 | 0.28 | 0.27 |
| Jed | 138,935 | $ 9.38 | $ 1,303,275.00 | 0.3 | 0.3 |
| Jeff | 197,879 | $ 9.20 | $ 1,821,970.00 | 0.42 | 0.42 |
| TOTALS: | 466,243 | | $ 4,367,444.00 | | |
| | | | | | |
| YTD | 955,461 | $ 10.03 | $ 9,585,756.00 | | |
| **Spring 2013** | | | | | |
| Eric | 230,078 | $ 11.79 | $ 2,711,854.00 | 0.38 | 0.34 |
| Jed | 156,382 | $ 9.56 | $ 1,613,381.00 | 0.22 | 0.23 |
| Jeff | 298,663 | $ 9.56 | $ 2,855,698.00 | 0.4 | 0.44 |
| TOTALS: | 688,744 | | $ 7,180,933.00 | | |
| | | | | | |
| **Fall 2013** | | | | | |

CLMT0015

Exhibit B Page 2 of 2

|  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
| Eric | 247,349 | $ 10.06 | $ 2,488,792.00 | 0.4 | 0.36 |
| Jed | 196,641 | $ 8.55 | $ 1,661,229.00 | 0.26 | 0.29 |
| Jeff | 243,232 | $ 8.66 | $ 2,107,029.00 | 0.34 | 0.35 |
| TOTALS: | 688,610 | $ | $ 6,277,050.00 | | |
| | | | | | |
| YTD | 1,377,354 | $ 9.77 | $ 13,457,983.00 | | |
| | | | | | |
| Spring 2014 | | | | | |
| Eric | 180,002 | $ 15.65 | $ 2,817,629.73 | | |
| Jed | 162,338 | $ 15.66 | $ 2,542,152.74 | | |
| Jeff | 195,749 | $ 14.95 | $ 2,927,401.42 | | |
| TOTALS: | 538,089 | $ 15.40 | $ 8,287,183.89 | | |
| | | | | | |
| Fall 2014 | | | | | |
| Eric | 252,237 | $ 10.65 | $ 2,717,455.61 | | |
| Jed | 238,496 | $ 11.09 | $ 2,645,084.77 | | |
| Jeff | 253,362 | $ 9.04 | $ 2,289,316.51 | | |
| TOTALS: | 762,077 | $ | $ 7,662,830.89 | | |
| | | | | | |
| YTD | 1,300,136 | $ | $ 15,950,014.00 | | |

Exhibit C     Page 1 of 3

CLMT0016

| Customer | From 2011 Dollars | | Packages | |
|---|---|---|---|---|
| Pero | $ | 6,034,511.44 | 480,333 | |
| Fresh Start | $ | 5,833,303.30 | 631,716 | |
| Jetro | $ | 5,800,230.79 | 664,128 | |
| Windsor | $ | 4,168,125.50 | 399,938 | |
| Custom Pak | $ | 3,872,509.31 | 417,108 | |
| Loblaw | $ | 3,692,211.05 | 238,072 | |
| Tavilla | $ | 3,403,514.92 | 330,226 | |
| Darrigo | $ | 2,874,831.58 | 361,989 | |
| Colace | $ | 1,928,538.90 | 154,436 | |
| Marano | $ | 1,396,689.00 | 145,084 | |
| | | | | |
| | $ | 39,004,465.79 | 47% | 3,823,030 | 46% |
| | $ | 82,379,926.12 | | 8,327,915 | |

23 over $1,000,000
224 customer

| Customer | 2011 | | Packages | |
|---|---|---|---|---|
| Pero | $ | 1,120,500.78 | 84,722 | |
| Fresh Start | $ | 993,958.10 | 90,316 | |
| Jetro | $ | 919,656.89 | 82,598 | |
| Custom Pak | $ | 749,461.00 | 74,244 | |
| Tavilla | $ | 713,460.70 | 62,292 | |
| Coastal | $ | 447,510.85 | 36,422 | |
| Pexco | $ | 388,386.02 | 25,768 | |
| Windsor | $ | 380,416.00 | 31,185 | |
| SMP | $ | 301,120.00 | 24,165 | |
| Marano | $ | 265,950.00 | 24,430 | |
| | | | | |
| | $ | 6,280,420.34 | 60% | 536,142 | 58% |

98 customer
25 over 100,000

| | $ | 10,422,047.40 | | 924,642 | |

| Customer | 2012 | | Packages | |
|---|---|---|---|---|
| Pero | $ | 756,458.85 | 74,844 | |
| Windsor | $ | 709,663.50 | 72,122 | |
| Jetro | $ | 632,325.59 | 77,020 | |
| Tavilla | $ | 579,861.55 | 60,942 | |
| Fresh Start | $ | 559,011.50 | 69,071 | |
| Custom Pak | $ | 497,039.40 | 59,995 | |
| Darrigo | $ | 482,643.80 | 69,017 | |
| Loblaw | $ | 406,356.45 | 29,085 | |
| Marano | $ | 353,670.00 | 36,416 | |
| Hamceed | $ | 323,420.00 | 23,020 | |
| | | | | |
| | $ | 5,300,450.64 | 61% | 571,532 | 60% |

Exhibit C   Page 2 of 3

CLMT0017

| | | | | |
|---|---|---|---|---|
| 85 customers 24 over 100,000 | $ 8,741,300.60 | | 949,095 | |
| | **2013** | | | |
| Pero | $ 1,711,147.85 | | 137,336 | |
| Custom Pak | $ 895,082.70 | | 116,276 | |
| Loblaw | $ 873,845.65 | | 57,271 | |
| Jetro | $ 810,931.70 | | 104,640 | |
| Fresh Start | $ 761,800.00 | | 80,932 | |
| Windsor | $ 529,674.00 | | 50,071 | |
| Tavilla | $ 517,805.80 | | 51,688 | |
| Marano | $ 461,068.00 | | 52,943 | |
| Fresh Link | $ 407,698.50 | | 32,916 | |
| | $ 6,969,054.20 | 52% | 684,073 | 50% |
| 104 Customers 20 over 100,000 | $ 13,401,434.44 | | 1,377,354 | |
| | **2014** | | | |
| Fresh Start | $ 1,408,137.00 | | 121,596 | |
| Custom Pak | $ 1,224,644.20 | | 108,039 | |
| Jetro | $ 1,053,468.31 | | 89,442 | |
| Loblaw | $ 1,000,239.05 | | 57,805 | |
| Pero | $ 904,776.25 | | 62,442 | |
| Tavilla | $ 601,386.52 | | 48,454 | |
| Colace | $ 599,982.55 | | 35,293 | |
| Darrigo | $ 554,706.43 | | 51,883 | |
| Windsor | $ 465,614.50 | | 38,628 | |
| G&G | $ 383,700.19 | | 34,311 | |
| | $ 8,196,655.00 | 51% | 647,893 | 49% |
| 109 Customer 29 over 100,000 | $ 15,948,281.23 | | 1,321,332 | |
| | **2015** | | | |
| Fresh Start | $ 1,670,085.70 | | 208,698 | |
| Windsor | $ 1,098,421.50 | | 109,912 | |
| Jetro | $ 1,039,566.45 | | 137,791 | |
| Pero | $ 919,028.21 | | 67,441 | |
| Darrigo | $ 679,922.10 | | 94,265 | |
| Wyco | $ 614,488.04 | | 64,324 | |
| RAM | $ 544,210.40 | | 49,170 | |
| Loblaw | $ 476,457.30 | | 32,451 | |
| L&M | $ 452,303.80 | | 32,198 | |
| G&G | $ 442,995.28 | | 52,749 | |
| | $ 7,937,478.78 | 45% | 848,999 | 44% |
| 129 Customers | $ 17,569,497.25 | | 1,956,225 | |

Exhibit C    Page 3 of 3

CLMT0018

41 Over 100,000

|  | | 2016 | | |
|---|---|---|---|---|
| Jetro | $ | 1,344,281.84 | | 172,637 |
| Windsor | $ | 984,336.00 | | 98,020 |
| Trinity | $ | 840,859.00 | | 110,271 |
| Loblaw | $ | 715,650.60 | | 46,140 |
| Tavilla | $ | 623,814.75 | | 65,834 |
| Pero | $ | 622,599.50 | | 53,548 |
| Colace | $ | 619,841.60 | | 50,306 |
| Wyco | $ | 520,512.00 | | 54,096 |
| L&M | $ | 481,958.60 | | 45,207 |
| Darrigo | $ | 443,337.10 | | 55,950 |
| | | | | |
| | $ | 7,197,190.99 | 44% | 752,009 | 42% |
| 114 Customers | $ | 16,193,305.54 | | 1,787,283 |
| 39 over 100,000 | | | | |

Exhibit D

April - 26th

Monday - 24th Stenbel

CLMT0019

Salesman Settlement

On Collected Sales as of: 4/26/17

Salesman Name: Jeff Stepanovich

Growing Year: 2016 (Final With exceptions)

| | |
|---|---|
| Spring 1% of Net Collected | 92,111.24 |
| | |
| Spring Brokered Product 50% of Net Collected | 2,085.20 |
| Fall 1% of Net Collected | 78,069.12 |
| | |
| Fall Brokered Product | 2,350.34 |
| | |
| Total | 174,615.90 |
| Salary Paid    2016   in 2016    in 2017 | -162,500.00    7,000.00 |
| Mileage Paid | |
| Total Due | 5,115.90 |

Exceptions:
RitePak 11682, 12505, 11871.1, 13051
Loblaw 12444.1
Wholesale Produce 13464

Exhibit E   Page 1 of 2   **CLMT0020**

Ken

Thought I would try to get some clarification on our conversation from yesterday. Would just like to put some things on the table for discussion. I am not trying to be confrontational, just a lot was thrown out there yesterday so trying to get a grasp on how this will move forward.  Based on what you said this change is due to the fact the farm is losing money. So if the farm makes money moving forward, due we get an opportunity to go back to our 1%.

Or is there just a max number that you don't think we should ever make more than. I remember once you said you wished your sales guys could make $2 million a year.

Since 2011 we have grown sales as the farm has grown additional product. We do not get the advantage of knowing when the farm makes or loses money. All we can do is respond to what the farm decides to do in how many acres you plant and what you put in the ground. We really have little opportunity for any input. The industry is changing in terms of usage, for example Jumbo Pepper has been selling all winter for $2 a box less than XL and XXL.  But will the farm look at this type of input or just worry about yield and box count?

Is this new person going to bring a book of business with them, to actually hit the ground running?  Or are the three of us going to subsidize a new person for the next year or two as they learn the business.

Does this mean, no matter if you hire someone today or not, the new pay structure takes place retro back to the start of this season.  Or does it happen only once you bring a new person on?  And then if the new person does not work out, do we go back to 1%.

Since we are going to lose 25% of are pay, that maybe now we can get paid once money is collected and not when ever.  And since we will have to try to make some of this money back, can we get some time period on how we will be paid our brokerage once it is collected.  If not monthly then at least quarterly. And it would be nice to know what we are actually paid on both invoice wise as well as brokerage with each pay check.

Exhibit E    2 of 2

CLMT0021

As we talked yesterday, it sounds like you have already made up your mind.  So any details you can provide us would be appreciated.

I am sure more questions might arise as things fall into place, you had said you wanted to talk further about this so I just wanted to try to get some clarification on some things.  I would guess the other two would have questions as well, and with Jed on the road it has been hard to talk much with him much today.

Also, just from a logistics perspective, if we have 4 sales people, then KCF will need to do something about the phone system since it only has 4 lines, as well as I know we just changed Famous to 7 users, so that will need to be added to as well.

CLMT0022

June 7, 2018

**VIA MAIL AND EMAIL TO** <u>TAL.HARRELL@EEOC.GOV</u>

Taj Harrell
Employment Investigator
U.S Equal Employment Opportunity Commission
7391 Hodgson Memorial Drive, Suite 200
Savannah, GA 31406

      Re:    **Stepanovich, Jeff v. Ken Corbett Farms, LLC.**
               **EEOC Charge No. 415-2017-00814**

Dear Investigator Harrell:

      As you are aware, this firm represents Mr. Jeff Stepanovich in the above-captioned matter. In response to the respondent's position statement, Mr. Stepanovich states as follows:

**Paragraphs 1 and 2**

      Mr. Corbett is correct. I did not have a written employment contract, only verbal. My employment compensation was changed by Mr. Corbett over our original agreement, again not in writing.

**Some background:**

      Ken Corbett Farms came to Immokalee looking for a new sales company to sell their product. At that time, I was working for Florida Specialties, Inc. I met with Ken Corbett and his son Justin Corbett. We worked out a sales agreement for Florida Specialties to sell their product under a typical sales agreement of 6%. This agreement was in place for roughly two years. I had left Florida Specialties when Ken approached me to take part of his production and market it for Ken Corbett Farms, with the caveat that I teach his future son in law, Eric Bolesta, the business. I agreed. Eric had graduated college and wanted to get into the business. At that time, I was offered a salary plus commission. I informed Ken once he brought me on board, more than likely, Florida Specialties would not be happy because they were no longer getting KCF's entire production and would

1

CLMT0023

terminate their agreement with KCF.  I also informed him if this did happen we needed to be prepared to bring on another sales person to handle the large amount of product.  This came to fruition and Jed Hunter was added to the sales staff.  Eric Bolesta had No customers when he started to sell at KCF.  Jed had a customer base he brought with him as did I, which was developed while selling product through Florida Specialties.  I gave Eric most of his customers from my client base I brought with me from Florida Specialties.  This is very unusual for a sales person to give up customers as I did.  The reason behind this was, compensation was set up so that all three salesmen would be paid the same commission no matter who sold the product.  Plus, at this time, I had my base salary in addition to the commission.

I asked to be considered a subcontractor. KCF insisted I become an employee, thus making me pay Georgia income taxes.  I, personally, had to cover all living expenses for each season in Georgia.  This was everything including cell phones, laptops, anything that was used in doing business for KCF.  There were no "employee benefits" provided to employees.  Also, as an employee, there was no year-round income and thus I had to have a second job because I was not compensated during the Off Seasons.  As KCF continued to grow more and more product, this allowed us to make more commission and at about year two, Ken told me he was discontinuing my salary portion of compensation, no discussion and no negotiation!

**Paragraph 3**

At no point were farm losses "ever" discussed with the sales staff.  The only statements we heard were "we lost money".  Anyone in the business knows farmers always lose money!  As they continue to put profits into more land etc.  There was never a discussion with us as a sales staff about this.

Regarding sales performance from 2011-2017:  Since I do not have access to the numbers Mr. Corbett is using, I can only go by what I know from previous numbers that I pulled over the years.  I would like to see how he came up with the 49 cents per package as well as the 71 cents per package.  Is this a number they came up with for total sales or individual?

If you were to look at the actual accounts through the years for each of us, you'd see why the "sales performance" numbers aren't really true numbers.  As stated before, Eric had no clients, Jed brought some customers from his previous job and I brought all of the customers that were being sold KCF product through Florida Specialties, then shared these customers with my fellow sales team.

CLMT0024

I have included some numbers from a document that I used while at KCF to share with the sales staff that would allow us to see where things stood over the years. The joke was always "I was tired of making the two of them money and now it was their turn to pay me". The idea was at some point we would all carry somewhat of an equal load. This is how it was set up. In this business, we're not making something, but growing it! Quality dictated what customers certain product could go to. A retailer would get only the best quality and then we'd have lower end customers to move product that was lower grade. Looking at where Mr. Corbett based his percentages isn't an easy thing to do in this business. The large increase you see with his numbers I question. As you can see from my numbers, I'm not sure how he's doing the math.

Regarding abandoning KCF, I have no idea where that came from. I have always overlapped with two jobs as there never was an end date when a crop would be finished. One year we could finish pepper the first of December, the following year, pick the week of Christmas. So…. this is normal, and I always sold the product until the very end! I may not have been sitting in the Georgia office but was still selling for KCF. This was never an issue that he or anyone at KCF discussed with me.

## Paragraph 4

Commitment to the company: When I was in Georgia, no one put in more hours at that facility than I did. I would work every night and help shipping with receiving and loading trucks. After Ken took away my salary, he told me the only thing he wanted me to do was sell, so I began not staying as late night as before. Instead of working until midnight every night, I would leave around 7 or 8pm. The other two salesmen had families there so would go home earlier. Again, commitment to KCF was never brought up as an issue!

The entire timeframe leading up to the day I was fired, never had a mention of any of the things he's listed in his Position Statement. None of these items were Ever brought to my attention. On Monday before I was let go, Ken informed Eric, Jed and me, that he was bringing on a new sales person. He also said that due to the losses KCF had, the three of us would pay for the new sales person by taking 1/4% or 25% from each sales staff member's compensation. The following day, Tuesday, I sent an email to Ken. A copy is attached as "Exhibit E" to this document. This email had questions regarding the future new sales person and compensation, etc.

Wednesday morning Ken called and fired me. No cause on his part. "It was his decision and no one else's". My guess is he said this to me because not even a week before, his son Justin, told me not to worry about my illness and if I needed time, my chair would be there.

CLMT0025

This was a running joke as none of us ever really had much contact from the Corbett's during the off season. If we showed up and our chair was there we had a job. Ha-ha! By the way, chairs were not provided to the staff, we had to purchase them.

How does it go from Monday, adding a sales person that current sales team is paying for to me being fired for all these stated reasons?? I fully believe he fired me because of illness and always will.

**Paragraph 5**

I set up my entire treatment program based on my job with KCF. I pushed my surgery out against my wife's wishes. She wanted me to have the cancer removed sooner than later. I convinced my surgeon as well, so it wouldn't affect my job. Again, I did all of this because I WAS loyal to KCF. I guess looking back was kind of foolish on my part.

**Paragraph 6**

The sales person that was going to be hired per the information we, (sales staff), were given from Ken (before the firing), was never hired. Also, he had no experience in the business. Eventually, they did add a sales person, but he did not have the same responsibility I had, he wasn't selling from the "pile" in Georgia.
With regard to brokering, the three of us tried to broker but got resistance from Mrs. Corbett. After that, Jed Hunter created his own company so that he could broker on his own. This was not part of our job, we tried to do it to help move product that was produced from KCF but got resistance from the accounting department, they didn't want the extra paperwork.

**Paragraph 7**

Commitment: Such an easy word for him to use. You could see his commitment to His sales team. If you need a chair, then go buy one! If you need a laptop, you better bring your own! You are on call 24/7 but we don't supply cell phones or anything else! My commitment was to help them build a company which I believe I did - from $1,000,000 a year to a $20,000,000 a year company in 6 years. Leaving my home and living in Georgia for 4-5 months a year. Never was the subject even brought up to me.

**Paragraph 8**

CLMT0026

Without reviewing any reports, it's very difficult for me to dispute numbers. I can only go by what I have included in this response as to what I had pulled over the years.

Furthermore, in response to Mr. Corbett's letter, I'd like to give some additional details about KCF that may make his numbers make more sense.

Before the Corbett's hired Florida Specialties, in which I negotiated the deal for, there was No KCF brand or label. They packed all products they grew in generic boxes with no label or way to promote their farm. When they came to Florida Specialties there was a discussion of KCF packing their product in a Florida Specialties label, the owners of Florida Specialties declined to do that not knowing quality of product. So, for the first time KCF developed their own label and Florida Specialties began to sell and market it for KCF. KCF had No customer base. They had one previous relationship with Pero Farms as they had grown some product for Pero to market in the past and that's about it. Moving forward to 2011, Ken started his own sales team. The customers were brought to KCF by me and Jed Hunter. Eric Bolesta had never sold before therefore he had no customer base. As the new sales team was set up, the agreement was for all 3 of the sales team to be paid the same commission base of 1% each. Jed and I both knew we'd be carrying Eric for a few years until he developed, but unlike most new sales rep's, Eric was given several good customers to work with from myself and Jed therefore allowing Eric to start ahead of the game as far as making his own contacts, setting up his own accounts, in the beginning. At some point the ideal scenario was to be each of the three of us would carry roughly 33% of the pile. Obviously, this is not real world and especially in the produce business as the product we are selling isn't manufactured but grown so…. Mother Nature has a huge impact on what customers can take and what product they desire.

For Mr. Corbett to use some of the numbers he used in his Position Statement, they were very simplistic and not indicative of actual truth. I guess this was meant to make me look bad.

Produce customers are unique. You've got Retail, who takes only the Top-Grade product. You have Wholesalers who take High to Mid-Range product, and then you have the Cheaper clients who only use the Low-End product. If Retail is paying $14/box for a jumbo pepper, the low of that same product but with "color or defects" sells for $6/box. Without Mr. Corbett identifying everything that was sold and using a gross average, this doesn't work in this regard.

Attached are some pages that I've labeled Exhibits A, B, C, etc. These are copies of informal numbers and customers I had put together at the end of each year for the sales team to look at and get an idea where we stood and to help us review our customer base and decide on any changes. These memos were put together by me from information taken

CLMT0027

out of our FAMOUS software. The numbers could change some as accounting manipulated things but in general they'd be accurate. Again, these attachments were done just for the three of us on the sales team, not used for anything else.

**Exhibit A**

This shows the sales number for each salesman from 2011 to 2016 along with the Total numbers that we sold, total number produced and packages that may have gone out as Cash. So yes, as you can see for 2016, Jed Hunter had a great year. This goes back to markets and product quality for that season. Jed moved a lot of product to New York in 2016 which was above average or normal.

**Exhibit B Pages 1 and 2**

This shows sales in packages and %, plus dollars and % for each season for each year. Again, the numbers are close and were used just for our benefit in the sales office. As mentioned before, all numbers do not show who was selling what "type" of product. I sold a lot of the lower grade product as I had those contacts to do that when we had lower quality product to sell.

**Exhibit C Pages 1 to 3**

This document shows the Top 10 Customers for each year. The number of customers we had sold for each year. The first page on top shows rough volume for years 2011 to 2016, with totals for dollars and packages. The hand-written numbers on the pages show my number of those Top 10 Customers and the % shows what they made up for sales Volume each year. I have to guess Ken could look at it and say my numbers were coming down but that was the point all along, balance between the three of us, equality in work performed, etc. You may have a good season depending on the crop conditions and which customers you had to sell to, that's why it worked well. I was never reprimanded or talked with about my numbers or performance, why?? I still believe I was fired for my illness, that he felt I may not be able to perform my duties and be in Georgia when he wanted. The funny thing about it is if that's the direction Ken goes, then Eric, his son in law was "always out of the office doing other things" and Jed and I covered for him. We never complained to management because we still got paid for it. We'd just give Eric a hard time about it in a joking way most of the time.

Bottom line, of the 224 customers that were sold over the years of my employment at KCF, the only customer they had a relationship with prior to me helping Ken open the sales office was with Pero.

CLMT0028

**Exhibit D**

Copy of the last statement from KCF.

    This is an example of what each sales person would receive from accounting showing what we earned and anything outstanding, etc. This was done by Kim Corbett. We were never given any detail or backup as to how or what we were compensated on. We were to accept this and not question anything or she would get very upset and say something to Ken, then it would be an issue for us.

**Exhibit E**

    This is the email I sent to Ken after our phone conversation Monday afternoon. I sent this the next day, which was Tuesday, fired on Wednesday.

    If you need anything further, please let me know. I still feel he's making the numbers the way he's provided to "justify" firing me. I asked him on the phone the day he fired me for a reason, he said he didn't have a reason, he just was and that it was his decision and his alone.

    Obviously, I believe I was fired due to my illness as nothing else was ever discussed or presented to me in those years employed by Ken Corbett Farms. I still feel to this day it was because of my cancer, otherwise why did he wait until he found out about it? Also, why did he wait to fire me if I was such a poor performing employee?

    We thank you for your time, and for investigating these issues thoroughly. Please do not hesitate to contact us should you have further questions or concerns.

Best regards,

**Robert Pecchio, Esq.**
**Richard Celler, Esq.**

Enclosure with EEOC
Form 161 (11/16)

**CLMT0030**

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

PRIVATE SUIT RIGHTS    --    **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),**
**the Genetic Information Nondiscrimination Act (GINA), or the Age**
**Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within**
**90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-
day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to
consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell
him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely
manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as
indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate
State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide
after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short
statement of the facts of your case which shows that you are entitled to relief. Courts often require that a copy of
your charge must be attached to the complaint you file in court. If so, you should remove your birth date from the
charge. Some courts will not accept your complaint where the charge includes a date of birth. Your suit may include
any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters
alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in
some cases can be brought where relevant employment records are kept, where the employment would have
been, or where the respondent has its main office. If you have simple questions, you usually can get answers from
the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint
or make legal strategy decisions for you.

PRIVATE SUIT RIGHTS    --    **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back
pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible. For
example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit
before 7/1/10 -- *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA
suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above.
Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA
claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

ATTORNEY REPRESENTATION    --    **Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction
in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be
made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your
efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above,
because such requests do not relieve you of the requirement to bring suit within 90 days.

ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any
questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to
inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide
your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files
are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge
file, **please make your review request within 6 months** of this Notice. (Before filing suit, any request should be
made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA):** CLMT0031 The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

"Actual" disability or a "record of" a disability (note: if you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability):

➤ **The limitations from the impairment no longer have to be severe or significant** for the impairment to be considered substantially limiting.

➤ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.

➤ **Only one** major life activity need be substantially limited.

➤ With the exception of ordinary eyeglasses or contact lenses, **the beneficial effects of "mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.

➤ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active.**

➤ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months.**

"Regarded as" coverage:

➤ An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

➤ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

➤ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively *BOTH* transitory (lasting or expected to last six months or less) *AND* minor.

➤ A person is not able to bring a failure to accommodate claim *if* the individual is covered only under the "regarded as" definition of "disability."

*Note: Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts actuate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
### VALDOSTA DIVISION

**JEFFREY STEPANOVICH,**

       **Plaintiff,**

                              **CASE NO.:**

**vs.**

**KEN CORBETT FARMS, LLC,
A GEORGIA LIMITED
LIABILITY COMPANY,**

       **Defendant.**

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, JEFFREY STEPANOVICH ("Mr. Stepanovich" or "Plaintiff"), by and through his undersigned counsel, and hereby files suit against the Defendant, KEN CORBETT FARMS, LLC, A Georgia Limited Liability Company ("KCF" or "Defendant"), and alleges the following:

    1.    Plaintiff brings these claims for disability discrimination against Defendant for its unlawful termination of Plaintiff based upon his disability, or "perceived disability," in violation of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 *et seq.* ("ADA"). Plaintiff is seeking damages including back pay, front pay, compensatory damages, punitive



EXHIBIT D-3
WIT: Stepanovich
DATE: 1-2?
Julie Lawrence, CCR

damages, and his attorneys' fees and costs.

## JURISDICTION

2.    The Court has original jurisdiction over Plaintiff's ADA claims pursuant to 28 U.S.C. § 1331 as they arise under 42 U.S.C. § 12101 *et seq.*

## VENUE

3.    Venue is proper because Defendant conducts substantial business in Echols County, Georgia and Plaintiff worked for Defendant in Echols County, Georgia, where the actions at issue took place.

## PARTIES

4.    Plaintiff suffers from a disability as defined by the ADA.

5.    Plaintiff is protected by the ADA because:

a.    Plaintiff was a disabled or "perceived as disabled" employee who suffered discrimination because of his disability or "perceived disability" by Defendant; and

b.    Plaintiff suffered an adverse employment action as a result of his disability or "perceived disability."

6.    Defendant was at all material times an "employer" as envisioned and defined by the ADA.

## CONDITIONS PRECEDENT

7.    Plaintiff, on or about August 2, 2017, filed a charge of

2

discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") against Defendant.

8.   On September 17, 2018, the EEOC mailed Plaintiff a Notice of Right to Sue, giving Plaintiff the right to bring a civil action on his claims within 90 days of his receipt of same.

9.   Plaintiff timely files this action within the applicable period of limitations against Defendant.

10.   All conditions precedent to this action have been satisfied and/or waived.

## GENERAL ALLEGATIONS

11.   Mr. Stepanovich worked as a Salesman at KCF from April 2011, until his termination on April 26, 2017.

12.   Mr. Stepanovich was an excellent employee who had no significant history of disciplinary, performance, or attendance issues.

13.   On March 10, 2017, Mr. Stepanovich disclosed to KCF management that he had been diagnosed with Prostate Cancer, and necessitated surgery for same.

14.   Approximately one month later, Mr. Stepanovich was terminated.

15.   Plaintiff was told he was terminated for "economic reasons."

3

16.   Yet, just prior to his termination, Defendant's owner, Ken Corbett, expressed his intention to hire a 4th salesman to KCF based on business need.

17.   KCF saw Mr. Stepanovich's disability as an opportunity to get rid of an employee because it perceived/regarded him as disabled and/or based on his disability

18.   Mr. Stepanovich's Cancer diagnosis is a protected disability under the ADA. *See* 42 U.S.C. § 12102.

19.   KCF's actions unquestionably constitute disability discrimination in violation of the ADA.

20.   The ADA requires an employer to provide its ADA protected employees with a reasonable accommodation unless doing so would impose an undue hardship.

21.   This accommodation requirement includes providing an employee with leave to treat his disability.

22.   Instead of accommodating Mr. Stepanovich's leave request, as the law requires, KCF discarded a loyal and highly productive employee because it decided that the protective provisions of the ADA could be casually disregarded.

23.   Given the timing and circumstances leading to Mr.

Stepanovich's termination, KCF's actions unquestionably constitute disability discrimination in violation of the ADA.

24. Mr. Stepanovich is an individual who, with minimal accommodation, was fully capable of performing the essential functions of his job.

25. By reason of the foregoing, Defendant's actions, and non-actions, affected the "terms, conditions or privileges" of Plaintiff's employment as envisioned by the ADA.

26. Alternatively, Defendant perceived Plaintiff as being "disabled," and therefore, unable to perform the essential functions of his position, despite the fact that Plaintiff could perform same with a reasonable accommodation.

27. Pleading in the alternative, Plaintiff's impairment did not substantially limit a major life activity, but was treated by Defendant as if it did.

28. Pleading in the alternative, Plaintiff's medical condition constituted an impairment that limited a major life activity only because of Defendant's attitude toward the impairment.

29. Defendant does not have a non-discriminatory rationale for terminating Plaintiff's employment.

30. Plaintiff was a disabled individual, or otherwise perceived as disabled by Defendant, during his employment. Therefore, he is the member

5

of protected classes as envisioned by the ADA.

31.    Plaintiff suffered sufficiently severe and pervasive treatment, and ultimate termination, because of his disability and/or "perceived disability," and request for accommodation regarding same.

## COUNT I: DISABILITY DISCRIMINATION- ADA

32.    Plaintiff realleges and adopts the allegations contained in paragraphs 1-31 as if fully set forth in this Count.

33.    The acts of Defendant, by and through its agents and employees, violated Plaintiff's rights against disability discrimination/harassment under the ADA.

34.    The discrimination to which Plaintiff was subjected was based on his disability and/or "perceived disability."

35.    The conduct of Defendant, its agents, and employees proximately, directly, and foreseeably injured Plaintiff, including, but not limited to, lost wages and benefits, future pecuniary losses, emotional pain and suffering, humiliation, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

36.    The conduct of Defendant was so willful and wanton, and in such reckless disregard of the statutory rights of Plaintiff, as to entitle him to an award of punitive damages against Defendant to deter it, and others, from such conduct

in the future.

37.   Plaintiff is entitled to recover reasonable attorneys' fees and litigation expenses pursuant to the ADA.

38.   Plaintiff has no plain, adequate or complete remedy at law for the actions of Defendant, which have caused, and continue to cause, irreparable harm.

### **REQUEST FOR RELIEF AS TO COUNT I**

WHEREFORE, Plaintiff prays that this Court will:

a.  Issue a declaratory judgment that the discrimination against Plaintiff by
   Defendant

was a violation of Plaintiff's rights under the ADA;

b.  Require that Defendant make Plaintiff whole for his losses suffered as
   a result of

the discrimination through reinstatement, or, if that is not practical, through an award of front pay;

c.  Grant Plaintiff a judgment against Defendant for damages, including
   punitive

damages;

d.  Award Plaintiff his reasonable attorney's fees and litigation expenses
   against

Defendant pursuant to the ADA.

e.  Provide any additional relief that this Court deems just.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated this 9th day of November 2018.

Respectfully submitted,

/s/ Carlos V. Leach
Carlos V. Leach, Esq.
The Leach Firm, P.A.
1950 Lee Rd., Suite 213
Winter Park, FL 32789
Telephone: (407) 574-4999
Facsimile: (833) 423-5864
Email: cleach@theleachfirm.com
Georgia Bar No.: 488443

JS 44 (Rev. 11/15)

Case 7:18-cv-00186-HL   Document 1-1   Filed 11/09/18   Page 1 of 2

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
JEFFREY STEPANOVICH

### DEFENDANTS
KEN CORBETT FARMS, LLC, A GEORGIA LIMITED LIABILITY COMPANY

(b) County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

(c) Attorneys *(Firm Name, Address, and Telephone Number)*
Carlos Leach, Esq. - The Leach Firm, P.A. 1950 Lee Rd, Suite 213, Winter Park, FL 32789 407-574-4999

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | | ☐ 840 Trademark | ☐ 460 Deportation |
| | | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☒ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*
- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
American's With Disabilities Act
Brief description of cause:
disability discrimination

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE
11/09/2018

SIGNATURE OF ATTORNEY OF RECORD
s/ Carlos Leach

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

JS 44 Reverse (Rev. 11/15)   Case 7:18-cv-00186-HL   Document 1-1   Filed 11/09/18   Page 2 of 2

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)  Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)  County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)  Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.  Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.  Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.  Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.  Origin.** Place an "X" in one of the six boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

**VI.  Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.  Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.  Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Middle District of Georgia

|  |  |
|---|---|
| _____ | ) |
| *Plaintiff(s)* | ) |
| v. | ) Civil Action No. |
| | ) |
| _____ | ) |
| *Defendant(s)* | ) |

### SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* KEN CORBETT FARMS, LLC
KENNETH CORBETT - REGISTERED AGENT
1545 GA HIGHWAY 135 S
LAKE PARK, GA 31636

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:  CARLOS LEACH, ESQ.
THE LEACH FIRM, P.A.
1950 LEE RD., SUITE 213
WINTER PARK, FL 32789
407-574-4999

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____      _____
                                    *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

  ❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

  ❏ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

  ❏ I served the summons on *(name of individual)* _____ , who is

  designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

  ❏ I returned the summons unexecuted because _____ ; or

  ❏ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.


Date: _____

           _____
                *Server's signature*

           _____
                *Printed name and title*


           _____
                *Server's address*

Additional information regarding attempted service, etc:

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

CASE NO.: 7:18-cv-186 (HL)

JEFFREY STEPANOVICH,

        Plaintiff,

vs.

KEN CORBETT FARMS, LLC, A
GEORGIA LIMITED LIABILITY
COMPANY,

        Defendant.

_____ /

## PLAINTIFF'S ANSWERS TO DEFENDANT'S
## FIRST SET OF INTERROGATORIES

      Plaintiff, JEFREY STEPANOVICH, by and through his undersigned counsel, pursuant to the

Local Rules for the Middle District of Georgia and the Federal Rules of Civil Procedure, hereby

serves his Answers to Defendant's First Set of Interrogatories.

      Dated:  July 10, 2019.

                                Respectfully submitted,

                                **By:/s/ Noah E. Storch**
                                Noah E. Storch, Esq.
                                Florida Bar No. 0085476
                                RICHARD CELLER LEGAL, P.A
                                10368 West State Road 84, Suite 103
                                Davie, Florida 33324
                                Telephone: (866) 344-9243 x111
                                Facsimile: (954) 337-2771
                                Email: noah@floridaovertimelawyer.com

                                *Counsel for Plaintiff*



EXHIBIT D-4
WIT: Stepanovich
DATE: 1-23
Julie Lawrence, CCR

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of July, 2019, I sent the foregoing via E-mail to:

Jeffrey D. Mokotoff, Esq.
FORD & HARRISON, LLP
271 17th Street, NW
Suite 1900
Atlanta, Georgia 30363
Telephone: (404) 888-3821
Facsimile: (404) 888-3863
Email: jmokotoff@fordharrison.com

*Counsel for Defendant*

*/s/ Noah E. Storch*
Noah E. Storch, Esq.

## PLAINTIFF'S ANSWERS TO INTERROGATORIES

1.    Identify each source of your income including, but not limited to, salaries, wages, commissions, payments from disability insurance, social security disability payments, proceeds from self-employment, gifts, loans, and/or unemployment compensation from 2011 to present. State the following with regard to each source of income:

(a)    the source of the income, or payments, including, but not limited to, the name, address, and telephone number of any employer;

(b)    the services rendered by you, if any, to acquire such income;

(c)    the dates for which you received the earnings or payments referred to in this interrogatory; and

(d)    the total amount of income or payments received from each such source and, if payments are continuing, the date through which you estimate such payments will continue.

**ANSWER:**

**Plaintiff was employed by Defendant from April 2011 through his termination on April 26, 2017.**

| | | |
|---|---|---|
| **2011   KCF Gross $128,775.00** | **Growers Direct Gross  $38,250.00** | |
| **2012   KCF Gross $153,369.52** | **Growers Direct Gross  $40,840.50** | |
| **2013   KCF Gross $143,1560.41** | **Growers Direct Gross  $33,340.00** | |
| **2104   KCF Gross $154,269.97** | **Unemployment: $3,850.00** | |
| **2015 KCF Gross $164,933.50** | | **Enterprise HR (Big Red)  Gross  $37,500.00** |
| **2016 KCF Gross $180,990.53** | | **Windsor Distributing Gross  $25,608.32** |
| **2017 KCF Gross $12,837.07** | | **Windsor Distributing Gross  $58,190.07** |

**2017  Unemployment income from 7/24 to 9/28 State of Georgia  $4,220.00**
**2018  Windsor Distributing $14,796.03    Florida Specialties  Gross $120,126.27**
**2019 Florida Specialties through 6/11 Gross  $72,647.78**

**Growers Direct is out of Business**
**Big Red Tomato is out of Business**
**Windsor Distributing  5495 Bryson Drive, Suite 401 Naples FL  34109**
**Phone:800-565-9500**
**Florida Specialties 601 E Main St, Immokalee FL  34142; Phone:239-657-2227**

2.      Identify each and every employer or other entity for whom you have performed work since the cessation of your employment with KCF until the time of trial of this matter, including whether you were self-employed, or any periods of time in which you claim you could not work. With respect to each such employer or entity, state the name and address, the dates of employment or association, your position with each employer or entity, the time periods during which you held each position, the identity of all individuals who supervised your work, your annual salary or hourly wage, whether you took a leave of absence while employed by that employer and the reason for the leave, and the reason(s) for cessation of employment, if applicable, with respect to each position.

**ANSWER: Please see Plaintiff's answer to Interrogatory No. 1. As of October of 2017, Plaintiff went to work for Windsor Distributing as a broker as no other opportunities had come up. Plaintiff worked for the owner, Jon Karalekas. Plaintiff worked with Windsor until he went to work for Florida Specialties in March 2018. At Florida Specialties, Plaintiff was given a salary and commission sales position. Plaintiff holds this job at the present time and his supervisor is Jake Davis (General Manager).**

3.      Identify any applications or inquiries you have made for employment of any kind since January 1, 2017, including the type or form of such application or inquiry; the date of such application or inquiry; the name, address, and telephone number of the prospective employer to whom such application or inquiry was made; the person to whom you spoke or with whom you had contact concerning possible employment; and whether you received an offer of employment.

**ANSWER: Plaintiff filed for unemployment in the State of Georgia. Plaintiff does not have a list of all jobs he applied for, however, Plaintiff believes the State of Georgia is in possession, custody, and/or control of such documents.**

4.      State whether you have ever been convicted of a crime, whether misdemeanor

or felony (excluding minor traffic citations) and regardless of whether such conviction has since

been expunged from your record; the crime of which you were convicted; the date(s) of the

conviction(s) and the related charge(s) and arrest(s); the jurisdiction(s) where he was

convicted; and the facts surrounding the conviction(s), including whether you were imprisoned

at any time and, if so, when and where.

**ANSWER: No.**

5.      State whether you took any notes, kept a diary, calendar, recording, or any other

form of record, or wrote any summary of events relating to any facts alleged in your Complaint or

otherwise pertaining to his claims alleged therein.

**ANSWER: Plaintiff objects to Interrogatory No. 5 on the grounds that it seeks information
and/or documentation that is protected by the attorney-client privilege and/or the work-
product doctrine.**

6.      Identify all e-mail accounts and usernames for any social networking sites *(i.e.,*

Facebook, Instagram, Linkedin, or Twitter) you've used since 2011.

**ANSWER: Plaintiff objects to Interrogatory No. 6 on the grounds that it is overly broad, and not
limited to the proportionate needs of the case.  Subject to, and without waiving the foregoing,
Plaintiff does not have any social media accounts.**

7.      Identify any and all physical or psychiatric injuries, conditions, or illnesses from

which you have suffered since 2011, including identification of the period of injury, condition or

illness, treating health care providers (including name and address and telephone number) and any

prescription medication for such injury, condition or illness.

**ANSWER: Plaintiff objects to Interrogatory No. 7 on the grounds that it is overly broad and
not limited to the proportionate needs of the case. Subject to, and without waiving the
foregoing, Plaintiff underwent surgery for prostate cancer in June 2017.**

8.     Please state whether you have ever been a party to a lawsuit, including any bankruptcy proceeding. If so, please identify the style of each case to include names of parties, the specific court in which the action was brought; the case number; the nature and subject matter of the case; and the outcome.

**ANSWER: None.**

9.     Identify all damages you allege to have has suffered as a result of KCF's alleged unlawful conduct. For each category of damages, identify the category itself, the damages, all facts supporting or establishing your entitlement to the category of damages and how you calculated your damages.

**ANSWER: This estimate is prepared by Plaintiff's counsel.  Plaintiff seeking back pay from the date of trial, through his termination. Plaintiff is seeking a declaratory judgment that the discrimination against him by Defendant was a violation of his rights under the ADA; and is seeking punitive damages, front pay, and compensatory damages, as well as attorneys' fees and costs.**

| a Employee's social security number | OMB No. 1545-0008 | This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it. |
|---|---|---|
| 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 | | |

| b Employer identification number (EIN) | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|
| 20-8157287 | 153769.52 | 38215.00 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| KEN CORBETT FARMS LLC | 110100.00 | 4624.20 |
| 972 HIGHWAY 376 | 5 Medicare wages and tips | 6 Medicare tax withheld |
| LAKE PARK, GA  31636 | 153769.52 | 2229.66 |
| | 7 Social security tips | 8 Allocated tips |

| d Control number | 9 | 10 Dependent care benefits |
|---|---|---|

| e Employee's name, address, and ZIP code | 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|---|
| JEFFREY     STEPANOVICH | | |
| 10651 REGENT CIRCLE | 13 Statutory employee / Retirement plan / Third-party sick pay | 12b |
| NAPLES, FL  34109 | 14 Other | 12c |
| | | 12d |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| GA | 3043045-YL | 153769.52 | 8709.02 | | | |

Form **W-2** Wage and Tax Statement

**2012**

Copy C—For EMPLOYEE'S RECORDS (See *Notice to Employee* on the back of Copy B.)

Department of the Treasury—Internal Revenue Service

Safe, accurate, FAST! Use  IRS e-file

---

Safe, accurate, FAST! Use  IRS e-file   Visit the IRS Web Site at www.irs.gov/efile

**W-2** Employee Reference Copy Wage and Tax Statement

**2012**  OMB No. 1545-0008

Copy C for employee's records.

| d Control number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 000001  RD/NXT | | A | 1 |

c Employer's name, address, and ZIP code
GROWERS  DIRECT  LLC
134 S DIXIE  HIGHWAY   SUIT
HALLENDALE,  FL  33009

Batch  #95096

e/f Employee's name, address, and ZIP code
JEFFREY  J STEPANOVICH
10651 REYENT  CIRCLE
NAPLES,  FL  34109

| b Employer's FED ID number | a Employee's SSA number |
|---|---|
| 27-1109318 | 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 |

| 1 Wages, tips, other comp. | 2 Federal income tax withheld |
|---|---|
| 40840.00 | 4543.56 |
| 3 Social security wages | 4 Social security tax withheld |
| 40840.00 | 1715.28 |
| 5 Medicare wages and tips | 6 Medicare tax withheld |
| 40840.00 | 592.18 |
| 7 Social security tips | 8 Allocated tips |

| 9 | 10 Dependent care benefits |
|---|---|
| 11 Nonqualified plans | 12a See instructions for box 12 |
| 14 Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp / Ret plan / 3rd party sick pay |

| 15 State | Employer's state ID no. | 16 State wages, tips, etc. |
|---|---|---|
| 17 State income tax | 18 Local wages, tips, etc. | |
| 19 Local income tax | 20 Locality name | |

## 2012 W-2 and EARNINGS SUMMARY

This blue Earnings Summary section is included with your W-2 to help describe portions in more detail. The reverse side includes general information that you may also find helpful.

1. The following information reflects your final 2012 pay stub plus any adjustments submitted by your employer.

| Gross Pay | 40840.80 | Social Security Tax Withheld Box 4 of W-2 | 1715.28 | State Income Tax Box 17 of W-2 |
|---|---|---|---|---|
| | | | | Local Income Tax Box 19 of W-2 |
| Fed. Income Tax Withheld Box 2 of W-2 | 4543.56 | Medicare Tax Withheld Box 6 of W-2 | 592.18 | SUB/SDI Box 14 of W-2 |

2. Your Gross Pay was adjusted as follows to produce your W-2 Statement.

| | Wages, Tips, other Compensation Box 1 of W-2 | Social Security Wages Box 3 of W-2 | Medicare Wages Box 5 of W-2 |
|---|---|---|---|
| Gross Pay | 40,840.00 | 40,840.00 | 40,840.00 |
| Reported W-2 Wages | 40,840.00 | 40,840.00 | 40,840.00 |

3. Employee W-4 Profile. To change your Employee W-4 Profile Information, file a new W-4 with your payroll dept.

JEFFREY  J STEPANOVICH
10651  REYENT  CIRCLE
NAPLES,  FL  34109

Social Security Number: 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
Taxable Marital Status:  MARRIED
Exemptions/Allowances:
FEDERAL:  2

EXHIBIT 
WIT: Stepanovic
DATE: 1-22
Julie Lawrence, CCR

Form **1040**   Department of the Treasury — Internal Revenue Service   (99)

**U.S. Individual Income Tax Return** **2012**   OMB No. 1545-0074 | IRS Use Only — Do not write or staple in this space.

For the year Jan 1 - Dec 31, 2012, or other tax year beginning _____ , 2012, ending _____ , 20 _____

See separate instructions.

| Your first name and initial | Last name | Your social security number |
|---|---|---|
| JEFFREY | J   STEPANOVICH | 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 |
| If a joint return, spouse's first name and initial | Last name | Spouse's social security number |
| LORA | D   STEPANOVICH | 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 |

Home address (number and street). If you have a P.O. box, see instructions.   Apartment no.

10651 REGENT CIRCLE

▲ Make sure the SSN(s) above and on line 6c are correct.

City, town or post office, state, and ZIP code. If you have a foreign address, also complete spaces below (see instructions).

NAPLES   FL   34109

**Presidential Election Campaign**

Foreign country name   Foreign province/state/county   Foreign postal code

Check here if you, or your spouse if filing jointly, want $3 to go to this fund? Checking a box below will not change your tax or refund. ▢ You ▢ Spouse

**Filing Status**

Check only one box.

1 ▢ Single
2 ☒ Married filing jointly (even if only one had income)
3 ▢ Married filing separately. Enter spouse's SSN above & full name here ▶
4 ▢ Head of household (with qualifying person). (See instructions.) If the qualifying person is a child but not your dependent, enter this child's name here. ▶
5 ▢ Qualifying widow(er) with dependent child

**Exemptions**

6a ☒ **Yourself.** If someone can claim you as a dependent, **do not** check box 6a ............
b ☒ **Spouse** ...........................................................................

Boxes checked on 6a and 6b ..... **2**
No. of children on 6c who:

c **Dependents:**

| (1) First name   Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if child under age 17 qualifying for child tax cr (see instrs) |
|---|---|---|---|

If more than four dependents, see instructions and check here ... ▶ ▢

• lived with you
• did not live with you due to divorce or separation (see instrs)

Dependents on 6c not entered above

Add numbers on lines above ▶ **2**

d Total number of exemptions claimed ..................................................

**Income**

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld.

If you did not get a W-2, see instructions.

Enclose, but do not attach, any payment. Also, please use Form 1040-V.

| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 ................................ | 7 | 194,610. |
|---|---|---|---|
| 8a | Taxable interest. Attach Schedule B if required ............................... | 8a | |
| b | Tax-exempt interest. **Do not** include on line 8a ..... | 8b | | |
| 9a | Ordinary dividends. Attach Schedule B if required .............................. | 9a | |
| b | Qualified dividends ..................................... | 9b | | |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes ............ | 10 | 1,936. |
| 11 | Alimony received ..................................................... | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ .......................... | 12 | |
| 13 | Capital gain or (loss). Att Sch D if reqd. If not reqd, ck here ............... ▶ ▢ | 13 | |
| 14 | Other gains or (losses). Attach Form 4797 .................................. | 14 | |
| 15a | IRA distributions .... | 15a | | b Taxable amount ............ | 15b | |
| 16a | Pensions and annuities ..... | 16a | | b Taxable amount ............ | 16b | |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E .. | 17 | 38,761. |
| 18 | Farm income or (loss). Attach Schedule F ................................... | 18 | |
| 19 | Unemployment compensation ............................................... | 19 | |
| 20a | Social security benefits ......... | 20a | | b Taxable amount ............ | 20b | |
| 21 | Other income ........................................................... | 21 | |
| 22 | Combine the amounts in the far right column for lines 7 through 21. This is your **total income** ............. ▶ | 22 | 235,307. |

**Adjusted Gross Income**

| 23 | Educator expenses .............................................. | 23 | |
|---|---|---|---|
| 24 | Certain business expenses of reservists, performing artists, and fee-basis government officials. Attach Form 2106 or 2106-EZ .................... | 24 | |
| 25 | Health savings account deduction. Attach Form 8889 ......... | 25 | |
| 26 | Moving expenses. Attach Form 3903 .......................... | 26 | |
| 27 | Deductible part of self-employment tax. Attach Schedule SE .......... | 27 | |
| 28 | Self-employed SEP, SIMPLE, and qualified plans............. | 28 | |
| 29 | Self-employed health insurance deduction ................... | 29 | |
| 30 | Penalty on early withdrawal of savings ...................... | 30 | |
| 31a | Alimony paid  b Recipient's SSN .... ▶ | 31a | |
| 32 | IRA deduction ............................................. | 32 | |
| 33 | Student loan interest deduction ............................. | 33 | |
| 34 | Tuition and fees. Attach Form 8917 .......................... | 34 | |
| 35 | Domestic production activities deduction. Attach Form 8903 .... | 35 | |
| 36 | Add lines 23 through 35 ...................................................... | 36 | |
| 37 | Subtract line 36 from line 22. This is your **adjusted gross income** ............. ▶ | 37 | 235,307. |

**BAA** For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.   FDIA0112  01/11/13   Form **1040** (2012)

Form **1040** (2012)   JEFFREY J & LORA D STEPANOVICH                         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   Page **2**

| | | | | |
|---|---|---|---|---|
| **Tax and Credits** | 38 | Amount from line 37 (adjusted gross income) | **38** | 235,307. |

**Standard Deduction for –**
- People who check any box on line 39a or 39b or who can be claimed as a dependent, see instructions.
- All others:

Single or Married filing separately, $5,950

Married filing jointly or Qualifying widow(er), $11,900

Head of household, $8,700

| | | | | |
|---|---|---|---|---|
| 39 a | Check if: | You were born before January 2, 1948, ☐  Blind. **Total boxes** | | |
| | | Spouse was born before January 2, 1948, ☐  Blind. **checked** ► 39 a ☐ | | |
| b | If your spouse itemizes on a separate return or you were a dual-status alien, check here ..... ► 39 b ☐ | | | |
| 40 | Itemized deductions (from Schedule A) or your standard deduction (see left margin) | **40** | 44,635. |
| 41 | Subtract line 40 from line 38 | **41** | 190,672. |
| 42 | **Exemptions.** Multiply $3,800 by the number on line 6d | **42** | 7,600. |
| 43 | **Taxable income.** Subtract line 42 from line 41. If line 42 is more than line 41, enter -0- | **43** | 183,072. |
| 44 | **Tax** (see instrs). Check if any from:  a ☐ Form(s) 8814  c ☐ 962 election  b ☐ Form 4972 | **44** | 39,039. |
| 45 | **Alternative minimum tax** (see instructions). Attach Form 6251 | **45** | 112. |
| 46 | Add lines 44 and 45 ► | **46** | 39,151. |
| 47 | Foreign tax credit. Attach Form 1116 if required | 47 | |
| 48 | Credit for child and dependent care expenses. Attach Form 2441 | 48 | |
| 49 | Education credits from Form 8863, line 19 | 49 | |
| 50 | Retirement savings contributions credit. Attach Form 8880 | 50 | |
| 51 | Child tax credit. Attach Schedule 8812, if required | 51 | |
| 52 | Residential energy credits. Attach Form 5695 | 52 | |
| 53 | Other crs from Form:  a ☐ 3800  b ☐ 8801  c ☐ | 53 | |
| 54 | Add lines 47 through 53. These are your **total credits** | **54** | |
| 55 | Subtract line 54 from line 46. If line 54 is more than line 46, enter -0- ► | **55** | 39,151. |

| | | | | |
|---|---|---|---|---|
| **Other Taxes** | 56 | Self-employment tax. Attach Schedule SE | **56** | |
| | 57 | Unreported social security and Medicare tax from Form:  a ☐ 4137  b ☐ 8919 | **57** | |
| | 58 | Additional tax on IRAs, other qualified retirement plans, etc. Attach Form 5329 if required | **58** | |
| | 59 a | Household employment taxes from Schedule H | **59 a** | |
| | b | First-time homebuyer credit repayment. Attach Form 5405 if required | **59 b** | |
| | 60 | Other taxes. Enter code(s) from instructions | **60** | |
| | 61 | Add lns 55-60. This is your **total tax** ► | **61** | 39,151. |

| | | | | |
|---|---|---|---|---|
| **Payments** | 62 | Federal income tax withheld from Forms W-2 and 1099 | 62 | 42,759. |
| If you have a qualifying child, attach Schedule EIC. | 63 | 2012 estimated tax payments and amount applied from 2011 return | 63 | |
| | 64 a | **Earned income credit (EIC)** | 64 a | |
| | b | Nontaxable combat pay election ► 64b | | |
| | 65 | Additional child tax credit. Attach Schedule 8812 | 65 | |
| | 66 | American opportunity credit from Form 8863, line 8 | 66 | |
| | 67 | Reserved | 67 | |
| | 68 | Amount paid with request for extension to file | 68 | |
| | 69 | Excess social security and tier 1 RRTA tax withheld | 69 | 1,715. |
| | 70 | Credit for federal tax on fuels. Attach Form 4136 | 70 | |
| | 71 | Credits from Form:  a ☐ 2439  b ☐ Reserved  c ☐ 8801  d ☐ 8885 | 71 | |
| | 72 | Add lns 62, 63, 64a, & 65-71. These are your **total pmts** ► | **72** | 44,474. |

| | | | | |
|---|---|---|---|---|
| **Refund** | 73 | If line 72 is more than line 61, subtract line 61 from line 72. This is the amount you **overpaid** | **73** | 5,323. |
| | 74 a | Amount of line 73 you want **refunded to you.** If Form 8888 is attached, check here ... ► ☐ | **74 a** | 5,323. |
| Direct deposit? See instructions. | ► b | Routing number   067006432    ► c Type: ☒ Checking  ☐ Savings | | |
| | ► d | Account number   1010012966943 | | |
| | 75 | Amount of line 73 you want applied to your 2013 estimated tax ....... ► 75 | | |
| **Amount You Owe** | 76 | Amount you owe. Subtract line 72 from line 61. For details on how to pay see instructions ► | **76** | |
| | 77 | Estimated tax penalty (see instructions) | 77 | |

| | |
|---|---|
| **Third Party Designee** | Do you want to allow another person to discuss this return with the IRS (see instructions)? ......... ☐ Yes. Complete below.  ☒ No |
| | Designee's name ►      Phone no. ►      Personal identification number (PIN) ► |

**Sign Here**

Joint return? See instructions.

Keep a copy for your records.

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| | | | |
|---|---|---|---|
| Your signature | Date  12-12-14 | Your occupation  SALESMAN | Daytime phone number |
| Spouse's signature. If a joint return, both must sign. | Date  12-12-14 | Spouse's occupation  MANAGER | If the IRS sent you an Identity Protection PIN, enter it here (see instrs) |

**Paid Preparer Use Only**

| | | | | |
|---|---|---|---|---|
| Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
| Firm's name ►  Non - Paid Preparer | | | Firm's EIN ► | |
| Firm's address ► | | | Phone no. | |

FDIA0112  01/11/13

Form **1040** (2012)

| | a Employee's social security number 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 | OMB No. 1545-0008 | This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it. | |
|---|---|---|---|---|
| b Employer identification number (EIN) 20-8157287 | | 1 Wages, tips, other compensation 143150.41 | 2 Federal income tax withheld 30825.00 |
| c Employer's name, address, and ZIP code KEN CORBETT FARMS LLC 972 HIGHWAY 376 LAKE PARK, GA 31636 | | 3 Social security wages 113700.00 | 4 Social security tax withheld 7049.40 |
| | | 5 Medicare wages and tips 143150.41 | 6 Medicare tax withheld 2075.68 |
| | | 7 Social security tips | 8 Allocated tips |
| d Control number | | 9 | 10 Dependent care benefits |
| e Employee's name, address, and ZIP code JEFFREY     STEPANOVICH 10651 REGENT CIRCLE NAPLES, FL 34109 | | 11 Nonqualified plans | 12a See instructions for box 12 |
| | | 13 Statutory employee  Retirement plan  Third-party sick pay | 12b |
| | | 14 Other | 12c |
| | | | 12d |

| 15 State GA | Employer's state ID number 3043045-YL | 16 State wages, tips, etc. 143150.41 | 17 State income tax 7953.70 | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|

Form **W-2** Wage and Tax Statement

2013

Department of the Treasury—Internal Revenue Service

Copy C—For EMPLOYEE'S RECORDS (See *Notice to Employee* on the back of Copy B.)

Safe, accurate, FAST! Use 

---

Visit the IRS Web Site at www.irs.gov/efile

Safe, accurate, FAST! Use 

Employee Reference Copy

**W-2** Wage and Tax Statement

2013

OMB No. 1545-0008

Copy C for employee's records.

| Control number 00001 | Dept. RD/NXY | Corp. | Employer use only 1 |
|---|---|---|---|

Employer's name, address, and ZIP code
GROWERS DIRECT LLC
134 S DIXIE HIGHWAY SUIT
HALLENDALE, FL 33009

**Batch #94154**

i Employee's name, address, and ZIP code
EFFREY J STEPANOVICH
0651 REYENT CIRCLE
IAPLES, FL 34109

| Employer's FED ID number 27-1109318 | a Employee's SSA number 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 |
|---|---|
| Wages, tips, other comp. 33340.00 | 2 Federal income tax withheld 3622.90 |
| Social security wages 33340.00 | 4 Social security tax withheld 2067.08 |
| Medicare wages and tips 33340.00 | 6 Medicare tax withheld 483.43 |
| Social security tips | 8 Allocated tips |
| | 10 Dependent care benefits |
| i Nonqualified plans | 12b |
| 1 Other | 12c |
| | 12d |
| | 13 Stat emp Ret. plan 3rd party sick pay |
| 5 State Employer's state ID no. | 16 State wages, tips, etc. |
| 7 State income tax | 18 Local wages, tips, etc. |
| 9 Local income tax | 20 Locality name |

## 2013 W-2 and EARNINGS SUMMARY

This blue Earnings Summary section is included with your W-2 to help describe portions in more detail. The reverse side includes general information that you may also find helpful.

1. The following information reflects your final 2013 pay stub plus any adjustments submitted by your employer.

| | | | | |
|---|---|---|---|---|
| Gross Pay | 33340.00 | Social Security Tax Withheld Box 4 of W-2 | 2067.08 | State Income Tax Box 17 of W-2 Local Income Tax Box 19 of W-2 |
| Fed. Income Tax Withheld Box 2 of W-2 | 3622.90 | Medicare Tax Withheld Box 6 of W-2 | 483.43 | SUI/SDI Box 14 of W-2 |

2. Your Gross Pay was adjusted as follows to produce your W-2 Statement.

| | Wages, Tips, other Compensation Box 1 of W-2 | Social Security Wages Box 3 of W-2 | Medicare Wages Box 5 of W-2 |
|---|---|---|---|
| Gross Pay | 33,340.00 | 33,340.00 | 33,340.00 |
| Reported W-2 Wages | 33,340.00 | 33,340.00 | 33,340.00 |

3. Employee W-4 Profile. To change your Employee W-4 Profile Information, file a new W-4 with your payroll dept.

JEFFREY J STEPANOVICH
10651 REYENT CIRCLE
NAPLES, FL 34109

Social Security Number: 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
Taxable Marital Status: MARRIED

Exemptions/Allowances:
FEDERAL: 2

© 2013 ADP, INC.

— Fold and Detach Here —



EXHIBIT D-7
WIT: Stepanovich
DATE: 1-22
Julie Lawrence, CCR

Form **1040**  Department of the Treasury—Internal Revenue Service  (99)
**U.S. Individual Income Tax Return**  **2013**  OMB No. 1545-0074  IRS Use Only—Do not write or staple in this space.

For the year Jan. 1–Dec. 31, 2013, or other tax year beginning _____, 2013, ending _____, 20 ___  | See separate instructions.

| Your first name and initial | Last name | Your social security number |
|---|---|---|
| JEFFREY J | STEPANOVICH | 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 |

| If a joint return, spouse's first name and initial | Last name | Spouse's social security number |
|---|---|---|
| LORA D | STEPANOVICH | 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 |

Home address (number and street). If you have a P.O. box, see instructions.  |  Apt. no.
1100 HOLIDAY LN

▲ Make sure the SSN(s) above and on line 6c are correct.

City, town or post office, state, and ZIP code. If you have a foreign address, also complete spaces below (see instructions).
NAPLES FL 34104

**Presidential Election Campaign**
Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund. ☐ You  ☐ Spouse

| Foreign country name | Foreign province/state/county | Foreign postal code |
|---|---|---|

**Filing Status**
Check only one box.

1. ☐ Single
2. ☒ Married filing jointly (even if only one had income)
3. ☐ Married filing separately. Enter spouse's SSN above and full name here. ▶
4. ☐ Head of household (with qualifying person). (See instructions.) If the qualifying person is a child but not your dependent, enter this child's name here. ▶
5. ☐ Qualifying widow(er) with dependent child

**Exemptions**

6a ☒ **Yourself.** If someone can claim you as a dependent, do **not** check box 6a . . . . .
b ☒ **Spouse** . . . . . . . . . . . . . . . . . . . . . . . . . . . .

| c | Dependents: | | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if child under age 17 qualifying for child tax credit (see instructions) |
|---|---|---|---|---|---|
| | (1) First name | Last name | | | |
| | | | | | ☐ |
| | | | | | ☐ |
| | | | | | ☐ |
| | | | | | ☐ |

If more than four dependents, see instructions and check here ▶ ☐

Boxes checked on 6a and 6b: **2**
No. of children on 6c who:
• lived with you
• did not live with you due to divorce or separation (see instructions)
Dependents on 6c not entered above
Add numbers on lines above ▶ **2**

d  Total number of exemptions claimed . . . . . . . . . . . . . . . . . .

**Income**

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld.

If you did not get a W-2, see instructions.

| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 . . . . . . . . . . | 7 | 176,490. |
|---|---|---|---|
| 8a | Taxable interest. Attach Schedule B if required . . . . . . . . . | 8a | |
| b | Tax-exempt interest. Do not include on line 8a . . . | 8b | | |
| 9a | Ordinary dividends. Attach Schedule B if required . . . . . . . . | 9a | |
| b | Qualified dividends . . . . . . . . | 9b | | |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes . . . . | 10 | 1,613. |
| 11 | Alimony received . . . . . . . . . . . . . . . . . . . | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ . . . . . . . | 12 | 8,000. |
| 13 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ ☐ | 13 | |
| 14 | Other gains or (losses). Attach Form 4797 . . . . . . . . . . | 14 | |
| 15a | IRA distributions . | 15a | | b Taxable amount . . . | 15b | |
| 16a | Pensions and annuities | 16a | | b Taxable amount . . . | 16b | |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | 17 | 3,028. |
| 18 | Farm income or (loss). Attach Schedule F . . . . . . . . . . | 18 | |
| 19 | Unemployment compensation . . . . . . . . . . . . . . | 19 | |
| 20a | Social security benefits | 20a | | b Taxable amount . . . | 20b | |
| 21 | Other income. List type and amount _____ | 21 | |
| 22 | Combine the amounts in the far right column for lines 7 through 21. This is your **total income** ▶ | 22 | 189,131. |

**Adjusted Gross Income**

| 23 | Educator expenses . . . . . . . . . . | 23 | | |
|---|---|---|---|---|
| 24 | Certain business expenses of reservists, performing artists, and fee-basis government officials. Attach Form 2106 or 2106-EZ | 24 | | |
| 25 | Health savings account deduction. Attach Form 8889 . | 25 | | |
| 26 | Moving expenses. Attach Form 3903 . . . . . | 26 | | |
| 27 | Deductible part of self-employment tax. Attach Schedule SE . | 27 | 107. | |
| 28 | Self-employed SEP, SIMPLE, and qualified plans . | 28 | | |
| 29 | Self-employed health insurance deduction . . . . | 29 | | |
| 30 | Penalty on early withdrawal of savings . . . . . | 30 | | |
| 31a | Alimony paid  b Recipient's SSN ▶ | 31a | | |
| 32 | IRA deduction . . . . . . . . . . . | 32 | | |
| 33 | Student loan interest deduction . . . . . . | 33 | | |
| 34 | Tuition and fees. Attach Form 8917 . . . . . . | 34 | | |
| 35 | Domestic production activities deduction. Attach Form 8903 | 35 | | |
| 36 | Add lines 23 through 35 . . . . . . . . . . . . . . . . | 36 | 107. |
| 37 | Subtract line 36 from line 22. This is your **adjusted gross income** . . . . . ▶ | 37 | 189,024. |

For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions. BAA  REV 05/19/14 PRO  Form **1040** (2013)

Form 1040 (2013)                                                                                  Page **2**

| | | | | |
|---|---|---|---|---|
| **Tax and Credits** | 38 | Amount from line 37 (adjusted gross income) . . . . . . . . . . . . | 38 | 189,024. |
| | 39a | Check { □ **You** were born before January 2, 1949, □ Blind. } **Total boxes** if: { □ **Spouse** was born before January 2, 1949, □ Blind. } checked ▶ 39a | | |
| Standard Deduction for— | b | If your spouse itemizes on a separate return or you were a dual-status alien, check here▶ 39b □ | | |
| • People who check any box on line 39a or 39b or who can be claimed as a dependent, see instructions. | 40 | **Itemized deductions** (from Schedule A) or your **standard deduction** (see left margin) . . | 40 | 39,592. |
| | 41 | Subtract line 40 from line 38 . . . . . . . . . . . . . . . . . | 41 | 149,432. |
| | 42 | **Exemptions.** If line 38 is $150,000 or less, multiply $3,900 by the number on line 6d. Otherwise, see instructions | 42 | 7,800. |
| | 43 | **Taxable income.** Subtract line 42 from line 41. If line 42 is more than line 41, enter -0- . . | 43 | 141,632. |
| • All others: | 44 | **Tax** (see instructions). Check if any from: **a** □ Form(s) 8814 **b** □ Form 4972 **c** □ | 44 | 27,266. |
| Single or Married filing separately, $6,100 | 45 | **Alternative minimum tax** (see instructions). Attach Form 6251 . . . . . | 45 | |
| | 46 | Add lines 44 and 45 . . . . . . . . . . . . . . . . . . ▶ | 46 | 27,266. |
| Married filing jointly or Qualifying widow(er), $12,200 | 47 | Foreign tax credit. Attach Form 1116 if required . . . . | 47 | | |
| | 48 | Credit for child and dependent care expenses. Attach Form 2441 | 48 | | |
| | 49 | Education credits from Form 8863, line 19 . . . . . | 49 | | |
| Head of household, $8,950 | 50 | Retirement savings contributions credit. Attach Form 8880 | 50 | | |
| | 51 | Child tax credit. Attach Schedule 8812, if required. . . . | 51 | | |
| | 52 | Residential energy credits. Attach Form 5695 . . . . . | 52 | | |
| | 53 | Other credits from Form: **a** □ 3800 **b** □ 8801 **c** □ | 53 | | |
| | 54 | Add lines 47 through 53. These are your **total credits** . . . . . . . . . | 54 | |
| | 55 | Subtract line 54 from line 46. If line 54 is more than line 46, enter -0- . . . . . ▶ | 55 | 27,266. |
| **Other Taxes** | 56 | Self-employment tax. Attach Schedule SE . . . . . . . . . . . . . | 56 | 214. |
| | 57 | Unreported social security and Medicare tax from Form: **a** □ 4137 **b** □ 8919 . . | 57 | |
| | 58 | Additional tax on IRAs, other qualified retirement plans, etc. Attach Form 5329 if required . . | 58 | |
| | 59a | Household employment taxes from Schedule H . . . . . . . . . . . . | 59a | |
| | b | First-time homebuyer credit repayment. Attach Form 5405 if required . . . . . . | 59b | |
| | 60 | Taxes from: **a** □ Form 8959 **b** □ Form 8960 **c** □ Instructions; enter code(s) | 60 | |
| | 61 | Add lines 55 through 60. This is your **total tax** . . . . . . . . . . ▶ | 61 | 27,480. |
| **Payments** | 62 | Federal income tax withheld from Forms W-2 and 1099 . . | 62 | 34,448. | |
| | 63 | 2013 estimated tax payments and amount applied from 2012 return | 63 | | |
| If you have a qualifying child, attach Schedule EIC. | 64a | **Earned income credit (EIC)** . . . . . . . . | 64a | | |
| | b | Nontaxable combat pay election | 64b | | | |
| | 65 | Additional child tax credit. Attach Schedule 8812 . . . . | 65 | | |
| | 66 | American opportunity credit from Form 8863, line 8 . . . . | 66 | | |
| | 67 | Reserved . . . . . . . . . . . . . . . | 67 | | |
| | 68 | Amount paid with request for extension to file . . . . | 68 | | |
| | 69 | Excess social security and tier 1 RRTA tax withheld . . . | 69 | 2,067. | |
| | 70 | Credit for federal tax on fuels. Attach Form 4136 . . . . | 70 | | |
| | 71 | Credits from Form: **a** □ 2439 **b** □ Reserved **c** □ 8885 **d** □ | 71 | | |
| | 72 | Add lines 62, 63, 64a, and 65 through 71. These are your **total payments** . . . . . ▶ | 72 | 36,515. |
| **Refund** | 73 | If line 72 is more than line 61, subtract line 61 from line 72. This is the amount you **overpaid** | 73 | 9,035. |
| | 74a | Amount of line 73 you want **refunded to you.** If Form 8888 is attached, check here . . ▶ | 74a | 9,035. |
| Direct deposit? ▶ See instructions. | b | Routing number 0 6 7 0 0 6 4 3 2 ▶ **c** Type: ☒ Checking □ Savings | | |
| | d | Account number 1 0 1 0 0 1 2 9 6 6 9 4 3 | | |
| | 75 | Amount of line 73 you want applied to your **2014 estimated tax** ▶ 75 | | |
| **Amount You Owe** | 76 | **Amount you owe.** Subtract line 72 from line 61. For details on how to pay, see instructions ▶ | 76 | |
| | 77 | Estimated tax penalty (see instructions) . . . . . . | 77 | | |
| **Third Party Designee** | | Do you want to allow another person to discuss this return with the IRS (see instructions)? □ **Yes.** Complete below. ☒ **No** | | |
| | | Designee's name ▶     Phone no. ▶     Personal identification number (PIN) ▶ | | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Joint return? See instructions.
Keep a copy for your records.

| Your signature | Date 12/12/14 | Your occupation SALESMAN | Daytime phone number |
|---|---|---|---|
| Spouse's signature. If a joint return, **both** must sign. | Date 12-12-14 | Spouse's occupation MANAGER | If the IRS sent you an Identity Protection PIN, enter it here (see inst.) |

**Paid Preparer Use Only**

| Print/Type preparer's name | Preparer's signature Non-Paid Preparer | Date | Check □ if self-employed | PTIN |
|---|---|---|---|---|
| Firm's name ▶ | | | Firm's EIN ▶ | |
| Firm's address ▶ | | | Phone no. | |

REV 05/19/14 PRO   Form **1040** (2013)

| | a Employee's social security number 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 | OMB No. 1545-0008 | This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it. | |
|---|---|---|---|---|
| b Employer identification number (EIN) 20-8157287 | | | 1 Wages, tips, other compensation 154269.97 | 2 Federal income tax withheld 30170.00 |
| c Employer's name, address, and ZIP code KEN CORBETT FARMS LLC 972 HIGHWAY 376 LAKE PARK, GA 31636 | | | 3 Social security wages 117000.00 | 4 Social security tax withheld 7254.00 |
| | | | 5 Medicare wages and tips 154269.97 | 6 Medicare tax withheld 2236.91 |
| | | | 7 Social security tips | 8 Allocated tips |
| d Control number | | | 9 | 10 Dependent care benefits |
| e Employee's name, address, and ZIP code JEFFERY STEPANOVICH 1100 HOLIDAY LANE NAPLES, FL 34104 | | | 11 Nonqualified plans | 12a See instructions for box 12 |
| | | | 13 Statutory employee ☐ Retirement plan ☐ Third-party sick pay ☐ | 12b |
| | | | 14 Other | 12c |
| | | | | 12d |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| GA | 3043045-YL | 154269.97 | 6652.30 | | | |

Form **W-2** Wage and Tax Statement

2014

Department of the Treasury—Internal Revenue Service

Copy C—For EMPLOYEE'S RECORDS (See *Notice to Employee* on the back of Copy B.)

Safe, accurate, FAST! Use  **e ∗ file**

LW2EEC

*(Lower inverted W-2 form — Employee Reference Copy, 2014)*

a Employee's social security number 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
b Employer's identification number 52-2184449
Wages, tips, other compensation 15000.00
2 Federal income tax withheld 2208.18
3 Social security wages 15000.00
4 Social security tax withheld 930.00
5 Medicare wages and tips 15000.00
6 Medicare tax withheld 217.50
c Control number 1 A 9215-000
Employer name, address, and ZIP code ENTERPRISE HR II, INC. 700 CENTRAL AVE, SUITE 500 ST. PETERSBURG, FL 33701
e Employee's first name and initial Last name Suff. JEFFERY J. STEPANOVICH 1100 HOLIDAY LN NAPLES, FL 34104
15 State FL



EXHIBIT D-8
WIT: Stepanovich
DATE: 1-23
Julie Lawrence, CCR

Form **1040** Department of the Treasury—Internal Revenue Service (99)
**U.S. Individual Income Tax Return** **2014** OMB No. 1545-0074 IRS Use Only—Do not write or staple in this space.

For the year Jan. 1–Dec. 31, 2014, or other tax year beginning _____, 2014, ending _____, 20____ | See separate instructions.

| | | |
|---|---|---|
| Your first name and initial | Last name | Your social security number |
| JEFFREY J | STEPANOVICH | 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 |
| If a joint return, spouse's first name and initial | Last name | Spouse's social security number |
| LORA D | STEPANOVICH | 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 |

Home address (number and street). If you have a P.O. box, see instructions. | Apt. no.
1100 HOLIDAY LN

▲ Make sure the SSN(s) above and on line 6c are correct.

City, town or post office, state, and ZIP code. If you have a foreign address, also complete spaces below (see instructions).
NAPLES FL 34104

**Presidential Election Campaign**
Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund. ☐ You ☐ Spouse

Foreign country name | Foreign province/state/county | Foreign postal code

**Filing Status**
Check only one box.

1 ☐ Single
2 ☒ Married filing jointly (even if only one had income)
3 ☐ Married filing separately. Enter spouse's SSN above and full name here. ▶
4 ☐ Head of household (with qualifying person). (See instructions.) If the qualifying person is a child but not your dependent, enter this child's name here. ▶
5 ☐ Qualifying widow(er) with dependent child

**Exemptions**

6a ☒ Yourself. If someone can claim you as a dependent, do not check box 6a . . . . .
b ☒ Spouse . . . . . . . . . . . . . . . . . . .

c Dependents:
| (1) First name   Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if child under age 17 qualifying for child tax credit (see instructions) |
|---|---|---|---|
| | | | ☐ |
| | | | ☐ |
| | | | ☐ |
| | | | ☐ |

If more than four dependents, see instructions and check here ▶ ☐

d Total number of exemptions claimed . . . . . . . . . . . . . . . . .

Boxes checked on 6a and 6b: **2**
No. of children on 6c who:
• lived with you
• did not live with you due to divorce or separation (see instructions)
Dependents on 6c not entered above
Add numbers on lines above ▶ **2**

**Income**

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld.

If you did not get a W-2, see instructions.

| | | |
|---|---|---|
| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 . . . . . . . . . . | 7 | 169,270. |
| 8a | Taxable interest. Attach Schedule B if required . . . . . . . . . . | 8a | |
| b | Tax-exempt interest. Do not include on line 8a . . . | 8b | | |
| 9a | Ordinary dividends. Attach Schedule B if required . . . . . . . . . | 9a | |
| b | Qualified dividends . . . . . . | 9b | | |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes . . . . . | 10 | 1,687. |
| 11 | Alimony received . . . . . . . . . . . . . . . . | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ . . . . . . . . | 12 | |
| 13 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ ☐ | 13 | 0. |
| 14 | Other gains or (losses). Attach Form 4797 . . . . . . . . . . | 14 | |
| 15a | IRA distributions . 15a | b Taxable amount . . . | 15b | |
| 16a | Pensions and annuities 16a | b Taxable amount . . . | 16b | |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | 17 | 5,424. |
| 18 | Farm income or (loss). Attach Schedule F . . . . . . . . . . . | 18 | |
| 19 | Unemployment compensation . . . . . . . . . . . . . . | 19 | 3,850. |
| 20a | Social security benefits 20a | b Taxable amount . . . | 20b | |
| 21 | Other income. List type and amount _____ | 21 | |
| 22 | Combine the amounts in the far right column for lines 7 through 21. This is your total income ▶ | 22 | 180,231. |

**Adjusted Gross Income**

| | | |
|---|---|---|
| 23 | Educator expenses . . . . . . . . . . . | 23 | | |
| 24 | Certain business expenses of reservists, performing artists, and fee-basis government officials. Attach Form 2106 or 2106-EZ | 24 | | |
| 25 | Health savings account deduction. Attach Form 8889 . | 25 | | |
| 26 | Moving expenses. Attach Form 3903 . . . . | 26 | | |
| 27 | Deductible part of self-employment tax. Attach Schedule SE . | 27 | | |
| 28 | Self-employed SEP, SIMPLE, and qualified plans . | 28 | | |
| 29 | Self-employed health insurance deduction . . . | 29 | | |
| 30 | Penalty on early withdrawal of savings . . . . | 30 | | |
| 31a | Alimony paid   b Recipient's SSN ▶ _____ | 31a | | |
| 32 | IRA deduction . . . . . . . . . | 32 | | |
| 33 | Student loan interest deduction . . . . . | 33 | | |
| 34 | Tuition and fees. Attach Form 8917 . . . . | 34 | | |
| 35 | Domestic production activities deduction. Attach Form 8903 | 35 | | |
| 36 | Add lines 23 through 35 . . . . . . . . . . . . . . . . | 36 | |
| 37 | Subtract line 36 from line 22. This is your adjusted gross income . . . . . . ▶ | 37 | 180,231. |

For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions. BAA    REV 05/19/15 PRO    Form **1040** (2014)

Form 1040 (2014)

Page **2**

| | | | | | |
|---|---|---|---|---|---|
| | 38 | Amount from line 37 (adjusted gross income) . . . . . . . . . . | | **38** | 180,231. |

**Tax and Credits**

| 39a | Check if: ☐ You were born before January 2, 1950, ☐ Blind. | Total boxes | |
|---|---|---|---|
| | ☐ Spouse was born before January 2, 1950, ☐ Blind. | checked ▶ 39a | |

**b** If your spouse itemizes on a separate return or you were a dual-status alien, check here▶ 39b☐

*Standard Deduction for—*

*• People who check any box on line 39a or 39b or who can be claimed as a dependent, see instructions.*

*• All others:*

*Single or Married filing separately, $6,200*

*Married filing jointly or Qualifying widow(er), $12,400*

*Head of household, $9,100*

| | | | |
|---|---|---|---|
| 40 | Itemized deductions (from Schedule A) or your standard deduction (see left margin) . . | **40** | 30,519. |
| 41 | Subtract line 40 from line 38 . . . . . . . . . . . . . . . | **41** | 149,712. |
| 42 | Exemptions. If line 38 is $152,525 or less, multiply $3,950 by the number on line 6d. Otherwise, see instructions | **42** | 7,900. |
| 43 | Taxable income. Subtract line 42 from line 41. If line 42 is more than line 41, enter -0- . | **43** | 141,812. |
| 44 | Tax (see instructions). Check if any from: a ☐ Form(s) 8814   b ☐ Form 4972   c ☐ | **44** | 27,166. |
| 45 | Alternative minimum tax (see instructions). Attach Form 6251 . . . . . . | **45** | |
| 46 | Excess advance premium tax credit repayment. Attach Form 8962 . . . . ▶ | **46** | |
| 47 | Add lines 44, 45, and 46 . . . . . . . . . . . . . . . ▶ | **47** | 27,166. |

| | | | |
|---|---|---|---|
| 48 | Foreign tax credit. Attach Form 1116 if required . . . | 48 | |
| 49 | Credit for child and dependent care expenses. Attach Form 2441 | 49 | |
| 50 | Education credits from Form 8863, line 19 . . . . | 50 | |
| 51 | Retirement savings contributions credit. Attach Form 8880 | 51 | |
| 52 | Child tax credit. Attach Schedule 8812, if required . . | 52 | |
| 53 | Residential energy credits. Attach Form 5695 . . . | 53 | |
| 54 | Other credits from Form: a ☐ 3800 b ☐ 8801 c ☐ | 54 | |
| 55 | Add lines 48 through 54. These are your total credits . . . . . . . . | **55** | |
| 56 | Subtract line 55 from line 47. If line 55 is more than line 47, enter -0- . . . ▶ | **56** | 27,166. |

**Other Taxes**

| | | | |
|---|---|---|---|
| 57 | Self-employment tax. Attach Schedule SE . . . . . . . . . . . | **57** | |
| 58 | Unreported social security and Medicare tax from Form: a ☐ 4137   b ☐ 8919 | **58** | |
| 59 | Additional tax on IRAs, other qualified retirement plans, etc. Attach Form 5329 if required | **59** | |
| 60a | Household employment taxes from Schedule H . . . . . . . . . | **60a** | |
| b | First-time homebuyer credit repayment. Attach Form 5405 if required . . . . | **60b** | |
| 61 | Health care: individual responsibility (see instructions)   Full-year coverage ☒ | **61** | |
| 62 | Taxes from: a ☐ Form 8959   b ☐ Form 8960   c ☐ Instructions; enter code(s) | **62** | |
| 63 | Add lines 56 through 62. This is your total tax . . . . . . . . . ▶ | **63** | 27,166. |

**Payments**

*If you have a qualifying child, attach Schedule EIC.*

| | | | |
|---|---|---|---|
| 64 | Federal income tax withheld from Forms W-2 and 1099 . . | 64 | 32,378. |
| 65 | 2014 estimated tax payments and amount applied from 2013 return | 65 | |
| 66a | Earned income credit (EIC) . . . . . . . . | 66a | |
| b | Nontaxable combat pay election | 66b | |
| 67 | Additional child tax credit. Attach Schedule 8812 . . . | 67 | |
| 68 | American opportunity credit from Form 8863, line 8 . . | 68 | |
| 69 | Net premium tax credit. Attach Form 8962 . . . . | 69 | |
| 70 | Amount paid with request for extension to file . . . | 70 | |
| 71 | Excess social security and tier 1 RRTA tax withheld . . | 71 | 930. |
| 72 | Credit for federal tax on fuels. Attach Form 4136 . . | 72 | |
| 73 | Credits from Form: a ☐ 2439 b ☐ Reserved c ☐ Reserved d ☐ | 73 | |
| 74 | Add lines 64, 65, 66a, and 67 through 73. These are your total payments . . ▶ | **74** | 33,308. |

**Refund**

*Direct deposit? ▶ See instructions.*

| | | | |
|---|---|---|---|
| 75 | If line 74 is more than line 63, subtract line 63 from line 74. This is the amount you overpaid | **75** | 6,142. |
| 76a | Amount of line 75 you want refunded to you. If Form 8888 is attached, check here . . ▶☐ | **76a** | 6,142. |
| b | Routing number  0 6 3 1 0 7 6 1 3   ▶ c Type: ☒ Checking  ☐ Savings | | |
| d | Account number  1 0 1 0 0 1 2 9 6 6 9 4 3 | | |
| 77 | Amount of line 75 you want applied to your 2015 estimated tax ▶ | 77 | |

**Amount You Owe**

| | | | |
|---|---|---|---|
| 78 | Amount you owe. Subtract line 74 from line 63. For details on how to pay, see instructions ▶ | **78** | |
| 79 | Estimated tax penalty (see instructions) . . . . . | 79 | |

**Third Party Designee**

Do you want to allow another person to discuss this return with the IRS (see instructions)?   ☐ Yes. Complete below.   ☒ No

Designee's name ▶          Phone no. ▶          Personal identification number (PIN) ▶

**Sign Here**

*Joint return? See instructions. Keep a copy for your records.*

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| Your signature | Date 10-9-15 | Your occupation SALESMAN | Daytime phone number |
|---|---|---|---|
| Spouse's signature. If a joint return, both must sign. | Date 10-9-15 | Spouse's occupation MANAGER | If the IRS sent you an Identity Protection PIN, enter it here (see inst.) |

**Paid Preparer Use Only**

| Print/Type preparer's name | Preparer's signature Non-Paid Preparer | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|
| Firm's name ▶ | | | Firm's EIN ▶ | |
| Firm's address ▶ | | | Phone no. | |

www.irs.gov/form1040          REV 05/19/15 PRO   Form **1040** (2014)

Form **1040** Department of the Treasury—Internal Revenue Service (99)
**U.S. Individual Income Tax Return** **2015** OMB No. 1545-0074 IRS Use Only—Do not write or staple in this space.

For the year Jan. 1–Dec. 31, 2015, or other tax year beginning _____, 20__ See separate instructions.

| | |
|---|---|
| Your first name and initial JEFFREY J | Last name STEPANOVICH | Your social security number 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 |
| If a joint return, spouse's first name and initial LORA D | Last name STEPANOVICH | Spouse's social security number 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 |

Home address (number and street). If you have a P.O. box, see instructions. **1100 HOLIDAY LN** Apt. no.

City, town or post office, state, and ZIP code. If you have a foreign address, also complete spaces below (see instructions). **NAPLES FL 34104**

Foreign country name | Foreign province/state/county | Foreign postal code

▲ Make sure the SSN(s) above and on line 6c are correct.

**Presidential Election Campaign**
Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund. ☐ You ☐ Spouse

**Filing Status**
Check only one box.

1. ☐ Single
2. ☒ Married filing jointly (even if only one had income)
3. ☐ Married filing separately. Enter spouse's SSN above and full name here. ▶
4. ☐ Head of household (with qualifying person). (See instructions.) If the qualifying person is a child but not your dependent, enter this child's name here. ▶
5. ☐ Qualifying widow(er) with dependent child

**Exemptions**

6a ☒ Yourself. If someone can claim you as a dependent, do not check box 6a
b ☒ Spouse

| c Dependents: | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if child under age 17 qualifying for child tax credit (see instructions) |
|---|---|---|---|
| (1) First name    Last name | | | ☐ |
| | | | ☐ |
| | | | ☐ |
| | | | ☐ |

If more than four dependents, see instructions and check here ▶ ☐

d Total number of exemptions claimed

Boxes checked on 6a and 6b **2**
No. of children on 6c who:
• lived with you
• did not live with you due to divorce or separation (see instructions)
Dependents on 6c not entered above
Add numbers on lines above ▶ **2**

**Income**

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld.

If you did not get a W-2, see instructions.

| | | |
|---|---|---|
| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 | 7 | 202,434. |
| 8a | Taxable interest. Attach Schedule B if required | 8a | 28. |
| b | Tax-exempt interest. Do not include on line 8a | 8b | |
| 9a | Ordinary dividends. Attach Schedule B if required | 9a | |
| b | Qualified dividends | 9b | |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes | 10 | |
| 11 | Alimony received | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ | 12 | |
| 13 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ ☐ | 13 | |
| 14 | Other gains or (losses). Attach Form 4797 | 14 | |
| 15a | IRA distributions 15a | b Taxable amount | 15b | |
| 16a | Pensions and annuities 16a | b Taxable amount | 16b | |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | 17 | 13,690. |
| 18 | Farm income or (loss). Attach Schedule F | 18 | |
| 19 | Unemployment compensation | 19 | |
| 20a | Social security benefits 20a | b Taxable amount | 20b | |
| 21 | Other income. List type and amount | 21 | |
| 22 | Combine the amounts in the far right column for lines 7 through 21. This is your total income ▶ | 22 | 216,152. |

**Adjusted Gross Income**

| | | |
|---|---|---|
| 23 | Educator expenses | 23 | |
| 24 | Certain business expenses of reservists, performing artists, and fee-basis government officials. Attach Form 2106 or 2106-EZ | 24 | |
| 25 | Health savings account deduction. Attach Form 8889 | 25 | |
| 26 | Moving expenses. Attach Form 3903 | 26 | |
| 27 | Deductible part of self-employment tax. Attach Schedule SE | 27 | |
| 28 | Self-employed SEP, SIMPLE, and qualified plans | 28 | |
| 29 | Self-employed health insurance deduction | 29 | |
| 30 | Penalty on early withdrawal of savings | 30 | |
| 31a | Alimony paid  b Recipient's SSN ▶ | 31a | |
| 32 | IRA deduction | 32 | |
| 33 | Student loan interest deduction | 33 | |
| 34 | Tuition and fees. Attach Form 8917 | 34 | |
| 35 | Domestic production activities deduction. Attach Form 8903 | 35 | |
| 36 | Add lines 23 through 35 | 36 | |
| 37 | Subtract line 36 from line 22. This is your adjusted gross income ▶ | 37 | 216,152. |

For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions. BAA   REV 12/30/15 PRO   Form **1040** (2015)

EXHIBIT P-9
WIT: Stepanovich
DATE: 7-23
Julie Lawrence, CCR

Form 1040 (2015)

Page **2**

| | | | | | |
|---|---|---|---|---|---|
| **Tax and Credits** | 38 | Amount from line 37 (adjusted gross income) | | 38 | 216,152. |
| | 39a | Check if: ☐ You were born before January 2, 1951, ☐ Blind. Total boxes | | | |
| | | ☐ Spouse was born before January 2, 1951, ☐ Blind. checked ► 39a | | | |
| | b | If your spouse itemizes on a separate return or you were a dual-status alien, check here ► 39b ☐ | | | |
| **Standard Deduction for—** • People who check any box on line 39a or 39b or who can be claimed as a dependent, see instructions. • All others: Single or Married filing separately, $6,300 Married filing jointly or Qualifying widow(er), $12,600 Head of household, $9,250 | 40 | Itemized deductions (from Schedule A) or your standard deduction (see left margin) | | 40 | 36,949. |
| | 41 | Subtract line 40 from line 38 | | 41 | 179,203. |
| | 42 | Exemptions. If line 38 is $154,950 or less, multiply $4,000 by the number on line 6d. Otherwise, see instructions | | 42 | 8,000. |
| | 43 | Taxable income. Subtract line 42 from line 41. If line 42 is more than line 41, enter -0- | | 43 | 171,203. |
| | 44 | Tax (see instructions). Check if any from: a ☐ Form(s) 8814 b ☐ Form 4972 c ☐ | | 44 | 34,988. |
| | 45 | Alternative minimum tax (see instructions). Attach Form 6251 | | 45 | |
| | 46 | Excess advance premium tax credit repayment. Attach Form 8962 | | 46 | |
| | 47 | Add lines 44, 45, and 46 ► | | 47 | 34,988. |
| | 48 | Foreign tax credit. Attach Form 1116 if required | 48 | | |
| | 49 | Credit for child and dependent care expenses. Attach Form 2441 | 49 | | |
| | 50 | Education credits from Form 8863, line 19 | 50 | | |
| | 51 | Retirement savings contributions credit. Attach Form 8880 | 51 | | |
| | 52 | Child tax credit. Attach Schedule 8812, if required | 52 | | |
| | 53 | Residential energy credits. Attach Form 5695 | 53 | | |
| | 54 | Other credits from Form: a ☐ 3800 b ☐ 8801 c ☐ | 54 | | |
| | 55 | Add lines 48 through 54. These are your total credits | | 55 | |
| | 56 | Subtract line 55 from line 47. If line 55 is more than line 47, enter -0- ► | | 56 | 34,988. |
| **Other Taxes** | 57 | Self-employment tax. Attach Schedule SE | | 57 | |
| | 58 | Unreported social security and Medicare tax from Form: a ☐ 4137 b ☐ 8919 | | 58 | |
| | 59 | Additional tax on IRAs, other qualified retirement plans, etc. Attach Form 5329 if required | | 59 | |
| | 60a | Household employment taxes from Schedule H | | 60a | |
| | b | First-time homebuyer credit repayment. Attach Form 5405 if required | | 60b | |
| | 61 | Health care: individual responsibility (see instructions) Full-year coverage ☒ | | 61 | |
| | 62 | Taxes from: a ☐ Form 8959 b ☐ Form 8960 c ☐ Instructions; enter code(s) | | 62 | |
| | 63 | Add lines 56 through 62. This is your total tax ► | | 63 | 34,988. |
| **Payments** If you have a qualifying child, attach Schedule EIC. | 64 | Federal income tax withheld from Forms W-2 and 1099 | 64 | 46,821. | |
| | 65 | 2015 estimated tax payments and amount applied from 2014 return | 65 | | |
| | 66a | Earned income credit (EIC)                    No | 66a | | |
| | b | Nontaxable combat pay election | 66b | | |
| | 67 | Additional child tax credit. Attach Schedule 8812 | 67 | | |
| | 68 | American opportunity credit from Form 8863, line 8 | 68 | | |
| | 69 | Net premium tax credit. Attach Form 8962 | 69 | | |
| | 70 | Amount paid with request for extension to file | 70 | | |
| | 71 | Excess social security and tier 1 RRTA tax withheld | 71 | 2,325. | |
| | 72 | Credit for federal tax on fuels. Attach Form 4136 | 72 | | |
| | 73 | Credits from Form: a ☐ 2439 b ☐ Reserved c ☐ 8885 d ☐ | 73 | | |
| | 74 | Add lines 64, 65, 66a, and 67 through 73. These are your total payments ► | | 74 | 49,146. |
| **Refund** Direct deposit? ► See instructions. | 75 | If line 74 is more than line 63, subtract line 63 from line 74. This is the amount you overpaid | | 75 | 14,158. |
| | 76a | Amount of line 75 you want refunded to you. If Form 8888 is attached, check here ► ☐ | | 76a | 14,158. |
| | ► b | Routing number 0 6 3 1 0 7 5 1 3 ► c Type: ☒ Checking ☐ Savings | | | |
| | ► d | Account number 1 0 1 0 0 1 2 9 6 6 9 4 3 | | | |
| | 77 | Amount of line 75 you want applied to your 2016 estimated tax ► 77 | | | |
| **Amount You Owe** | 78 | Amount you owe. Subtract line 74 from line 63. For details on how to pay, see instructions ► | | 78 | |
| | 79 | Estimated tax penalty (see instructions) | 79 | | |
| **Third Party Designee** | | Do you want to allow another person to discuss this return with the IRS (see instructions)? ☐ Yes. Complete below. ☒ No | | | |
| | | Designee's name ► | Phone no. ► | Personal identification number (PIN) ► | |

**Sign Here**
Joint return? See instructions.
Keep a copy for your records.

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| Your signature | Date | Your occupation SALESMAN | Daytime phone number |
|---|---|---|---|
| Spouse's signature. If a joint return, both must sign. | Date | Spouse's occupation MANAGER | If the IRS sent you an Identity Protection PIN, enter it here (see inst.) |

**Paid Preparer Use Only**

| Print/Type preparer's name | Preparer's signature Non-Paid Preparer | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|
| Firm's name ► | | | Firm's EIN ► | |
| Firm's address ► | | | Phone no. | |

www.irs.gov/form1040

REV 12/30/15 PRO

Form **1040** (2015)

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    OMB No. 1545-0008    FAST! Use    www.irs.gov/efile

| | |
|---|---|
| **b** Employer identification number (EIN) 20-8157287 | **1** Wages, tips, other compensation 12,837.87 | **2** Federal income tax withheld 2,640.30 |

**c** Employer's name, address, and ZIP code
KEN CORBETT FARMS LLC

972 HIGHWAY 376
LAKE PARK, GA, US. 31636

| | |
|---|---|
| **3** Social security wages 12,837.87 | **4** Social security tax withheld 795.95 |
| **5** Medicare wages and tips 12,837.87 | **6** Medicare tax withheld 186.15 |
| **7** Social security tips | **8** Allocated tips |

**d** Control number

| **9** Verification code | **10** Dependent care benefits |
|---|---|

**e** Employee's name, address, and ZIP code     Suff.

| **11** Nonqualified plans | **12a** See instructions for box 12 |

JEFFREY          STEPANOVICH
1100 HOLIDAY LANE
NAPLES, FL, US, 34104

| 13 Statutory / Retirement / Third party | 12b |
| **14** Other | 12c |
| | 12d |

| 15 State GA | Employer's state ID number 3043045-YL | 16 State wages, tips, etc. 12,837.87 | 17 State income tax 726.77 | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

Form **W-2** Wage and Tax Statement      **2017**      Department of the Treasury—Internal Revenue Service

Copy B—To Be Filed With Employee's FEDERAL Tax Return.
This information is being furnished to the Internal Revenue Service.

---

| **22222** | Void ☐ | **a** Employee's social security number 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 | For Official Use Only ▶ OMB No. 1545-0008 |

| **b** Employer identification number 84-1297077 | **1** Wages, tips, other compensation 58190.07 | **2** Federal income tax withheld 11591.72 |
|---|---|---|

**c** Employer's name, address, and ZIP code
Windsor Distributing Inc.
5495 Bryson Dr #611
Naples FL 34109

| **3** Social security wages 58190.07 | **4** Social security tax withheld 3607.78 |
| **5** Medicare wages and tips 58190.07 | **6** Medicare tax withheld 843.76 |
| **7** Social security tips | **8** Allocated tips |

| **d** Control number jeff | **9** Verification code | **10** Dependent care benefits |

| **e** Employee's first name and initial Jeff | Last name Stepanovich | Suff | **11** Nonqualified plans | **12a** See instructions for box 12 |

1100 Holiday Lane
Naples FL 34104

| 13 Statutory / Retirement / Third party | 12b |
| **14** Other | 12c |
| | 12d |

**f** Employer's address and ZIP code

| 15 State FL | Employer's state ID number 1527236-5 | 16 State wages, tips, etc. 58190.07 | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

Form **W-2** Wage & Tax Statement      **2017**      Department of the Treasury--Internal Revenue Service

Copy A for Social Security Administration - Send this entire page with   0000/1725
Form W-3 to the Social Security Administration; photocopies are not acceptable.

For Privacy Act and Paperwork Reduction
Act Notice, see the separate Instructions.
Black-and-White Form W2 (Revised 03/17)



EXHIBIT D-11
WIT: Stepanovich
DATE: 1-23
Julie Lawrence, CCR

Form **1040** Department of the Treasury—Internal Revenue Service   (99)
**U.S. Individual Income Tax Return** **2017** OMB No. 1545-0074 | IRS Use Only—Do not write or staple in this space.

For the year Jan. 1–Dec. 31, 2017, or other tax year beginning ____, 2017, ending ____ 20____ | See separate instructions.

| Your first name and initial | Last name | Your social security number |
|---|---|---|
| JEFFREY J. | STEPANOVICH | 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 |
| If a joint return, spouse's first name and initial | Last name | Spouse's social security number |
| LORA D. | STEPANOVICH | 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 |

Home address (number and street). If you have a P.O. box, see instructions. | Apt. no.
1100 HOLIDAY LANE

City, town or post office, state, and ZIP code. If you have a foreign address, also complete spaces below (see instructions).
NAPLES                FL    34104

**Make sure the SSN(s) above and on line 6c are correct.**

Foreign country name | Foreign province/state/county | Foreign postal code

**Presidential Election Campaign**
Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund. ☐ You ☐ Spouse

**Filing Status** 
1 ☐ Single
2 ☒ Married filing jointly (even if only one had income)
3 ☐ Married filing separately. Enter spouse's SSN above and full name here. ▶
**Check only one box.**
4 ☐ Head of household (with qualifying person). (See instructions.) If the qualifying person is a child but not your dependent, enter this child's name here. ▶
5 ☐ Qualifying widow(er) (see instructions)

**Exemptions**
8a ☒ Yourself. If someone can claim you as a dependent, do not check box 6a
b ☒ Spouse

| c | Dependents: | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if child under age 17 qual. for child tax credit (see instr.) |
|---|---|---|---|---|
| | (1) First name    Last name | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

If more than four dependents, see instructions and check here ▶ ☐

**Boxes checked on 6a and 6b** **2**
**No. of children on 6c who:**
• lived with you ___
• did not live with you due to divorce or separation (see instructions) ___
Dependents on 6c not entered above ___
**Add numbers on lines above ▶** **2**

d   Total number of exemptions claimed

| **Income** | 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 | | 7 | 71,028 |
|---|---|---|---|---|---|
| Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld. | 8a | Taxable interest. Attach Schedule B if required | | 8a | |
| | b | Tax-exempt interest. Do not include on line 8a | 8b | | |
| | 9a | Ordinary dividends. Attach Schedule B if required | | 9a | |
| | b | Qualified dividends | 9b | | |
| | 10 | Taxable refunds, credits, or offsets of state and local income taxes | | 10 | 1,755 |
| | 11 | Alimony received | | 11 | |
| If you did not get a W-2, see instructions. | 12 | Business income or (loss). Attach Schedule C or C-EZ | | 12 | |
| | 13 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ ☐ | | 13 | |
| | 14 | Other gains or (losses). Attach Form 4797 | | 14 | |
| | 15a | IRA distributions | 15a | b Taxable amount | 15b | |
| | 16a | Pensions and annuities | 16a | b Taxable amount | 16b | |
| | 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | | 17 | 25,471 |
| | 18 | Farm income or (loss). Attach Schedule F | | 18 | |
| | 19 | Unemployment compensation | | 19 | 4,620 |
| | 20a | Social security benefits | 20a | b Taxable amount | 20b | |
| | 21 | Other income. List type and amount | | 21 | |
| | 22 | Combine the amounts in the far right column for lines 7 through 21. This is your **total income** ▶ | | 22 | 102,874 |

| **Adjusted Gross Income** | 23 | Educator expenses | 23 | |
|---|---|---|---|---|
| | 24 | Certain business expenses of reservists, performing artists, and fee-basis government officials. Attach Form 2106 or 2106-EZ | 24 | |
| | 25 | Health savings account deduction. Attach Form 8889 | 25 | |
| | 26 | Moving expenses. Attach Form 3903 | 26 | |
| | 27 | Deductible part of self-employment tax. Attach Schedule SE | 27 | |
| | 28 | Self-employed SEP, SIMPLE, and qualified plans | 28 | |
| | 29 | Self-employed health insurance deduction | 29 | |
| | 30 | Penalty on early withdrawal of savings | 30 | |
| | 31a | Alimony paid   b Recipient's SSN ▶ | 31a | |
| | 32 | IRA deduction | 32 | |
| | 33 | Student loan interest deduction | 33 | |
| | 34 | Tuition and fees. Attach Form 8917 | 34 | |
| | 35 | Domestic production activities deduction. Attach Form 8903 | 35 | |
| | 36 | Add lines 23 through 35 | | 36 | |
| | 37 | Subtract line 36 from line 22. This is your **adjusted gross income** ▶ | | 37 | 102,874 |

For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.
DAA
Form **1040** (2017)

Form 1040 (2017)   JEFFREY J. & LORA D. STEPANOVICH   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 Page 2

| | | | | |
|---|---|---|---|---|
| **Tax and Credits** | 38 | Amount from line 37 (adjusted gross income) | 38 | 102,874 |
| | 39a | Check if: ☐ You were born before January 2, 1953, ☐ Blind. ☐ Spouse was born before January 2, 1953, ☐ Blind. } Total boxes checked ▶ 39a | | |
| | b | If your spouse itemizes on a separate return or you were a dual-status alien, check here ▶ 39b ☐ | | |
| **Standard Deduction for—** | 40 | Itemized deductions (from Schedule A) or your **standard deduction** (see left margin) | 40 | 14,469 |
| - People who check any box on line 39a or 39b or who can be claimed as a dependent, see instructions. | 41 | Subtract line 40 from line 38 | 41 | 88,405 |
| | 42 | Exemptions. If line 38 is $156,900 or less, multiply $4,050 by the number on line 6d. Otherwise, see instructions | 42 | 8,100 |
| | 43 | **Taxable income.** Subtract line 42 from line 41. If line 42 is more than line 41, enter -0- | 43 | 80,305 |
| | 44 | Tax (see inst.). Check if any from: a ☐ Form(s) 8814  b ☐ Form 4972  c ☐ | 44 | 11,559 |
| - All others | 45 | **Alternative minimum tax** (see instructions). Attach Form 6251 | 45 | |
| Single or Married filing separately, $6,350 | 46 | Excess advance premium tax credit repayment. Attach Form 8962 | 46 | |
| | 47 | Add lines 44, 45, and 46 ▶ | 47 | 11,559 |
| Married filing jointly or Qualifying widow(er), $12,700 | 48 | Foreign tax credit. Attach Form 1116 if required | 48 | |
| | 49 | Credit for child and dependent care expenses. Attach Form 2441 | 49 | |
| Head of household, $9,350 | 50 | Education credits from Form 8863, line 19 | 50 | |
| | 51 | Retirement savings contributions credit. Attach Form 8880 | 51 | |
| | 52 | Child tax credit. Attach Schedule 8812, if required | 52 | |
| | 53 | Residential energy credits. Attach Form 5695 | 53 | |
| | 54 | Other credits from Form: a ☐ 3800  b ☐ 8801  c ☐ | 54 | |
| | 55 | Add lines 48 through 54. These are your **total credits** | 55 | |
| | 56 | Subtract line 55 from line 47. If line 55 is more than line 47, enter -0- ▶ | 56 | 11,559 |
| **Other Taxes** | 57 | Self-employment tax. Attach Schedule SE | 57 | |
| | 58 | Unreported social security and Medicare tax from Form: a ☐ 4137  b ☐ 8919 | 58 | |
| | 59 | Additional tax on IRAs, other qualified retirement plans, etc. Attach Form 5329 if required | 59 | |
| | 60a | Household employment taxes from Schedule H | 60a | |
| | b | First-time homebuyer credit repayment. Attach Form 5405 if required | 60b | |
| | 61 | Health care: individual responsibility (see instructions) Full-year coverage ☒ | 61 | |
| | 62 | Taxes from: a ☐ Form 8959  b ☐ Form 8960  c ☐ Instructions; enter code(s) | 62 | |
| | 63 | Add lines 56 through 62. This is your **total tax** ▶ | 63 | 11,559 |
| **Payments** | 64 | Federal income tax withheld from Forms W-2 and 1099 | 64 | 14,232 |
| | 65 | 2017 estimated tax payments and amount applied from 2016 return | 65 | |
| If you have a qualifying child, attach Schedule EIC. | 66a | **Earned income credit (EIC)** | 66a | |
| | b | Nontaxable combat pay election | 66b | |
| | 67 | Additional child tax credit. Attach Schedule 8812 | 67 | |
| | 68 | American opportunity credit from Form 8863, line 8 | 68 | |
| | 69 | Net premium tax credit. Attach Form 8962 | 69 | |
| | 70 | Amount paid with request for extension to file | 70 | |
| | 71 | Excess social security and tier 1 RRTA tax withheld | 71 | |
| | 72 | Credit for federal tax on fuels. Attach Form 4136 | 72 | |
| | 73 | Credits from Form: a ☐ 2439  b ☐ Reserved  c ☐ 8885  d ☐ | 73 | |
| | 74 | Add lines 64, 65, 66a, and 67 through 73. These are your **total payments** ▶ | 74 | 14,232 |
| **Refund** | 75 | If line 74 is more than line 63, subtract line 63 from line 74. This is the amount you **overpaid** | 75 | 2,673 |
| | 76a | Amount of line 75 you want **refunded to you.** If Form 8888 is attached, check here ▶ ☐ | 76a | 2,673 |
| Direct deposit? See instructions. | ▶ b | Routing number  063107513  ▶ c Type: ☒ Checking ☐ Savings | | |
| | ▶ d | Account number  1010012966943 | | |
| | 77 | Amount of line 75 you want **applied to your 2018 estimated tax** ▶ | 77 | |
| **Amount You Owe** | 78 | **Amount you owe.** Subtract line 74 from line 63. For details on how to pay, see instructions ▶ | 78 | |
| | 79 | Estimated tax penalty (see instructions) | 79 | |

| **Third Party Designee** | Do you want to allow another person to discuss this return with the IRS (see instructions)? ☒ **Yes.** Complete below. ☐ No | | |
|---|---|---|---|
| | Designee's name ▶ BENJAMIN COTTRELL JR | Personal identification number (PIN) ▶ 59049 | Phone no. ▶ 239-449-4881 |

| **Sign Here** | Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and accurately list all amounts and sources of income I received during the tax year. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge. | | |
|---|---|---|---|
| Joint return? See instructions. Keep a copy for your records. | Your signature | Date | Your occupation |
| | Spouse's signature. If a joint return, both must sign. | Date | Spouse's occupation |

Daytime phone number

If the IRS sent you an Identity Protection PIN, enter it here (see inst.)

| **Paid Preparer Use Only** | Print/Type preparer's name: BENJAMIN COTTRELL JR | Preparer's signature: BENJAMIN COTTRELL JR | Date: 06/05/18 | Check ☐ if self-employed | PTIN: P01066509 |
|---|---|---|---|---|---|
| | Firm's name ▶ COTTRELL TAX & ACCOUNTING, LLC | | | Firm's EIN ▶ | 27-1393390 |
| | Firm's address ▶ 5147 CASTELLO DR | | | Phone no. | |
| | NAPLES   FL 34103-8929 | | | 239-449-4881 | |

Go to www.irs.gov/Form1040 for instructions and the latest information.
DAA

Form **1040** (2017)